



**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
Kevin Chan, Esq. (KC 0228)
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: kchan@rosenlegal.com

Counsel for Plaintiff Atkinson

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORI ATKINSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | Case No.: |
| Plaintiff, | CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| FORCEFIELD ENERGY INC., DAVID NATAN, JASON WILLIAMS, RICHARD ST-JULIEN, THE DREAMTEAM GROUP, and MISSION INVESTOR RELATIONS d/b/a MISSIONIR, | |
| Defendants. | |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Plaintiff Lori Atkinson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public

1

documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ForceField Energy Inc. ("ForceField" or the "Company"), advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired ForceField securities between September 16, 2013 and April 15, 2015, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors.

2.     ForceField is a designer, distributor and licensee of alternative energy products and solutions. The Company distributes light emitting diode ("LED") commercial lighting and fixtures. It also uses waste heat from manufacturing source to provide clean electricity.

3.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business and operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) some of the reports issued by promoters paid by the Company pretended to be independent authors, did not disclose their compensation, and the content of the reports were reviewed by ForceField's management before publication; and (2) members of ForceField's management have troubling histories with fraudulent companies.

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Securities Exchange Act, and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

5.      This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

6.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15

U.S.C. § 78aa and 28 U.S.C.  § 1391(b) because ForceField conducts business and has an office

in this District.

7.      In connection with the acts, conduct, and other wrongs alleged in this Complaint,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and

the facilities of the national securities exchange.

## PARTIES

8.      Plaintiff Lori Atkinson, as set forth in the accompanying certification,

incorporated by reference herein, purchased ForceField securities at artificially inflated prices

during the Class Period and has been damaged thereby.

9.      Defendant ForceField is a Nevada corporation with principal executive offices

located in this District at 245 Park Avenue, 39th Floor, New York, New York 10167. Through its

subsidiaries, Forcefield designs, distributes, and licenses alternative energy products and

technologies in the People's Republic of China ("PRC") and the United States. It distributes

LED commercial lighting products and fixtures; and produces trichlorosilane, a chemical used

for the production of polysilicon that is utilized as a raw material in the production of solar cells

for photovoltaic panels. The Company also designs and installs proprietary modular organic

rankine cycle units utilizing various refrigerant mixtures to enhance heat recovery and convert that waste heat directly into electrical energy. The Company's common stock is listed on NASDAQ under ticker symbol "FNRG."

10.    Defendant David Natan ("Natan") has served as the Chief Executive Officer ("CEO") and a director of Forcefield since December 8, 2010 and throughout the Class Period. He previously served as the Company's Chief Financial Officer ("CFO") from February 9, 2010 until his resignation on October 17, 2011.

11.    Defendant Jason Williams ("Williams") has served as the Company's CFO since October 17, 2011 and throughout the Class Period.

12.    Defendant Richard St-Julien ("St-Julien") has served as the Company's Executive Chair of the Board of Directors throughout the Class Period.

13.    Defendants Natan, Williams, and St-Julien are sometimes herein collectively referred to as "Individual Defendants."

14.    Defendants DreamTeamGroup ("DTG") is a securities advertiser and investor relations firm. It is an affiliate of Mission Investor Relations ("MissionIR").

15.    Defendant MissionIR is a securities advertiser and investor relations firm. It is an affiliate of DTG.

16.    Defendants ForceField, DTG, MissionIR, and Individual Defendants are herein referred to as "Defendants."

## SUBSTANTIVE ALLEGATIONS

*Undisclosed Paid Stock Promotion*

17.     The Class Period begins on September 16, 2013 when the Company issued a

press release entitled *ForceField Energy Announces Engagement of MissionIR Investor*

*Relations Services.* The press release states in relevant part:

> ATLANTA, GA(Marketwired Sep 16, 2013) ForceField Energy Inc. (OTCQB:
> FNRG) (the "Company") today announces that they have engaged the investor
> relations services of MissionIR. Through a network of investor oriented sites and
> full suite of investor awareness services, MissionIR broadens the influence of
> publicly traded companies and enhances their ability to attract growth capital as
> well as improve shareholder value.
>
> "ForceField Energy has an exciting business model targeting two of the largest
> and fastest growing areas of the global renewable energy space," stated Sherri
> Franklin, Director of Marketing at MissionIR. "The Company is well positioned
> in both sectors and has an experienced management team in place to fully execute
> its growth strategy."
>
> David Natan, CEO of ForceField Energy, stated, "Engagement of a full service
> investor relations firm to develop and implement a strategic investor relations
> campaign is a key part of our overall strategy to achieve short term and long term
> goals. MissionIR is providing a much needed service in the small cap markets."

18.     Under the direction and control of ForceField and the Individual Defendants,

DTG and MissionIR began to tout ForceField stock throughout the Class Period.

19.     The purpose of this promotional campaign was to raise additional capital, increase

shareholder value, and raise visibility to the public capital market.

20.     DTG and MissionIR conducted a massive promotional campaign, which included

publishing articles or news reports and making various statements through various social media

outlets and websites, including *SeekingAlpha.com.*

21.     The articles did not disclose that they were authored by paid promoters under the control of ForceField nor did they disclose the authors had a business relationship with ForceField.

22.     Articles by DTG's paid authors Tom Meyer and John Mylant caused a steep run-up in the Company's stock price as well as the articles created by MissionIR. Not only did they publish articles under their names, but they used pseudonyms. For example, Tom Meyer wrote under the name Wonderful Wizard.

23.     On October 28, 2013, Wonderful Wizard, also known as Tom Meyer of the DTG published the article entitled *3 Reasons To Buy ForceField Energy*, on *SeekingAlpha.com*. The article touted the Company and gave investors several reasons why it was a good choice to invest in the Company. This article failed to disclose that it was a paid promotion.

24.     On November 27, 2013, John Mylant of the DTG published the article entitled *ForceField Energy Is One Company Worth Watching In The LED Industry* on *SeekingAlpha.com*. This article also touted ForceField as a good investment. This article failed to disclose that it was a paid promotion.

**Management's Lack of Disclosures Of Its Past**

25.     On April 15, 2014, the Company filed its Form 10-K for the year ending December 31, 2013 with the SEC ("2013 Form 10-K"). With regards to the background information concerning the Individual Defendants, the 2013 Form 10-K incorporated by reference the solicitation of proxies for the Company's 2014 Annual Meeting of Shareholders ("2014 Proxy Statement"). The 2013 Form 10-K was signed by all Individual Defendants.

26.     On April 30, 2014, the Company filed the 2014 Proxy Statement with the SEC on Form DEF 14A. The 2014 Proxy Statement includes information about the executive officers of

ForceField including Individual Defendants. The Proxy, signed by Defendant St-Julien, stated

the following with regards to the Individual Defendants' prior occupations:

> The following includes the principal occupations for the past five years (and, in some instances, for prior years) of each of our executive officers:
>
> Mr. Natan is a seasoned financial executive. Formerly a Big Four CPA with Deloitte Touche, he has more than thirty years of experience in areas of accounting, treasury, finance, corporate operations, and executive level management of both public and private companies. Mr. Natan was appointed our Chief Financial Officer and Director in February 2010 and was appointed our Chief Executive Officer in December 2010. Mr. Natan maintained both positions until October 2011 when Jason Williams was appointed our Chief Financial Officer. From November 2007 through January 2010, Mr. Natan was President of Natan & Associates, LLC, a financial consulting firm. Mr. Natan's career has spanned a wide range of industries. He has previously served as CFO/Treasurer of four public companies and as CFO of three private companies. During his tenure as CFO, his public company was ranked as one of Forbes Magazine's "Top 50 Best Small Companies in America" for three consecutive years. He also served as a Director of a public company and as President of a public company subsidiary. Mr. Natan has participated in over fifteen merger and acquisition transactions. He has been instrumental in raising in excess of $500 million of debt and equity capital on favorable terms and from a variety of funding sources. Mr. Natan holds a B.A. in Economics from Boston University, where he was elected to the National Economics Honor Society. He also holds a Certified Public Accountant license (inactive) in the state of Florida.
>
> Mr. ST Julien has been a Director, Secretary and Chief Legal Officer of the Company since 2009 and Chairman of the Board of Directors since October 2011. Mr. ST Julien holds a Bachelor of Law from the University of Ottawa. Since 1992, he has been a practicing attorney in the areas of Commercial and International Law. Simultaneously, he has been involved in numerous business ventures as entrepreneur in Canada, in the United States as well as in other countries. Mr. ST Julien specializes in both International Business Law and Securities law in collaboration with strategic partners in Canada in the USA and in China. He possesses several years of experience in the public company environment, mostly in the USA, where he was involved in various listings, reorganizations, financings and acquisitions. Additionally, he acts as a consultant to corporations in their business ventures, including international financing. Finally, Mr. ST Julien has held positions in various public companies, such as secretary and member of the board of directors and officers.
>
> Mr. Williams has served as Chief Financial Officer and Corporate Treasurer since October 2011. Mr. Williams has significant financial and operational experience with publicly traded companies. From August 2007 to August 2010, he served as

Corporate Controller and Chief Financial Officer at Protective Products of America, Inc. and its successors. From July 2002 to August 2007, he served as Corporate Controller and Director of Reporting & Analysis at PharmaNet Development Group, Inc. From 1995 to 2002, he served in various financial leadership positions with Patagon.com, Inc., vFinance, Inc. and The BISYS Group. Mr. Williams has served as President of WM Consulting, LLC, a business advisory firm, since March 2001. He holds a Bachelor of Science from Florida Atlantic University.

27.     The statements referenced in ¶¶17-26 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) some of the reports issued by promoters paid by the Company pretended to be independent authors, did not disclose their compensation, and the content of the reports were reviewed by ForceField's management before publication and (2) members of its management have a troubling history with fraudulent companies.

### The Truth Begins To Emerge

28.     On March 20, 2014, *Fortune.com* published the article, *At financial news sites, stock promoters make inroads*. The article discussed the role of stock promoters, specifically the DTG, and how stock promoter's must reveal compensation for these types of articles. The article states in relevant part:

> For example, Seeking Alpha has an article by Mylant, touting ForceField Energy (FNRG -1.82% ). ***Mylant's disclosure in the article says he did not receive any compensation to write the piece. Yet ForceField is listed as a client on DreamTeam's website. Seeking Alpha, which is in the process of reviewing and removing other articles, says it has evidence that Mylant was paid by some of his subjects to write articles about them.*** Mylant could not be reached for comment. ForceField Energy did not return a call for comment.
>
> (Emphasis added).

8

29.     As a result of this partial disclosure, shares of ForceField fell $0.53 per share or almost 9% over the next two days to close at $5.65 per share on March 21, 2014.

30.     On April 15, 2015, *SeekingAlpha.com* published an article entitled, *Forcefield Energy: Undisclosed Promotions And Management Connections to Past Fraud*, which further revealed the undisclosed promotion and control and knowledge over DTG activities. The article states in relevant part:

> **In the past, ForceField was a Dream Team client. The Dream Team was a firm that got paid to write undisclosed paid articles, which were edited and approved by management teams of their clients. The retail targeted articles were designed to prop up the share price and volume so that companies could issue stock to raise money. The scam worked exceptionally well.**
>
> *        *        *
>
> Back in 2014, I wrote a detailed article about stock promotion firm "The Dream Team Group" which was hiring out writers to conduct undisclosed paid promotions on small cap companies. The writers would pretend to be well qualified industry experts putting forth a professional analysis (and a strong buy) on a stock. In fact, they were simply hired gun writers with no credentials whatsoever. Yet their professional writings invariably caused their target stocks to soar. The authors managed to infiltrate a wide variety of locations, including Forbes.com, TheStreet.com, Seeking Alpha and the Wall Street Cheat Sheet.
> To gain information, I posed as a paid stock promoter looking to write undisclosed paid articles. The chief writer for the Dream Team (Tom Meyer) then began giving me assignments.
>
> The main stocks I wrote about in this promotion scandal were Galena Biopharma (NASDAQ:GALE) and CytRx (NASDAQ:CYTR), both of which ended up plunging by as much as 50-80% when the promotions unraveled. CytRx has rebounded some, while Galena has continued to plunge.
>
> But there were other companies which I did not give as much attention to because they were too small or illiquid to matter at the time. (Although I did not write about many of these stocks, I did notify all of the various websites such as Seeking Alpha, TheStreet.com and Wall Street Cheat Sheet so that they could remove any articles and ban any violating authors).
>
> **ForceField Energy is one such stock. At the time, it was one of a number of beaten down illiquid stocks which didn't seem to be catching the promotional wave. But now it appears that the continued promotional efforts have resulted**

*in the stock hitting all-time highs on much greater volume. This is all occurring just as the company needs to raise money.*

*ForceField was a paid Dream Team promotion which was written about by both Tom Meyer (multiple aliases including Wonderful Wizard and others) and John Mylant. These were the two main Dream Team writers.* Their articles have since been removed from Seeking Alpha, but the original references can still be found in various places. In addition, *ForceField is listed here among the other Dream Team clients on the Investors Hub page for Mission IR.* Mission IR was the Dream Team subsidiary responsible for handling the paid articles.

Mr. Meyer was also attempting to recruit me as a paid writer specifically for ForceField. ForceField was an ongoing project of his.

*It should be kept in mind that the standard process for these writers was to submit their drafts to management at the target company for review before publishing. In other words, management of these companies knew and encouraged the illegal stock promotion as a way of getting their share prices up.*

(Emphasis added.)

31.     The *Seeking Alpha* article also to disclose the unscrupulous backgrounds of the

Individual Defendants that they were required, but failed to, disclose in the Company's SEC

filings. The article states in relevant part:

Aside from their history of using the Dream Team to promote their stock, *ForceField's three top managers all have extensive ties to past fraudulent companies which have gotten into substantial trouble, including investigations by the SEC, FBI, the US Senate and the Canadian Federal Government.*
ForceField is run by CEO David Natan. Notably, Mr. Natan does not name any of his past companies on his official bio. We can now see why.
From Bloomberg we can see the detailed history of Mr. Natan and his lengthy history of working with promotional companies based out of Boca Raton. For those who don't know, Boca Raton happens to be the center of stock promotion (and sometimes fraud) in America.
Further digging shows that his past companies are mostly bankrupt former pink sheets companies based out of South Florida, such as MBf, Global Technovations and IMX Pharma.

*Just prior to running ForceField/SunSi, Mr. Natan was CFO of a company called SFBC and he was the one responsible for signing off on their financial statements.*
*SFBC was basically a south Florida recruitment mill for finding subjects (often illegal immigrants) to act as guinea pigs in clinical trials for drugs that*

*had not yet been approved by the FDA. A lengthy and scathing exposé on SFBC can be found on Bloom*berg, entitled "Big Pharma's Shameful Secret", and it is well worth reading. Anyone who has an interest in pharma or clinical trials should absolutely read that article. In the wake of this exposé, SFBC's share price fell by as much as 75%.

According to the fraud complaint filed in the District Court of New Jersey, SFBC told investors that it had a new state of the art facility which would drive the majority of revenues going forward. In fact, the building was nothing more than a dilapidated former Holiday Inn that was so structurally unsound that the Miami Dade County Unsafe Structures Board has since ordered the facility to be demolished.

It was fraud, plain and simple.

The fraud case goes on to state that:

SFBC risked its reputation and recruitment ability by utilizing a variety of unethical and dangerous practices that severely compromised the integrity of the drug trials conducted by the Company. For example, as detailed below, SFBC violated applicable minimum waiting requirements, used deceptive payment schemes to decrease the likelihood that a participant would report adverse reactions to the drugs being tested, failed to put into place adequate controls to prevent participants from applying to concurrent drug trials at other facilities, and failed to ensure that participants - the majority of whom are low-income individuals who speak English, if at all, as a second language - provided the required "informed consent."

Further, in order to ensure that SFBC's improper and unethical practices remained hidden from public view, the Company hired regulatory companies that were completely beholden to SFBC and its employees. For example, throughout the Class Period, SFBC paid hundreds of thousands of dollars to a regulatory company called Southern Institutional Review Board ("Southern IRB") - a supposedly independent review board ("IRB") - to oversee and "approve" a substantial portion of their clinical tests. Southern IRB was owned and operated by the wife of a senior officer of SFBC. Similarly, SFBC utilized LeeCoast IRB to supervise its tests, despite the fact that LeeCoast IRB was owned by an SFBC subsidiary and employees of LeeCoast were paid directly by SFBC with checks prepared by SFBC's own accounting offices.

Clearly the goal of all of this was to prop up the stock so that money could be raised. And that plan worked quite well.

Defendants' untrue and misleading statements and omissions allowed SFBC to project the appearance of growth and success, which inflated the price of SFBC's securities and enabled the Company's insiders to enrich themselves at investors' expense. Indeed, during the Class Period, the individual defendants sold significant portions of their SFBC stock, generating tens of millions of dollars in personal profits. They were also able to orchestrate two

large secondary offerings of SFBC securities, which allowed the Company to raise a total of approximately $250 million from unwitting investors.

Insider sales were large. As noted in the Sought Florida Business Journal, "SFBC execs pull in $15.71M from stock sales". This was just shortly before the fraud came unraveled and occurred before the stock price collapsed.

*CEO Natan isn't the only one with connections to fraudulent companies in his background. Like Mr. Natan, Chairman Richard St-Julien refrains from actually naming any of his past ventures or employers. He simply notes in his bio that:*

*Richard has a great deal of success and experience as a practicing attorney in the areas of Commercial and International Law. In addition, Richard has been involved in numerous business ventures as an entrepreneur in Canada, the U.S., China and other countries.*

*In reality, it is a bit more colorful than that. Mr. St. Julien appears to be an expert at moving money around in places such as (again, no coincidence) Costa Rica. Costa Rica is, of course, where ForceField ended up establishing its operations and where 100% of its assets were located until 2014.*

*In 2009, Mr. St. Julien was working as a lawyer in Costa Rica helping to funnel cash to and from convicted fraudster Jean LaFleur who was running a fraudulent scheme in Belize.*

The Canadian federal government was suing LaFleur for $7 million for his role in a government sponsorship scandal. According to the Globe and Mail:

Federal lawyers allege in the court documents that Mr. Lafleur "tried to liquidate his assets when it became obvious that [the government] would undertake legal action to recoup money that it had paid to [Mr. Lafleur] as part of his fraudulent scheme."… Mr. Lafleur said as part of his bankruptcy proceedings that he called on Mr. St-Julien to invest the money on his behalf in Liechtenstein, the Caribbean and Belize… Mr. St-Julien is a member of the Quebec bar, but he is working in Costa Rica, and has refused to explain what happened to $460,000 from the house sale that was invested in his Belize company, Parameter, which is now insolvent.

LaFleur was ultimately sent to prison for his role, but the money disappeared.

*As for ForceField's CFO, Jason Williams, he notes on his bio that he was previously at Protective Products of America (OTCPK:PPAFQ), which happens to be a pink sheets company that trades for less than 1 penny. Not surprisingly, Protective was based in South Florida. In the 3 years that it traded as a public company, Protective never filed a single financial statement, so it is unclear what Mr. Williams' actual duties might have been at that company. (At ForceField, financial statements have been delinquent in each of the past 3 years, again raising doubts about his role as CFO).*

But it gets better.

Prior to that, Williams notes that at PharmaNet he was an integral part of the management team that facilitated a market capitalization rise from $150 million to $800 million during a three-year period. It does sound impressive.

***However, this bio fails to mention some key facts. Most importantly, PharmaNet is in fact the same SFBC that <u>settled fraud charges</u> two years after the Bloomberg article.***
Yes, in fact, the stock did spike to a valuation of over $800 million during the tenure of Mr. Williams. But that was before it cratered to as low as $50 million (down 85%) in the wake of the Bloomberg fraud exposé.

I would encourage readers to re-read the fraud case against SFBC and its management to fully appreciate its implications.
From the introduction of the fraud case:

This is a case about a company that repeatedly misled investors about the most fundamental aspects of its business and operations. That company is SFBC, and throughout the Class Period, SFBC and its senior officers told investors that SFBC was a well-run business with highly-qualified management and significant competitive advantages in its field. In reality, however, SFBC suffered from a raft of undisclosed problems that infected its business and threatened the Company's very survival.

After the US Senate launched an official investigation into the company, they simply began running their clinical trials in Canada.
You can read about the name change and the move to Canada in this article.

**"Troubled SFBC changes its name in hope of changing its fortunes"**
***The point of this is that all three top managers have substantial ties to companies with fraudulent activities in the past. They are now all working together in a fledgling company that is hitting all-time highs even as there are obvious signs of stock promotion. And of course, the company happens to be out of money.***

(Emphasis added).

32.     This adverse information caused the price of ForceField stock to tumble $2.97 per share, or approximately 39%, over the next two days to close at $4.74 per share on April 16, 2015.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired ForceField securities traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

34.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ForceField securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ForceField or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

35.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

36.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

14

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ForceField;

- whether the Individual Defendants caused ForceField to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of ForceField securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

38.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

39.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- ForceField securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold ForceField securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

40.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

41.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

42.     At all relevant times, the market for ForceField's common stock was an efficient market for the following reasons, among others:

43.     As a result of the foregoing, the market for ForceField's common stock promptly digested current information regarding ForceField from all publicly available sources and reflected such information in ForceField's stock price.  Under these circumstances, all purchasers of ForceField's common stock during the Class Period suffered similar injury through their purchase of ForceField's common stock at artificially inflated prices, and a presumption of reliance applies.

**FIRST CLAIM**
**Violation of Section 10(b) Of**
**The Exchange Act Against and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

44.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (2) cause plaintiff and other members of the Class to purchase ForceField's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

46.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for ForceField's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

47.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of ForceField as specified herein.

48.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ForceField value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about ForceField and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of ForceField common stock during the Class Period.

49.    Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

50.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly.

51.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ForceField's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of ForceField's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclose in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired ForceField common stock during the Class Period at artificially high prices and were or will be damaged thereby.

52.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding ForceField's financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their ForceField common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

53.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

54.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

55.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## SECOND CLAIM
### Violation of Section 20(a) Of
### The Exchange Act Against Individual Defendants and ForceField

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     Individual Defendants are sued herein as a controlling person of ForceField, DTG, and MissionIR.

58.     Defendant ForceField is sued herein as a controlling person of DTG and MissionIR.

59.     By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, these defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violator, including the content and dissemination of the various statements that plaintiff contends are false and misleading.  In particular, each defendant had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.     As set forth above, ForceFiled, MissionIR and DTG each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

61.     By virtue of their positions as controlling persons, the individual defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

62.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 17, 2014

Respectfully submitted,

THE ROSEN LAW FIRM, P.A.

Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
Kevin Chan, Esq. (KC 0228)
275 Madison Avenue, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827

Counsel for Plaintiff Atkinson

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against ForceField Energy Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The ForceField Energy Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Lori
**Middle initial:** A
**Last name:** Atkinson
**Address:** ███████████████
**City:** ██████
**State:** ███
**Zip:** ███
**Country:** ███
**Facsimile:**
**Phone:** ██████
**Email:** ███████

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 4/13/2015 | 650 | 7.77 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate: **YES**

**Certification for Lori Atkinson (cont.)**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 04/16/2015