

**The Rosen Law Firm**
INVESTOR COUNSEL

Phillip Kim, Esq.
pkim@rosenlegal.com

September 21, 2015

**VIA ECF**
Honorable Naomi Rice Buchwald
United States District Judge
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re: *In re ForceField Energy Inc. Sec. Litig.*, **No. 15-cv-3020**

Your Honor:

We are Lead Counsel in this action. We write in response to the September 11, 2015 pre-motion letter of Defendants ForceField Energy, Inc. ("ForceField"), David Natan, and Jason Williams (collectively, "Defendants").

As a preliminary matter, ForceField should not be a party to a Motion to Dismiss. As a result of the misdeeds of ForceField and its executive officers, and its failure to respond after being served in this action, ForceField is in default. *See Atkinson. v. ForceField Energy Inc. et al.*, No. 1:15-cv-03020-NRB, at Docket Entry No. 30 ("Clerk's Certificate of Default"), filed on July 13, 2015. ForceField has not moved to set aside the notation of default, a prerequisite to its filing a Motion to Dismiss.

Defendants attempts to parry allegations of this fraud, involving not one but two undisclosed schemes to inflate the price of the Company's common stock, as well as the dissemination of false and misleading statements, all of which artificially inflated the price of ForceField common stock in violation of the federal securities laws, are unconvincing.

As an initial matter, Defendants' letter ignores misrepresentations and omissions that will prevent them from securing a dismissal, regardless of how this Court rules on the fraudulent schemes and false statements raised in their letter. For example, on November 14, 2014, the Company filed a Quarterly Report on Form 10-Q, describing its acquisition of a controlling interest in TransPacific and recording over $1.3 million in goodwill on its balance sheet related thereto. ¶123.[1] Defendants Natan and Williams certified the accuracy of the Company's financial statements. ¶124. Defendants knew or recklessly disregarded that ForceField had not acquired a controlling interest in TransPacific, that TransPacific's business was "dormant," and that as a

---

[1] "¶" or "¶¶" refers to paragraph(s) of the Amended Class Action Complaint.

result of failing to write-down the goodwill associated with the TransPacific acquisition, the Company's disclosure and its financial statements were materially false and misleading. Defendant Natan conceded that ForceField, he and Williams knew that TransPacific's business had been "essentially dormant" since September of 2013. ¶103. Thus, during the Class Period, Natan and Williams knowingly or recklessly certified materially inaccurate financial statements and affirmatively touted an ownership interest in TransPacific that ForceField did not purchase. When Defendants finally wrote-down the goodwill attributable to TransPacific, they lied about the reason, stating that the inability to meet anticipated sales led to the impairment of the asset. The true reason was ForceField's refusal to fund TransPacific's operations, as it had agreed to do. ¶133(a). The Complaint establishes, therefore – and Defendants do not contradict – that Natan, Williams, and ForceField as liars.

Next, while Defendants do not wholly ignore the Mexican contract allegations, they misrepresent them. Defendants state that the complaint pleads no facts "that Natan or Williams had any knowledge concerning the contract. . . ." The Company, however, issued a press release from New York that it uploaded to its website, announcing the Uruapan contract. ¶107. These Defendants, therefore, cannot claim they did not know of the Uruapan contract. Moreover, as CEO and CFO, the notion that they did not know the amount of the contract – that they never saw a relatively enormous contract for the Company about which it issued a press release – is not credible. That, according to Defendants' letter, St. Julien "zealously guarded information" about the Mexican contracts, however, offers them no out. Either Natan and Williams knew about the contracts and their terms or they were reckless in not demanding that St. Julien divulge everything to them before the press release. Either way, they allowed the Company to lie about the size of a material contract. Worse still, while the Complaint pleads that Natan and Williams were reckless in not knowing that the Company was not licensed to do business in Mexico, it specifically pleads, but Defendants ignore, that Natan knew that the Company's Former Employee – the person who secured the Mexican contracts – "was never authorized to sell in Mexico." ¶112. Once again, with respect to the Mexican contracts, the Complaint establishes Defendants as liars.

The Complaint describes the foundation for Defendants' lies: the Company was a publicly traded entity in search of operations that it could purchase, during the Class Period, in large part for shares of ForceField common stock. The higher ForceField's stock price, the fewer shares it would have to issue to acquire critical operations. Against that background, and in the context of these Defendants' lies which they do not even attempt to parry in their September 11, 2015 letter, Defendants' attempts to distance themselves from the outright manipulation of ForceField's common stock price through the volume manipulation and promoter schemes are unconvincing.

The Complaint pleads facts linking the Defendants to the schemes to manipulate the price of ForceField common stock. Defendants Natan and Williams were not only the CEO and CFO, respectively, of ForceField. Along with St. Julien, they essentially were ForceField, comprising two of eleven employees Company-wide, two of four in New York, and two of only three senior executives. In these roles, for each relevant reporting period during the Class Period and before, they certified the material accuracy of the Company's financial statements and, critically, certified that they designed and implemented control systems "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to

us by others within those entities, particularly during the period in which this report is being prepared." *See, e.g.*, ¶¶122-123. Defendants then gloss over the critical allegation that the monies St. Julien used to pay for the illegal stock manipulation came directly from ForceField bank accounts. In the context of the Company's financial condition throughout the Class Period, those payments were material to the schemes to inflate the price of the Company's common stock. The Defendants' claim that they were not minimally reckless with respect to the stock manipulation scheme, when it involved at least two transfers of material sums from ForceField's own bank account to an offshore account in a Belize bank that St. Julien controlled, and while Natan and Williams claimed to have implemented adequate internal controls, defies credibility.

Moreover, Defendants ignore direct evidence of their involvement in the promoter scheme, including that the Company's press release announcing that it had retained defendant MissionIR quoted Defendant Natan. ¶50. Furthermore, each had access to information suggesting that the published promotions about ForceField were materially inaccurate or contained material omissions, and repeatedly chose to ignore this information. In turn, Defendant ForceField's scienter can be imputed from the scienter of the individual defendants. *See*, *e.g.*, *In re Vivendi Universal S.A. Securities Litigation*, 765 F.Supp.2d 512, 542 (S.D.N.Y. 2011).

For example, an October 28, 2013 paid promotion urging investors to buy ForceField stock claimed that the Company was "poised for significant growth" because of its "LED lighting and waste heat recovery through its majority ownership of TransPacific (TPE)," ¶121, a claim that Defendants knew was false, by virtue of the dormancy of TransPacific's business. Furthermore, Natan and Williams knew that statements made regarding ForceField's Mexico contracts were false. They knew or recklessly disregarded both that the amounts were wrong and that the Company was not licensed to do business in Mexico, ¶112, even as at least one promotion touted a license to distribute in Mexico LED commercial lighting products and fixtures of Shanghai Lightsky. With regard to the many allegations of bought and paid for stock promotion (¶¶53-65, 169), Defendants approved and had editorial control over all copy before the "independent" analysis was published and had the power to influence the decision-making of the promoter defendants (¶¶53-56). Defendants knew or intentionally ignored the material misrepresentations and omissions, and that the touts failed to include the fact that ForceField paid for and approved the publications (¶¶53-65, 169). Indeed, Defendant Natan himself is quoted in the inaccurate stock promotions and in misleading and inaccurate press releases (¶¶38, 50, 115-118, 161-162).

Finally, with respect to Plaintiffs' Section 20(a) claim, defendants concede that Messrs. Natan and Williams were "controlling persons" of ForceField, and that ForceField itself can be a control person over both the promoter defendants and St. Julien. *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), *abrogated on other grounds, as recognized in In re Initial Pub. Offering Secs. Litig.,* 399 F. Supp. 2d 298 (S.D.N.Y. 2005) (bank liable for securities fraud for conduct of bank officer who had primary responsibility for the bank's dealings in the venture). Throughout the Class Period, Defendants Natan and Williams certified that they had instituted controls to uncover fraud and improper practices. Either they knew of the transfers of material funds from ForceField to a Belize bank account, controlled by St. Julien, or were reckless in failing to catch those transfers. Defendants are culpable participants in each of the schemes and other fraudulent devices of ForceField, St. Julien and the promoters. This Court will deny any motion to dismiss that Defendants file. Plaintiffs stand ready to participate in pre-motion conference at the Court's convenience.

Respectfully submitted,

/s/ Phillip Kim
Phillip Kim, Esq.

cc:   All counsel of record (via ECF)

4

**THE ROSEN LAW FIRM, P.A.**      ♦ 275 MADISON AVENUE, 34TH FLOOR ♦ NEW YORK, NY 10016 ♦ TEL: (212) 686-1060  ♦ FAX: (212) 202- 3827