**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (PK 9384)
Laurence M. Rosen (LR 5733)
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

***Lead Counsel for Lead Plaintiff***
***Named Plaintiffs and the Class***

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: FORCEFIELD ENERGY INC. SECURITIES LITIGATION | Case No.: 15 Civ. 3020 (NRB)<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

# CONSOLIDATED THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Beverly Brewer ("Lead Plaintiff") and named Plaintiffs Nipul Patel and Edward Huang ("Named Plaintiffs" and, together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for this Consolidated Third Amended Complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, criminal and civil court filings in other cases against these Defendants, interviews with witnesses, wire and press releases published by and regarding ForceField Energy Inc. ("ForceField" or the

"Company"), advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a Class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired ForceField securities between August 20, 2013 and April 20, 2015, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors and various persons who improperly promoted ForceField common stock to investors.

2. During the Class Period, Defendants disseminated false and misleading statements and participated in several blatantly fraudulent schemes, artifices and devices, knowingly or recklessly designing each to inflate the price of ForceField common stock artificially. These fraudulent schemes and materially false and misleading statements succeeded, enabling ForceField to raise critical cash through private offerings and to use its stock as currency, thus avoiding both cash expenses and severe dilution of ForceField's public float.

3. First, throughout the Class Period, on numerous occasions, ForceField's Executive Chairman, Defendant Richard St. Julien ("St. Julien"), illegally transferred ForceField funds to secret, offshore accounts that he controlled. In turn, he transferred those funds to straw persons who, themselves, used the money to purchase ForceField stock on the open market. Throughout the Class Period, these frequent trades created the impression of increased trading volume. St.

Julien engaged in this scheme to maintain or to boost ForceField's trading volume and, in turn, its stock price materially and artificially. On April 17, 2015, the Federal Bureau of Investigation ("FBI") arrested St. Julien for this very fraudulent scheme as he attempted to board a plane in Florida for Costa Rica. As of the filing of this Amended Complaint, he remains in jail, unable to secure a release on bail because he is a flight risk.

4. Second, Defendants paid promoters to tout ForceField and its stock to investors. In violation of the federal securities laws, these promoters concealed that ForceField bought and paid for their buy recommendations and positive analyses. During the Class Period, ForceField paid various promoters to draft articles, touting its financial and operating condition and suggesting that its stock price would rise. The Company was able to retain editorial control and authority over these paid promotions. The paid promoters then published, posted or otherwise disseminated their overwhelmingly positive pieces about ForceField, suggesting the stock was underpriced and urging investors to buy it. Neither the Company nor the promoters disclosed that ForceField paid for and retained editorial control and authority over these articles, blog-posts, and emails. Rather, the promoters either remained silent or affirmatively misrepresented that they were independent – unaffected by anything but their own research and opinions.

5. Third, on May 3, 2016, the SEC filed a civil complaint,[1] and on May 2, 2016, the United States Attorney for the Eastern District of New York filed an indictment,[2] both alleging that ForceField hired promoters to recruit and induce investors to purchase Forcefield stock on public exchanges or in private purchase agreements. The United States called Defendants' actions

---

[1] The SEC Complaint, *SEC v. Richard St. Julien, et al.*, 1:16-cv-2193 ("SEC Complaint"), is attached hereto as Exhibit A and incorporated by reference.

[2] The Indictment, *United States v. Jared Mitchell, et al.*, Cr. No. CR-16-00234 ("Indictment"), is attached hereto as Exhibit B and incorporated by reference.

"a $131 million market manipulation scheme." ForceField paid the promoters "kickbacks" equal to 10% of the value of ForceField stock the promoters induced investors to purchase. The promoters never disclosed their financial relationship with ForceField to investors. ForceField and the promoters duped more than 100 investors into purchasing more than $6.2 million in ForceField stock during the course of this scheme. Also on May 2, 2016, the FBI arrested the promoters to whom ForceField paid kickbacks for their participation in this scheme.

6. Fourth, the SEC and the United States allege that ForceField paid brokers a "kickback" of 10% of the purchase amount of ForceField stock purchased for their clients' brokerage accounts. ForceField hired a "brown bag man" to distribute the kickbacks. The "brown bag man" and brokers split the 10% kickbacks. None of the brokers disclosed to their clients that they were receiving kickbacks, and the clients were never told of the brokers' financial relationship with the "brown bag man" or with ForceField. The participants attempted to hide the scheme by using cash, by communicating with each other on prepaid, disposable (i.e., "drop" or "burner") phones, and by using an encrypted, "content-expiring" messaging application (or app) on their cellphones, such as Wickr and Threema, which encrypted all communications on each user's cellphone, and allowed the user to auto-delete a message after the expiration of a set period of time chosen by the user. Again, the brokers conned investors into purchasing more than 425,000 shares of ForceField stock, at a cost of more than $3 million. On May 3, 2016, the FBI also arrested the "brown bag man," as well as the brokers, for this fraudulent scheme.

7. No Defendant disclosed any of these schemes, artifices and devices to defraud but the schemes were effective at inflating and/or maintaining ForceField's stock price during the Class Period. This was critical because from 2012 on, ForceField was a publicly traded, micro-cap company in search of profitable operations. Initially, the Company claimed to produce and

distribute in China the chemical trichlorosilane, an essential raw material for producing solar panels. In 2012, it became a distributor of a commercial LED lighting product, also manufactured in China. Also in 2012, it purchased a purported controlling interest in TransPacific Energy ("TransPacific"), a renewable energy technology company focused on converting waste heat into energy. Unbeknownst to investors, however, the chemical business was lackluster, ForceField did not have the sales and marketing staff or program to leverage the LED light distributorship and, upon acquiring its interest in TransPacific, ForceField refused to fund any of its operations, something it had obligated itself to do. Not only did ForceField fail to fund TransPacific's operations, as obligated, but it improperly disabled TransPacific's owners from selling their stock – another way in which the Company avoided both the dilution of the float and a conspicuous insider sale at a critical time.

8. Without operations and cash flow, ForceField could not buy the profitable operations it needed to sustain the enterprise. Each of the senior officers of ForceField – St. Julien, David Natan ("Natan"), its CEO and Jason Williams ("Williams"), its CFO – had checkered pasts, having been involved in suspicious, unscrupulous and downright fraudulent enterprises and endeavors that they hid that from investors. Each reverted to form at ForceField, using the schemes, summarized above and described, in detail, below, to inflate and/or maintain the price of ForceField's common stock artificially and then use it as payment for both businesses and services.

9. During the Class Period, their schemes succeeded. Buoyed by strawperson trades paid research, and kickbacks to brokers, broker dealers and stock promoters, the stock rose and/or maintained its price. This enabled the Company to sell shares through ongoing private placements, themselves the product of Defendants' fraudulent kickbacks to promoters – showing immediate value accretion where, without the schemes there would have been none – and use that cash to

acquire potentially profitable operations. It also used its stock both as partial consideration for acquisitions and to pay for services to the Company, all without over-diluting the float. Using cash and artificially inflated stock, ForceField purchased two profitable LED lighting outfits, American Lighting Design and ESCO, and was able to tout their contracts to inflate the price of its common stock even further.

10. Then, on April 15, 2015, an article appeared on the website *SeekingAlpha.com*, alerting investors not only that the senior executives of ForceField each had undisclosed, disturbing past affiliations – calling into question management's integrity – but that at ForceField, they had engaged in an undisclosed scheme to pay promoters to inflate the price of its stock. Within days, the FBI arrested St. Julien as he tried to flee the United States to avoid the inevitable fall-out from the *SeekingAlpha.com* article, the SEC and NASDAQ halted trading in ForceField stock and, in a series of announcements, the Company disclosed that it was divesting itself of its operations, selling them back to their original owners. ForceField stock is now all but worthless.

11. Defendants' schemes, artifices and devices to defraud and their materially false and misleading statements during the Class Period caused Plaintiffs and members of the Class to lose virtually the entirety of their investments.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

14. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) because ForceField conducts business and has an office in this District.

15. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14. Lead Plaintiff, Beverly Brewer purchased ForceField securities at artificially inflated prices during the Class Period and suffered damages as set forth in her certification previously filed with the Court and incorporated by reference herein.

15. Named Plaintiff Nipul Patel purchased ForceField securities at artificially inflated prices during the Class Period as set forth in his certification previously filed with the Court and incorporated by reference herein.

16. Named Plaintiff Edward Huang purchased ForceField securities at artificially inflated prices during the Class Period as set forth in his certification previously filed with the Court and incorporated by reference herein.

17. Defendant ForceField is a Nevada corporation with principal executive offices located in this District at 245 Park Avenue, 39th Floor, New York, New York 10167. Prior to its name change to ForceField on February 28, 2013, the Company was SunSi Energies Inc. ("SunSi").[3] The Company's wholly-owned subsidiary, SunSi Energies Hong Kong Ltd. ("SunSi HK"), retained the SunSi name. Through its subsidiaries, ForceField purports to design, distribute,

[3] Unless otherwise specified, references to ForceField include Sunsi.

and license alternative energy products and technologies in the People's Republic of China ("PRC") and the United States. It distributes LED commercial lighting products and fixtures; and produces trichlorosilane, a chemical used for the production of polysilicon that is utilized as a raw material in the production of solar cells for photovoltaic panels. The Company also purports to design and install proprietary modular organic rankine cycle units utilizing various refrigerant mixtures to enhance heat recovery and convert that waste heat directly into electrical energy. Prior to February 28, 2013, the Company traded under the ticker symbol "SSIE," changing to "FNRG" at the time it changed its name. The Company's common stock was listed on NASDAQ Capital Market ("NASDAQ"), until the NASDAQ and SEC suspended trading on April 20, 2015. Subsequently, on May 1, 2015, the Company, citing "a number of uncertainties related to the Registrant's current and future available cash, cash flow and operations," voluntarily terminated its listing "to conserve its resources and to eliminate other administrative burdens related to the Registrant's common stock being listed on Nasdaq." As of January 31, 2016, ForceField has been in "default" with the Nevada Secretary of State, for failure to renew its Nevada state business license, and to file a list of officers.

18. Defendant David Natan ("Natan") has served as the Chief Executive Officer ("CEO") and a director of Forcefield since December 8, 2010 and throughout the Class Period. He previously served as the Company's Chief Financial Officer ("CFO") from February 9, 2010 until his resignation on October 17, 2011.

19. Defendant Jason Williams ("Williams") has served as the Company's CFO since October 17, 2011 and throughout the Class Period.

20. Defendant Richard St. Julien ("St. Julien") has served as the Company's Executive Chair of the Board of Directors throughout the Class Period.

21. Defendant Herschel C. "Tres" Knippa III ("Knippa") owned Kenai Capital Management throughout the Class Period, and was Director of Investor Relations for Defendant ForceField during part of the Class Period.

22. Defendants Natan, Williams, St. Julien and Knippa are referred to collectively as the "Individual Defendants" and, together with ForceField, the "Company Defendants."

23. Defendant DreamTeamGroup ("DTG") is a securities advertiser and investor relations firm. It is an affiliate of Mission Investor Relations ("MissionIR"). During the Class Period, DTG participated in or orchestrated the drafting and dissemination of promotional articles, touting ForceField without disclosing that it was paid for that promotion. DTG caused such paid promotions to be published or posted only after obtaining approval from ForceField's management.

24. Defendant MissionIR is a securities advertiser and investor relations firm. It is an affiliate of DTG. During the Class Period, MissionIR participated in or orchestrated the drafting and dissemination of promotional articles, touting ForceField without disclosing that it was paid for that promotion. DTG caused such paid promotions to be published or posted only after obtaining approval from ForceField's management.

25. Defendants DTG, MissionIR, and Knippa are referred to collectively as the "Promoter Defendants."

26. Defendant Richard L. Brown ("Brown") was a registered broker until his arrest in May of 2016. He resides in Huntington, New York. He was employed by and registered with Defendant Chelsea Morgan Securities, Inc., dba Chelsea Financial Services, from February of 2012 to November, 2015.

27. Defendant Chelsea Morgan Securities, Inc., dba Chelsea Financial Services ("Chelsea") is a brokerage firm with its corporate headquarters at 242 Main Street, Staten Island, New York 10307. In 2013 Chelsea paid a $40,000 fine and restitution of over $260,000 for "failure to supervise" one of its brokers. Defendant Brown worked for Defendant Chelsea as a registered broker from February, 2012 to November, 2015.

28. Defendant Gerald Cocuzzo ("Cocuzzo") is a registered broker. He resides in Delray Beach, Florida. He has been employed by and registered with Defendant Newbridge Securities Corporation since December of 2014.

29. Defendant Newbridge Securities Corporation ("Newbridge") is a brokerage firm with offices in Florida, at 5200 Town Center Circle, Suite 308, Boca Raton, Florida 33486. Newbridge has previously consented to sanctions for "failing to supervise its registered representatives adequately by failing to detect apparent trading irregularities and inconsistent trading recommendations." Further, Newbridge has been repeatedly cited, by various regulatory authorities, for failure to, among other findings, "provide for supervision reasonably designed to achieve compliance with respect to certain applicable securities laws regarding… trade reporting… and recordkeeping," failure of its "written supervisory procedures… to provide for the minimum requirements," and failure to "maintain and enforce a supervisory system and written procedures." Despite this history, Newbridge itself claims that its Compliance Department is comprised of "experienced, knowledgeable and dedicated" "compliance professionals," who "works with the [brokers]" "closely," and "in an effective manner." Defendant Cocuzzo has worked for Defendant Newbridge as a registered broker since December, 2014.

30. Defendant Naveed A. "Nick" Khan ("Khan") is a registered broker. He resides in Staten Island, New York. He has been employed by and registered with Defendant Meyers Associates, L.P, since April of 2013.

31. Defendant Meyers Associates, L.P ("Meyers"), is a brokerage firm with offices in New York, at 42 Richmond Terrace, 4th Floor, Staten Island, New York, 10301. Meyers was fined $700,000 on April 27, 2016, for 2014 violations largely centered on failures to supervise the actions of its employees, and implement supervisory procedures. Defendant Khan has worked for Defendant Meyers as a registered broker since April, 2013.

32. Defendant Maroof Miyana ("Miyana") is a registered broker. He resides in Pompano Beach, Florida. He has been employed by and registered with Defendant Legend Securities, Inc. since December of 2014.

33. Defendant Legend Securities, Inc. ("Legend"), is a brokerage firm with offices in New York, at 45 Broadway, 32nd Floor, New York, New York, 10006, and in Florida, at 440 E. Sample Rd., Suite 201A, Pompano Beach, Florida, 33064. In 2011, the SEC censured Legend and its compliance officer for telling a broker to back-date documents requested by the SEC. Legend and the compliance officer paid fines totaling $75,000 for failing to keep current records relating to the business. Defendant Miyana has worked for Defendant Legend as a registered broker since December, 2014.

34. Defendant Pranav V. Patel ("Patel") was a registered broker through the end of 2015. He resides in Tamarac, Florida. He was employed during all of calendar 2015 by Defendant Dawson James Securities, Inc., which has offices in Boca Raton, Florida.

35. Defendant Dawson James Securities, Inc. ("Dawson"), is a brokerage firm with offices in Boca Raton, Florida. In April of 2014, Dawson was fined $75,000 for having an

inadequate supervisory system, including inadequate written supervisory procedures. Specifically, Dawson failed to investigate a number of "red flags" in customer accounts, including high concentrations of one security in a specific broker's accounts, and suspicious transactions. Defendant Patel worked as a registered broker for Defendant Dawson during the entire 2015 calendar year.

36. Defendants Brown, Cocuzzo, Khan, Miyana, and Patel are referred to collectively as the "Broker Defendants." Defendants Newbridge, Meyers, Legend, Chelsea, and Dawson are referred to collectively as the "Brokerage Defendants."

37. Together the Promoter Defendants, the Broker Defendants, the Brokerage Defendants, and the Company Defendants are referred to as "Defendants."

## SUBSTANTIVE ALLEGATIONS

***Background***

### a. A Company In Search of a Profitable Operation

38. In its Annual Report on Form 10-K for the year ended December 31, 2012 ("2012 10-K"), the Company described itself as "an international designer, distributor, and licensee of alternative energy products and technologies." Prior to May, 2012, the Company claimed two lackluster, underperforming operating units, including "the exclusive North American distributor of light emitting diode (LED) commercial lighting products and fixtures for" Shanghai Lightsky Optoelectronics Technology Co., Ltd., ("Shanghai Lightsky"), "a premier manufacturer in China," and trichlorosilane[4] production and distribution business in China of which it would divest itself by early 2014.

39. As the Company stated in its 2012 10-K:

[4] Trichlorosilane is an element of an essential raw material for producing solar panels.

> Prior to our acquisition of a controlling interest in TPE and the exclusive North American distribution rights to Lightsky products, our U.S.-based operations consisted solely of a holding company that incurred expenses and had no revenue generating activities. Proceeds generated from private placements of our common stock and loans have been the primary sources of funding for our U.S.-based operations. We believe our current cash position and ability to raise funds through the sale of new equity and convertible notes, coupled with the revenue potential of our newly acquired U.S.-based businesses, will be sufficient to fund our U.S. activities for the next twelve months. Furthermore, we expect to generate positive cash flow over the next twelve months which will supplement our cash position.

40. The trichlorosilane business, however, was lackluster and – based on the allegations from a former employee, detailed below – ForceField did not have the sales staff necessary to leverage its distribution arrangement with Shanghai Lightsky. As such, the Company needed both to issue stock to obtain cash and to boost the price of its stock to use it as currency for acquisitions and services without troubling dilution of the outstanding shares. According to the 2012 10-K, in September, 2011, the Company commenced an offering, enabling it to sell 1,500,000 unregistered shares at $6.00 per share. In February, 2012, it lowered the price per share to $4.00. In 2012, pursuant to that offering, ForceField sold 212,750 shares of ForceField common shares for proceeds of $765,900 net of commissions, or $4.00 per share. This sale was part of and pursuant to "an ongoing private placement of up to 1,500,000" ForceField shares. The Company also issued the same number of warrants exercisable within one year at a price of $4.00.

41. According to ForceField's Annual Report on Form 10-K for the year ended December 31, 2013 ("2013 10-K"), again, in 2013, as part of its 1,500,000 shares private placement, the Company sold 607,500 shares at $4.00 per share for net proceeds of $2,817,000 and issued the same number of warrants, exercisable at $4.00 per share within a year. According to ForceField's Annual Report on Form 10-K for the year ended December 31, 2014 ("2014 10-

K"), again, in 2014, as part of its 1,375,000 shares private placement, the Company sold 709,250 shares at an average price of $4.36 per share for net proceeds of $2,828,500. The Company also issued 253,000 warrants exercisable within one year at a price of $5.00.

42. In May, 2012, according to the 2012 10-K, ForceField executed two share "Exchange Agreements" with shareholders of TransPacific to acquire an aggregate controlling equity stake in TransPacific's common stock ("Asset Purchase"). According to ForceField, "[TransPacific] is a renewable energy technology corporation located in California and Nevada that designs and installs proprietary modular ORC[5] units utilizing up to nine different proprietary refrigerant mixtures (which it has patented) to maximize heat recovery and convert that waste heat directly into electrical energy."

43. About the merger, ForceField disclosed that "[it] paid $520,000 in cash and issued 255,351 shares of our common stock, valued at approximately $965,226 or $3.78 per share, in exchange for . . . approximately a 50.3% equity interest in the common stock of [TransPacific]." Having generated just over $240,000 in 2012 revenues, ForceField disclosed its intention to generate revenue and profits using TransPacific's technology to generate electricity and sell it back to customers or to utilities, to sell equipment and collect royalty payments based on "incremental energy generated and to license TransPacific's technology." About that technology, ForceField stated, "TPE contracts with a United States based independent third party to manufacture the major components of the ORC units. Additionally, TPE's proprietary refrigerants are manufactured by another independent third party using TPE's formulation."

[5] According to the 2013 10-K, Organic Rankine Cycle (ORC) technology "is a key renewable energy technology and process that has been deployed at hundreds of sites around the world. ORC is utilized as a combination of energy conservation through the recovery of waste heat which is then converted into electricity."

44. Defendants wasted no time touting TransPacific's business and its boost to ForceField's bottom line. On June 25, 2012, the Company announced that TransPacific would participate in "a three-company consortium that will design, develop, install, and optimize" an ORC project in Morocco, featuring TransPacific's unique technology. About this consortium, Defendant Natan stated, "[w]e are very pleased that [TransPacific] was selected to work on this project. We believe that [TransPacific]'s technology has multiple applications in a wide variety of industries, both domestically and internationally. With TPE's products starting to receive market traction and notoriety," Natan concluded, "we believe that their revenues and profitability will begin to increase very substantially."

45. For reasons discussed more thoroughly below, the union of TransPacific and ForceField was wholly fruitless. This left ForceField in desperate need of profitable operating units. Among the problems preventing this was the Company's relegation to the over-the-counter bulletin board market, which meant low investor interest and low share prices. To acquire profitable operating units, therefore, the Company needed a more healthy market capitalization. Given that the Company's primary source of cash was its ongoing private placements of securities and that it was using its stock, in whole or in part, to pay for business acquisitions and services, it was critical to boost and to maintain ForceField's share price.

46. Defendants were motivated to inflate the stock price artificially and maintain it above $4.00 per share, to entice new investors to its private placement with the promise of immediate accretion in value, and to pay fewer shares to acquisition targets, thus avoiding material dilution in the float and the attendant drop in the stock price. Through their own schemes and with the assistance of the Promoter Defendants, the Company Defendants were able to inflate the price of ForceField's common stock artificially throughout the Class Period.

**b. The Federal Securities Laws on Stock Promotion.**

47. Section 17(b) of the Securities Act of 1933 [15 U.S.C. 77q(b)] is commonly known as the "anti-touting" provision. It prohibits publicizing information about a security without "fully disclosing" any consideration received or to be received, directly or indirectly, from the issuer. *Id.*

48. Congress enacted the anti-touting provision in part to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for." *S.E.C. v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (*quoting* House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

49. In an "investor bulletin," the SEC has stated that "[s]ome microcap companies pay stock promoters to recommend or 'tout' the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows." The SEC continued that any such publication must "disclose who paid them for the promotion, the amount, and the type of payment. ***But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice***." (Emphasis added).[6]

50. As of December 31, 2014, ForceField had 17,737,908 shares issued and outstanding. As of that same date, the closing price was $6.44, giving ForceField a market capitalization of just over $114 million. The SEC defines "microcap companies" as those with market capitalizations of less than $250 million and more than $50 million. Throughout the Class Period, therefore, ForceField was a microcap company.

**c. ForceField's Undisclosed, Paid Promotions**

51. *SeekingAlpha.com* is a financial news and analysis website. It publishes third party

[6] http://www.sec.gov/investor/pubs/microcapstock.htm.

reports, analysis, and commentary as articles, and permits open discussion of the articles. As of February of 2014, *Seeking Alpha* had 3 million registered users, and as of August of 2013, received between 500,000 and 1 million unique visitors per day. It received *Forbes*' Best of the Web Award in 2007, and took first place in *Inc. Magazine*'s list of Essential Economic Blogs.

52. *SeekingAlpha.com* provides a platform for writing about individual companies and allows users to comments on those posts. Seeking Alpha authors have written about almost 7,000 companies. In March, 2014, four Purdue researchers published an article establishing a relationship between negative articles on *SeekingAlpha.com* and subsequent low stock returns.[7] They concluded that *SeekingAlpha.com* articles, and negative comments on those articles, correlated to lower stock prices at each of 3 months, 6 months, 1 year, and 3 years after the article's publication. The authors concluded that "opinions revealed on [*Seeking Alpha*] strongly predict future stock returns and earnings surprises. . . . Together, our findings point to the usefulness of peer-based advice in financial markets."

53. *SeekingAlpha.com* permits authors to post anonymously, using pseudonyms, but strictly enforces an author's code of conduct. It requires that authors disclose their positions in the subject of the post, forbids paid promoters, prohibits the use of multiple pseudonyms without disclosure to *SeekingAlpha.com*, and requires that all authors disclose their true identities to *SeekingAlpha.com*.

54. Each article published on Seeking Alpha ***must*** include the following "Seeking Alpha Disclosure:

> Disclosure: The author has no position in [the stock discussed in the article] and no plans to initiate one in the next 72 hours [or, if the

---

[7] Hailiang Chen, Prabuddha De Yu (Jeffrey) Hu, and Byoung-Hyoun Hwang, "The Wisdom of Crowds: The Value of Stock Opinions Transmitted Through Social Media." Free version available at < http://tinyurl.com/kgnq8gd>.

> author has a short or long position, the type of position.] ***The author wrote this article themselves, and it expresses their own opinions. The author is not receiving compensation for it (other than from Seeking Alpha). The author has no business relationship with any company whose stock is mentioned in this article.*** (Emphasis added).

55. *SeekingAlpha.com* Director of Contributor Success Colin Lokey has confirmed that *SeekingAlpha.com* demands that all authors disclose to it any consideration received for writing articles. If an author discloses receipt of consideration, *SeekingAlpha.com* refuses to publish the post "99% of the time,"

56. On September 16, 2013, the Company issued a press release, titled "ForceField Energy Announces Engagement of MissionIR Investor Relations Services," announcing its retention of MissionIR to provide "investor relations services." According to Defendants, "[t]hrough a network of investor oriented sites and full suite of investor awareness services, MissionIR broadens the influence of publicly traded companies and enhances their ability to attract growth capital as well as improve shareholder value." According to Defendant Natan, ForceField hired MissionIR "to develop and implement a strategic investor relations campaign," something he stated "is a key part of our overall strategy to achieve short term and long term goals. At no time did the Company Defendants disclose MissionIR's affiliation with DTG or with any other paid promoter of ForceField.

57. Under the authority, direction and control of ForceField and the Individual Defendants, DTG, MissionIR, and others began to tout ForceField stock throughout the Class Period. DTG, MissionIR and others conducted a promotional campaign, which included publishing articles or news reports and making various statements through various social media outlets and websites, including *SeekingAlpha.com.* The articles, by DTG's paid authors Tom Meyer and John Mylant, did not disclose that they were authored by paid promoters under the

authority and control of ForceField, nor did they disclose that the authors had a business relationship with ForceField.

58. On March 20, 2014, *Fortune.com* published an article entitled "At financial news sites, stock promoters make inroads" ("Fortune Article"), exposing unscrupulous stock promoters, including DTG. The Fortune Article explained that stock promoters must disclose the compensation they receive in the very article or post they publish, but that some do not. By way of example, the Fortune Article mentioned an article by John Mylant, promoting ForceField. "Mylant's disclosure," the article stated, "says he did not receive any compensation to write the piece. Yet ForceField is listed as a client on DTG's website. *Seeking Alpha*, which is in the process of reviewing and removing other articles, says it has evidence that Mylant was paid by some of his subjects to write articles about them." Neither Mylant nor ForceField returned *Fortune.com*'s request for comment.

59. A year later, on April 15, 2015, *SeekingAlpha.com* published a post by Richard Pearson ("Pearson"), titled "ForceField Energy: Undisclosed Promotions and Management Connections to Past Fraud" ("Pearson Article"), exposing completely ForceField's undisclosed knowledge, control and authority over the activities of paid stock promoters. After linking ForceField and DTG as client and agent, Pearson stated that DTG "was a firm that got paid to write undisclosed paid articles, which were edited and approved by management teams of their clients. The retail targeted articles were designed to prop up the share price and volume so that companies could issue stock to raise money. The scam worked exceptionally well."

60. Pearson described how DTG – through Mission IR, the DTG subsidiary responsible for handling the paid articles – recruited "hired-guns," writers with no particular credential or expertise in investing or finance, to pose as industry experts. Those writers, Pearson found, posted

purportedly professional analysis without disclosing that the very small-cap companies they promoted paid them to do so. He also found that DTG's authors "managed to infiltrate a wide variety of financial media outlets, including *Forbes.com*, *TheStreet.com*, *Seeking Alpha* and the *Wall Street Cheat Sheet*.

61. Pearson, in turn, infiltrated DTG, posing as a stock promoter looking to draft positive posts for pay. Pearson identified paid author Thomas Meyer both as DTG's chief writer and as the person who assigned him posts on several different stocks. Among the issuers about which Thomas Meyer asked Pearson to draft a positive post was ForceField. Pearson wrote that for Meyer "ForceField was an ongoing project." Indeed, both Mylant and Meyer – "the two main [DTG] writers" – promoted ForceField, in their own names and through aliases like "the Wonderful Wizard."

62. Lastly, Pearson made clear "that the standard process for these writers was to submit their drafts to management at the target company for review before publishing. In other words, management of these companies knew and encouraged the illegal stock promotion as a way of getting their share prices up."

63. Ultimately, *Seeking Alpha* removed Mylant's and Meyer's articles about ForceField from the website, stating for each that "[t]his author's articles have been removed from Seeking Alpha due to a Terms of Use violation."

64. Paid author Thomas Meyer was named as a defendant in a securities lawsuit captioned *In re: Cytrx Corporation Sec. Litig.*, CV-14-01956-GHK (PJWx), currently pending in the United States District Court for the Central District of California and alleging substantially similar fraud allegations as are asserted against the Promoter Defendants in this case. On December 8, 2014, Meyer answered the *Cytrx* complaint. In his answer Meyer "assert[ed] his

privilege not to be a witness against himself under the Fifth Amendment to the United States Constitution, and on that basis, generally and specifically denies Plaintiffs' allegations as they relate to him."

65. A former promoter ("Promoter") who participated in ForceField's promotional schemes said that he was hired by Michael McCarthy, the CEO of DTG, to write promotional materials about ForceField. He wrote at least five articles about ForceField for DTG. He was paid for this work with checks that came from either DTG or MissionIR, entities he believes are connected. He says that the monies paid to him came from the compensation paid by ForceField to DTG.

66. Promoter says that he worked on paid promotions with DTG for approximately 20-25 companies before he began work on ForceField promotions. In each case, he says, including ForceField, the drafts of his articles were sent to McCarthy, and then by McCarthy to officers of the company at issue for approval and editing. McCarthy himself did not do larger edits; rather, he sometimes corrected simple factual errors. He knows that ForceField received, edited and approved the articles because on multiple occasions he phoned McCarthy to ask about the status of an article, since he got paid only upon an article being published, only to be told that ForceField had his draft but had not yet approved the article or finished editing the article, so that the article was "still on hold."

67. Every single article Promoter wrote about ForceField came back to him with edits. When the edited documents came back to him, he could look at the "markup" view in Microsoft Word and see the edits that had been made. Often, the name of the editor – always a person from the company being promoted – appeared in the edits. On other occasions, Promoter participated in conference calls with McCarthy and someone from the promoted company to discuss his

articles, edits, and what the company wanted from the articles. Oftentimes a second draft and second round of editing were required, including on articles he wrote for and about ForceField. ForceField again edited and approved the final versions before publication.

68. Sometimes the drafts of articles that were sent to ForceField came back with more than just edits, but with entirely new sections. For example, Promoter says that with respect to an article he wrote concerning ForceField's merger with TransPacific Energy, his draft came back to him with sections that "embellish[ed] the deal beyond what [Promoter] thought was reasonable."

69. According to Promoter, ForceField's edits were sometimes "ridiculous" and were "changing a little too much." ForceField's edits were "pushing the boundaries on what I thought was reasonable," and "making Forcefield out to be the next pioneer in energy." However, Promoter "didn't think I could necessarily say no," and, therefore, "by and large I published what I was given."

70. Promoter says that the goal was to get articles published on sites such as Yahoo Finance, which had wide readership. In order to do so, Promoter would include larger, more established companies in articles about ForceField, both to make ForceField look better by association by being in the same article as these other companies, and to increase the chances that sites such as Yahoo Finance would agree to publish the article. Promoter says that he added "reasonable" companies to his articles. However, when the edits came back, ForceField had "become more aggressive" by substituting much larger companies in the articles.

71. Promoter says that with respect to the promotional articles he wrote about ForceField, "to the best of my knowledge, David Natan was the person responsible for making edits to any articles." Defendant Natan was ForceField's CEO.

72. Promoter discussed the issue of making full financial disclosures with McCarthy of

DTG. Even though Promoter was paid from funds paid to DTG by ForceField, McCarthy told him not to disclose that ForceField was paying for the promotions, since ForceField was only paying DTG directly, not Promoter.

73. According to Pearson, whose post exposing ForceField's paid promotional schemes was published in *Seekingalpha.com*, the undisclosed, paid promotions did not stop with Defendants DTG and MissionIR. Rather, other enterprises called GSCR, SCIR and Ultimate took up DTG's cudgel. Thomas Meyer was affiliated with some of these entities. Pearson wrote that Meyer had told him that he preferred GSCR because it paid him in money orders made out to cash so he could avoid paying taxes.

74. GSCR states that it offers "Select Research" and "Opportunity Research." For Select Research it disseminates and publishes, it claims to "introduce internally-driven listed stock research ideas that offer meaningful upside with limited downside risk via our daily Market Monitor blogs, The Goldman Guide newsletter, special reports, alerts, and premium subscription trading publications such as The 30-30 Report." On the other hand, according to GSCR, "Opportunity Research" is "sponsored (paid) research" in reports, updates, trade alerts, and articles that seeks "to enhance the limited visibility that hampers stocks' capital appreciation potential and companies' abilities to increase the value of their firms via future financings, M&A, or other transactions." Simply stated, GSCR promises that Select Research is unsponsored – independent research for which no one has paid.[8]

75. Beginning as early as April 30, 2013 with the publication of GSCR's research, "*Forcefield Energy, Inc. Company is Positioning Itself as a Leader in LED Lighting*," the Company Defendants sought to manipulate public opinion about ForceField using paid promoters

[8] http://www.goldmanresearch.com/Article/coverage-criteria.html.

who failed to disclose their compensation. In this April 30, 2013 report, Goldman and GSCR briefly discuss the LED market, ForceField's affiliation with Shanghai Lightsky and the Company's financing opportunities with undisclosed "major banks." Calling ForceField's model "brilliant," the GSCR research stated that "[c]onsidering that FNRG could generate sales in the tens of millions in LED alone this year, the stock should be trading significantly higher just for this segment alone," and predicted a $9.00 target for the LED business alone. Again, according to GSCR, that would mean "getting the renewable energy/waste heat ORC, and solar TCS businesses for free."

76. With respect to its compensation, GSCR was crystal clear: while ForceField had paid it $8,000 in 2011, by December, 2012, the Company's "status was upgraded to Select Research," meaning unsponsored, independent research. GSCR continued that it paid analysts in advance to make them "responsible only to the public [and] to eliminate pecuniary interests, retain editorial control, and ensure independence. Analysts," GSCR continued, "are compensated on a per report basis and not on the basis of his/her recommendations." Goldman himself certified that his research about ForceField reflected accurately his "personal views about the subject securities and issuers." Goldman also stated that "no part of my compensation was, is, or will be, directly or indirectly, related to the recommendations or views expressed in this research report."

77. GSCR's Class Period Reports were all designated "Select Research," indicating a lack of paid sponsorship and independence of thought, and each omitted that ForceField had paid for research in 2011. According to Pearson – whom Meyer had recruited to work for GSCR – ForceField paid for all of GSCR's ForceField research during the Class Period.

78. With respect to Ultimate, Pearson wrote, it employs a deceptive technique by linking its paid research to unpaid research on far larger, more liquid stocks. For example, an

article touting three great stocks will show two good stocks and one that has paid for the research. ". . . [T]he purpose of mentioning these other stocks is simply to hijack their high traffic hit rates and draw attention towards much smaller ForceField." Pearson wrote that Ultimate was paid $35,000 to place its April 8, 2015 story about ForceField, *MarketWatch*, disguised as a research article.

79. Pearson concluded:

> ForceField Energy is a stock promotion pure and simple. The company has been engaging paid promoters to issue a series of upbeat reports on its prospects which has successfully powered the stock higher. Some of the reports on ForceField have made use of undisclosed promotions pretending to be independent authors. Since this time last year, the stock has nearly doubled off of its lows and volume has increased several fold. This is a reflection of the success of the promotions. Management has a troubling history of involvement with fraudulent companies, misleading investors and the ability to shift money around in international locations such as Costa Rica, where ForceField continues to maintain the bulk of its operations. The hype surrounding ForceField continues to focus on "$100 million" worth of projects being bid on, while ignoring the fact that a single white elephant project accounts for $95 million of the supposed pipeline. With ForceField running dangerously low on cash, the timing of the recent flurry of hype and promotions becomes clear. ForceField has still not filed its annual Form 10-K (it is delinquent). But as soon as the 10-K comes out (any day now), ForceField will end up issuing a large amount of equity. This will be the catalyst for a very sharp drop in the share price to $3.00-4.00 or below.

80. ForceField's stock promotion scheme was complex and designed to obfuscate from investors the layers of cross-promotions among many entities, all of whom had different names but many of whom were connected. One example of this morass of layers can be seen on "Hotstocked.com," ("hotstocked") a website that publishes paid promotions. Between September 16, 2013 and April 13, 2015, hotstocked accepted at least $240,000 to publish second party, and sometimes third and fourth party, promotions of ForceField. The actual amount is likely

significantly higher than $240,000, as a number of the promotions do not reveal the amount paid to hotstocked. The total amount of money paid by ForceField to parties that paid hotstocked is unknown and unknowable from looking at the online paid promotions.

81. The paid promotions published by hotstocked were a confusing labyrinth of paid promoters separated by layers. Between September 16, 2013 and April 15, 2015, positive paid promotions about ForceField appeared on hotstocked that were paid for or promoted by the following: Galaxy LLC, TSX Ventures LLC, Drew Ciccarelli, AllPennyStocks, SecretStockPromoter, GSCR, Robert Goldman, Adventure Holding, SmartOTC, GreatStockAlerts.com, @PennyStockAlerts, RedChip companies, Inc., and Tips.us (a partner of both Defendant DreamTeamGroup and Defendant MissionIR).

82. These promotions repeat untruths about ForceField, including about ForceField's business in Mexico, about its supposed $100 million of "bids currently outstanding," and that ForceField's separation from TransPacific "netted the company profits of $500K." They quote Defendant Knippa and identify him as the owner of "Kenai Capital Management" without mentioning that he was the Director of Investor Relations for ForceField. The promotions cite to separate, positive analyst reports about ForceField without mentioning that the reports were written by paid promoters SCIR, GSCR and Robert Goldman.

#### d. The Company Defendants Directly Manipulate the Price of ForceField Common Stock Through Multiple Schemes Timed to Fuel Critical Acquisitions

83. On April 17, 2015, within a day and a half of the publication of the Pearson Article on *SeekingAlpha.com*, the FBI arrested Defendant St. Julien while he was attempting to board a flight from Florida to Costa Rica. According to the "Complaint and Affidavit in Support of Application for Arrest Warrant" ("Criminal Complaint") in *United States of America v. Richard*

*St. Julien*, 1:15-mj-00356-MDG, (E.D.N.Y.) and the affidavit of FBI Special Agent Aristotelis Kougemitros ("Kougemitros") in support thereof, "defendant St. Julien, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud investors and potential investors in" ForceField. According to Agent Kougemitros, in violation of 18 U.S.C. §1348, St. Julien attempted to and did defraud investors "by means of materially false and fraudulent pretenses, representations and promises in connection with purchases and sales of [ForceField] securities.

84. Agent Kougemitros is a four year FBI veteran who has "participated in numerous financial fraud investigations and . . . in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations and analyzing telephone toll information." His FBI unit "investigates securities fraud, wire fraud and other financial crimes."

85. Agent Kougemitros personally participated in the investigation of Defendant St. Julien, including his "review of trading records, telephone records, and bank records, among other sources of evidence." He also spoke with others special agents who worked on the investigation with him. He submitted his Affidavit to establish probable cause against St. Julien, sufficient to arrest him.

86. Small-cap stocks, according to Kougemitros, are those with relatively small market capitalization, usually under $2 billion. He stated that promoters and others can manipulate the share prices of small-cap stocks which are thinly traded. "When large blocks of small-cap stock are controlled by a small group of individuals," he continued, "it enables those in the group to control or orchestrate manipulative trading in those stocks, including creating the false appearance that there is a genuine market interest in the stock."

87. In addition to serving as executive chairman of ForceField, Agent Kougemitros wrote, Defendant St. Julien also beneficially owned "Adventure Overseas Holding Corp. ("Adventure Overseas"), an [International Business Corporation] ("IBC")[9] located in Belize City, Belize," and was "the signatory on that IBC's bank account at the Belize Bank International ("BBI")."

88. Agent Kougemitros linked St. Julien to a dermatologist from Boulder, Colorado, referring to him as co-conspirator-1 ("CC-1"). Not only was CC-1 not a licensed or registered broker, but he had never worked in the securities industry. He did, however, maintain a brokerage account at Scottrade, Inc. (the "Scottrade brokerage account")[10] and Wells Fargo bank account (the "Wells Fargo bank account").

89. Starting in August, 2012 and continuing through April, 2015, Agent Kougemitros wrote, Defendant St. Julien, CC-1 and others "conspired to deceive the investing public and manipulate the price of SunSi and ForceField stock in a variety of ways, including: (1) through St. Julien's use of nominees to purchase and sell SunSi and ForceField stock on his behalf without disclosure to investors and potential investors, in violation of securities laws; (2) through the use of orchestrated trading of ForceField stock that was designed to create the appearance of genuine trading volume and interest in the stock; and (3) through the use of stock promoters, brokers,

[9] Agent Kougemitros described an IBC as "an offshore, untaxed company, formed under the laws of a foreign jurisdiction, which is not permitted to engage in business within the jurisdiction in which it is incorporated." Such a structure enabled the owner of an IBC to "deposit money and transfer stock to an IBC to facilitate banking and securities trading activities while maintaining a level of anonymity for an IBC's true owner because an IBC's ownership records are typically not publicly available. He concluded that "stock fraudsters often use IBCs formed in countries like Belize to perpetrate securities fraud and launder the proceeds of their illegal stock activity."

[10] CC-1's Scottrade brokerage account was a margin account, for which Scottrade lent him money to purchase securities that it then collateralized using the securities and cash in the account.

broker dealers and others who did not disclose to potential investors that they had been paid by St. Julien and others to promote the purchase of ForceField stock."

90. St. Julien engineered a fraudulent scheme, funding and directing CC-1's purchases of SunSi and then ForceField common stock and then directing their sale, all through the Scottrade brokerage account. For example, Agent Kougemitros detailed that on or about August 20, 2012, SunSi transferred approximately $20,000 from its HSBC bank account – on which Defendant St. Julien was a signatory – to the Adventure Overseas BBI bank account that St. Julien controlled. The next day, Adventure Overseas transferred nearly $100,000 from its BBI bank account to the Wells Fargo bank account that CC-1 controlled. In turn, the same day, "CC-1 wired $20,000 from his Wells Fargo bank account to his Scottrade brokerage account, which had a balance at the time of approximately $132." Then, on or around August 23, 2012, CC-1 used the Scottrade brokerage account to begin acquiring SunSi stock. Agent Kougemitros continued that his "review of trading records has revealed that for the remainder of 2012 and 2013, CC-l periodically bought and sold SunSi and then ForceField stock in an apparent effort to create trading volume in SunSi and ForceField using funds provided to him by St. Julien.

91. Defendant St. Julien continued this fraudulent scheme to show trading activity through 2014. According to Agent Kougemitros, St. Julien continued to provide funding to CC-1. In turn, CC-1 transferred those funds into the Scottrade brokerage account and purchased ForceField common stock. During the course of this conspiracy to commit fraud, St. Julien frequently contacted CC-1 by telephone "within minutes of CC-1's buying and selling of ForceField stock, further evidencing St. Julien's control over CC-1's trading activity."

92. Agent Kougemitros described in detail the fraudulent coordination between St. Julien and CC-1. Simply put, CC-1 traded relatively large amounts of ForceField common stock

while in very close contact with St. Julien. For example, on March 3, 2014, CC-1 placed six orders to purchase 4,000 shares of ForceField common stock from about 10:29 a.m. to 10:34 a.m. EST. According to telephone records, at 10:35 a.m., that day, CC-1 texted St. Julien back. That day, CC-1's ForceField trades accounted for nearly twenty five percent (25%) of the day's total trading volume. Similarly, on March 11, 2014, when CC-1's trades accounted for nearly twenty one percent (21%) of ForceField's daily trading volume, CC-1 traded ForceField shares at approximately 9:32 a.m., exchanged text messages with St. Julien at 9:33 a.m. and 9:34 a.m., and purchased again at approximately 9:35 a.m. Once again, on March 19, 2014, CC-1 bought and sold ForceField shares six times between 1:46 p.m. to 2:42 p.m. CC-1 exchanged text messages with St. Julien at 2:51 p.m., after which, from approximately 3:03 p.m. to 3:57 p.m., he transacted in ForceField stock three more times. Once again, at 4:00 p.m. that day, CC-1 transmitted yet another text message to St. Julien. According to Agent Kougemitros, it was CC-1's "manipulative and undisclosed trading" on St. Julien's behalf that caused, in part, ForceField's stock price to increase from $5.00 per share on March 3, 2014 to $6.18 per share on March 19, 2014.

93. St. Julien and ForceField engaged in this scheme while ForceField participated in negotiations to acquire American Lighting & Distribution ("ALD"), a San Diego, California commercial lighting specialist. On March 26, 2014, just days after manipulating its stock price upward, ForceField issued a press release, announcing a letter of intent to acquire ALD for consideration, including "a combination of cash, stock and a secured promissory note."

94. On April 29, 2014, ForceField filed with the SEC a Current Report on Form 8-K, attaching a Share Purchase Agreement between it and the owners of ALD. The Subscription Agreement included ForceField's payment of "$1,500,000 in unregistered shares of Common Stock . . . , or an aggregate of ___ such shares . . . calculated based on a price per share equal to

90% of the volume weighted-average closing price per share of Common Stock as quoted on the NASDAQ for the 30 trading days prior to the date of delivery . . .” likely enabling ForceField to pay less for the acquisition by using common stock with an artificially inflated price.

95. Moreover, the Subscription Agreement subjected the shares the ALD owners received “to an initial twelve month lock-up period and are then released in equal monthly installments over the following six months.” As such, not only did the direct manipulation of ForceField’s common stock likely lead to ForceField’s expending materially fewer shares on the acquisition, but ForceField was able to gain an important operating unit without affecting the stock price by adding to the float. According to the Quarterly Report on Form 10-Q that ForceField filed with the SEC on May 20, 2014, ultimately, the $5,000,000 consideration for ALD included $1.5 million of restricted ForceField common stock or 289,529 shares, “subject to an initial twelve month lock-up period and are then released in equal monthly installments over the following six months.” Thus, the volume weighted-average closing price per share that the parties used to calculate the number of shares was $5.75, far higher than the $4.88 per share closing price on March 4, 2014.

96. According to Agent Kougemitros, Defendant St. Julien’s manipulation of the price of ForceField common stock continued in June of 2014. On or about June 3, 2014, Adventure Overseas transferred $25,000 from its BBI account to CC-1’s Wells Fargo bank account. As he did in March of 2014, on that same day St. Julien transmitted a text message to CC-1 at 9:35 a.m. Directly after receiving that text message, between approximately 9:51 a.m. and 10:05 a.m., CC-1 purchased ForceField common stock through four (4) separate orders. CC-1 traded in ForceField common stock four more times that day and exchanged five (5) more text messages with St. Julien.

97. The pattern of text message exchanges and CC-1's trading continued on June 6, 2014, when CC-l transferred approximately $25,000 from his Wells Fargo bank account to his Scottrade brokerage account. At the time, CC-1 maintained a deficit of nearly -$37,000 in the Scottrade brokerage account. On that day, after exchanging with St. Julien eight text messages between approximately 2:34 p.m. and 3:49 p.m., CC-1 traded in ForceField common stock twice. Directly thereafter, the two co-conspirators exchanged at least four (4) text messages from approximately 3:51 p.m. to 3:58 p.m., after which CC-1 purchase ForceField common stock twice more, followed by eleven (11) more text messages amongst the two between then and 11:15 p.m.

98. On June 13, 2014, ForceField itself once again, wired nearly $25,000 from its HSBC account to Adventure Overseas' BBI bank account. On June 16, 2014, Adventure Overseas transferred nearly $25,000 to CC-1's Wells Fargo bank account. The very next day, CC-1 transferred that amount to his Scottrade brokerage account which, at the time, had a negative balance of $47,000. Defendant St. Julien followed these transfers with two text messages between approximately 9:56 a.m. and 10:12 a.m. At 10: 12 a.m., CC-1 purchased shares of ForceField Energy common stock, followed by six text messages with St. Julien from 12:25 p.m. to 8:46 p.m.

99. Similarly, on June 27, 2014, CC-1 transferred nearly $25,000 from his Wells Fargo bank account to his Scottrade brokerage account, at a time when the brokerage account had a negative balance of $42,000. That same day, at 3:59 p.m., after completing the transfer of funds, CC-1 purchased ForceField stock. Shortly thereafter, at approximately 4:11 p.m., CC-1 and St. Julien traded two text messages. Three days later, CC-1's Wells Fargo bank account received a nearly $25,000 wire transfer from St. Julien's BAC San Jose bank account.

100. Shortly after manipulating its stock price upward, ForceField once again engaged in an acquisition. On July 23, 2014, the Company issued a press release announcing the acquisition

of ESCO Energy Services Company ("ESCO"), purportedly a "leader in energy efficiency upgrades and lighting retrofit projects." Again, ForceField included as consideration for this deal "a combination of cash, stock and a seller's note" plus "additional performance-based consideration payable only upon ESCO achieving mutually agreed EBITDA milestones over the two to three year period following the closing."

101. Once more, on September 26, 2014, Adventures Overseas transferred $15,000 from its BBI bank account to CC-1's Wells Fargo bank account. According to Agent Kougemitros, "the wire detail for this transaction was 'Advance on Purchase of Shares.'" Just as with the other transfers, on September 29, 2014, CC-1 transferred to his Scottrade brokerage account $15,000. According to trading and telephone records that Agent Kougemitros saw, "St. Julien continued to direct CC-1's trading of ForceField stock."

102. On October 22, 2014, the Company filed with the SEC a Current Report on Form 8-K, appending a final Subscription Agreement and other closing documents relating to the ESCO acquisition. The consideration included 366,845 shares of ForceField's restricted common stock to the owners of ESCO and 87,700 restricted shares to certain employees of ESCO. The total value of those shares was $2.5 million. In a press release the Company issued on October 20, 2014 that was appended to the Form 8-K, the Company Defendants afforded investors a clear understanding of why ForceField needed to acquire ESCO. According to the Company Defendants, "[f]or the twelve months ended June 30, 2014, ESCO generated unaudited revenue of approximately $10.0 million and EBITDA of approximately $1.2 million. ForceField expects ESCO's operating margins will be enhanced on a going forward basis once ESCO is fully integrated into ForceField Energy by taking advantage of certain additional synergies."

103. Review of the public filings of both ForceField and St. Julien indicate that neither ever publically disclosed that Defendant St. Julien repeatedly funded CC-1's significant purchases of ForceField common stock or "the control he exercised over CC-1's trading activity in ForceField. . . ."

104. In its complaint, the SEC described in detail ForceField's multiple schemes. Agent Kougemitros stated that Defendants' goals were to "deceive the investing public and manipulate the price of SunSi and ForceField stock" "through the use of stock promoters, brokers and broker dealers who did not disclose to potential investors that they had been paid by St. Julien and others to promote the purchase of ForceField stock."

105. In or about October, 2014, St. Julien hired Jared Mitchell ("Mitchell"), a purported "investor relations" professional,[11] to pay the Broker Defendants (Defendants Cocuzzo, Khan, Miyana, Patel, and Brown) cash kickbacks to induce them to recommend ForceField stock to their customers and to buy ForceField stock in those customers' accounts.

106. St. Julien and Mitchell agreed that St. Julien would pay Mitchell a kickback of approximately 10% of the dollar amount of ForceField stock that the Broker Defendants purchased in their customers' accounts. St. Julien and Mitchell further agreed that Mitchell would split the kickbacks with the Broker Defendants, paying them approximately half of what St. Julien wired to him.

107. Money was wired from ForceField's bank accounts, including its HSBC account, to Adventure Overseas' BBI bank account, according to the Indictment. St. Julien then wired the

[11] Mitchell has been the Managing Partner of Mitchell & Sullivan Holdings LLC, which purports to be an "open market buyer in the public equities market," since January of 2012, and a Principal of Excelsior Global Advisors LLC, a purported investor relations firm, since January 8, 2015.

kickbacks from the Adventure Overseas, the type of company described by Agent Kougemitros as often used by "stock fraudsters… to perpetrate securities fraud and launder the proceeds of [] illegal stock activity," to an account that Mitchell controlled. At other times, St. Julien caused third parties to wire the kickbacks to an account that Mitchell controlled.

108. Mitchell tried to hide his payment of kickbacks to the Broker Defendants by withdrawing funds from his account in cash, meeting the Broker defendants face-to-face, and handing them the cash. Indeed, Mitchell referred to himself as St. Julien's "brown bag man," a reference to this practice. Mitchell and some of the Broker Defendants also tried to conceal their illegal scheme by communicating with each other on prepaid, disposable (i.e., "drop" or "burner") phones. Beginning in approximately December, 2014, St. Julien, Mitchell, and some of the Broker Defendants began communicating with each other using an encrypted, "content-expiring" messaging application (or app) on their cellphones, such as Wickr and Threema, which encrypted all communications on each user's cellphone, and allowed the user to auto-delete a message after the expiration of a set period of time chosen by the user, lasting seconds up to one day.

109. Mitchell tracked money he received from St. Julien, his payment of kickbacks to the Broker Defendants, and the quantity of and price paid for the ForceField shares purchased by the Broker Defendants' clients, in a detailed Excel spreadsheet that he periodically updated and sent to St. Julien.

110. The scheme worked. The Broker Defendants' clients paid over $3 million to purchase more than 425,000 shares of ForceField stock.

111. Mitchell paid each of the Broker Defendants, from funds received from St. Julien, as follows:

(a) Between October 2014 and April 2015, Mitchell paid Defendant Brown more than $30,000 in cash in exchange for Brown recommending and buying more than 256,000 shares of ForceField stock in approximately 25 customers' accounts at a cost of more than $1,735,000. At the time of St. Julien's arrest, Mitchell owed Brown approximately $55,000.

(b) Between January and April 2015, Mitchell paid Defendant Cocuzzo more than $18,500 in cash in exchange for Cocuzzo recommending and buying more than 65,000 shares of ForceField stock in approximately 13 customers' accounts at a cost of more than $485,000. At the time of St. Julien's arrest, Mitchell owed Cocuzzo approximately $15,000.

(c) Between January and April 2015, Mitchell paid Defendant Khan more than $49,000 in cash in exchange for Khan recommending and buying more than 69,000 shares of ForceField stock in more than 40 customers' accounts at a cost of more than $531,000. At the time of St. Julien's arrest, Mitchell owed Khan additional money for some of these purchases.[12]

(d) Between March and April 2015, Mitchell paid Defendant Miyana more than $2,800 in cash in exchange for Miyana recommending and buying more than 30,000 shares of ForceField stock in approximately 20 customers' accounts at a cost of more than $250,000. At the time of St. Julien's arrest, Mitchell owed Miyana additional money for some of these purchases.

(e) Between March and April 2015, Mitchell paid Defendant Patel more than $2,144 in cash in exchange for Patel recommending and buying more than 8,100 shares of ForceField stock in 5 customers' accounts at a cost of more than $62,855.

---

[12] Khan put ForceField's fraudulent scheme above those of the investors who trusted him. Following the publication of the Pump Stopper report on April 15, 2015, that caused ForceField's stock price to plummet, Khan sent a series of texts to St. Julien, including the following, where he urges those advisers not to sell the collapsing stock: "I bought 2 days ago at 7. Yesterday at 5.50 and today at 4.17. It goes down every minute. You need to put [out] strong press to stop this. I am so [expletive], this is a falling knife… people are angry at me for not selling Tuesday… I'm having them hang in there.

112. Review of ForceField's public filings, signed by Defendants CEO Natan and CFO Williams, and of St. Julien, indicate that none ever mentioned the hundreds of thousands of dollars that left the Company's coffers to pay kickbacks to Mitchell and the Broker Defendants, or ever publically disclosed that Defendant St. Julien paid Mitchell and the Broker Defendants to recommend ForceField stock to their customers and to then buy ForceField stock in those customers' accounts.

113. The Broker Defendants never disclosed to their customers that St. Julien and Mitchell were paying them cash kickbacks to recommend and buy ForceField stock in their customers' accounts.

114. The scheme with Mitchell and the Broker Defendants was not the first time that ForceField paid undisclosed kickbacks to others to sell stock and pump up volume. From approximately June 2012 to January 2014, St. Julien and Christopher F. Castaldo ("Castaldo"), the President of Wall Street Buy Sell Hold, Inc. ("WSBSH"), a subscription investment newsletter, engaged in just such a scheme. St. Julien paid kickbacks of approximately 10% of the dollar amount of ForceField stock that Castaldo and his WSBSH employees convinced investors to purchase in their personal brokerage accounts.[13]

115. Castaldo and his employees, who were not registered brokers, solicited individuals to whom they had sold (or tried to sell) subscriptions to the WSBSH newsletter. In their phone solicitations, Castaldo and his employees described ForceField's business, and touted ForceField's

[13] On September 30, 2008, the SEC charged and a jury later convicted Castaldo of violating Section 15(b)(7) of the Exchange Act by a broker-dealer. Castaldo was ordered to pay penalties totaling $280,000. Castaldo still owes $240,353.56, and has not made a payment in over six months. Castaldo worked previously as a broker for Stratton Oakmont Inc., the corrupt pump-and-dump boiler room firm infamously portrayed in the film "Wolf of Wall Street."

purported successes. Castaldo and his employees frequently prescribed for prospective investors the number of shares of ForceField stock they should buy, and at what price.

116. After an investor had bought ForceField stock in his personal brokerage account, Castaldo and his employees asked the investor to confirm the number of shares bought and the price. They recorded the information in writing, and Castaldo communicated to St. Julien, often by email, the names of the investors and the numbers of shares they had claimed to buy. St. Julien confirmed that information against beneficial stock ownership information he obtained from the Depository Trust & Clearing Corporation, then wired from the Adventure Overseas account, to a WSBSH account that Castaldo controlled, a kickback of approximately 10% or more of the total dollar amount of stock bought by Castaldo's investors.

117. The Indictment alleges that a second ForceField executive actively participated in the scheme. Castaldo sent an email to "Co-Conspirator 2," described by the United States as a "ForceField executive," providing the account and routing information for WSBSH's bank account.

118. Castaldo was diligent about collecting his kickbacks. On or about September 6, 2013, he complained to St. Julien in an email, writing, "[a]re you wiring money today? We are owed $15K… we are owed money for the work we did. We won't continue until we are brought up to date." On September 9, 2013, he wrote, "call me when you are in NY. We don't work for free."

119. The kickback scheme worked, creating interest in ForceField stock that otherwise would not have existed, and artificially driving up trading volume and the stock price. Castaldo noted in a September 9, 2013 email to St. Julien, that it was "[a]mazing[,] when we don't work you barely trade."

120. From approximately June 2012 to January 2014, Castaldo and his employees solicited more than $600,000 in open market purchases of ForceField stock, from more than 40 investors.

121. The fraudulent scheme proved lucrative for Castaldo. He was paid more than $183,000, and St. Julien caused approximately 86,000 shares of ForceField stock to be issued to or transferred to WSBSH for Castaldo's benefit, which Castaldo subsequently sold, garnering another $229,000.

122. St. Julien was not the only ForceField employee who had worked with Castaldo. Earlier, from 2011 to late 2012, at least, Defendant Natan and Castaldo produced several promotional videos, in which Castaldo praised ForceField, and Natan echoed the praise.[14]

123. Review of the public filings of both ForceField, signed by Defendants CEO Natan and CFO Williams, and of St. Julien, indicate that none ever mentioned the hundreds of thousands of dollars in cash and other benefits that left the Company's coffers and were used to pay kickbacks to Castaldo for recommending ForceField stock to his customers and causing those customers to buy ForceField stock for their accounts.

124. Castaldo and his employees never disclosed to their customers that ForceField was paying them cash kickbacks to recommend ForceField stock and to cause customers to buy ForceField stock for their accounts.

125. Not only did St. Julien orchestrate multiple secret schemes to pump the price of ForceField common stock and materially increase trading volume, but according to Agent

[14] Castaldo also produced written and online paid promotional materials for ForceField. While Castaldo disclosed the amount he was paid in any particular month, he never revealed the aggregate sum he had been paid up to the date of publication of a particular promotion. The SEC Complaint charges Castaldo with §17 violations for this deceptive practice.

Kougemitros, CC-1 – presumably on behalf of St. Julien – engaged in other of ForceField's illegal promotions. Again, according to Agent Kougemitros, on "January 27, 2015, CC-1 wired approximately $50,000 to a corrupt stock promoter ("CC-2")." Shortly thereafter, on January 30, 2015, "CC-2, through his stock promotion company, began promoting the purchase of ForceField stock on the company's publicly available Facebook page." While that post included a disclaimer that CC-2's company was a paid promoter, it disclosed that it received only $25,000 – not the $50,000 CC-1 paid – and mentioned "a corporate entity that is not associated with CC-1."

126. In sum, Agent Kougemitros stated, "[b]ased on the actions of the defendant Richard St. Julien and his co-conspirators, from approximately January 1, 2014 to April 10, 2015, the price of ForceField's stock rose from a low of $4.55 per share to $7.82 per share, an increase of approximately 42 percent." Kougemitros concluded that "[i]n my training and experience, corporate executives such as St. Julien engage in the kinds of activities set forth herein – the use of nominees, manipulative stock trading and corrupt stock promoters – to hide their beneficial ownership of the company's stock and manipulate the price of the stock to defraud the investing public and profit from the money generated from investors' purchase of stock, all in violation of securities laws."

127. In the government's prayer for relief requesting an arrest warrant for Defendant St. Julien, Agent Kougemitros stated that "Because public filing of this document could result in a risk of flight by the defendant Richard St. Julien, as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal."

128. On May 7, 2015, St. Julien appeared for his Criminal Cause for Arraignment, including a bail hearing before the Honorable Steven M. Gold, United States Chief Magistrate

Judge. Assistant United States Attorney Jacquelyn M. Kasulis ("Kasulis"), appeared for the United States, "seeking a permanent order of detention"

129. In seeking remand, Ms. Kasulis informed Judge Gold that the United States possessed "even additional evidence that [Defendant St. Julien's] manipulation efforts extend back to 2009, 2010. He used a corrupt network of stock promoters and stockbrokers including co-conspirator number one as set forth in the complaint." Ms. Kasulis proceeded to argue that short of permanent detention pending trial, no set of conditions "would reasonably assure us that the defendant would appear in the future for future proceedings."

130. Ms. Kasulis stated that St. Julien lived in Costa Rica and did business through "shell companies in order to hide his identity." She continued that "he uses a shell company to open a bank account and then moves money through that bank account and notably, that bank account the Adventure Overseas bank account was not reported by Mr. St. Julien to pretrial services as a bank account he does control." She added his lack of ties to the United States, including no family, his lack of employment here and, critically, that "his one contact in the United States, Mr. Nattan (ph.), will not post any bond for Mr. St. Julien or act as a suretor." Ms. Kasulis further noted that "[t]here is no such moral suasion here. His children are older. If they moved here, they could easily just leave with him. He also has significant assets and I note that in the pre-trial services report, he has $12 million in stock. So he has the means to reimburse folks who are posting for him and he has the means to flee."

131. In further support of her request for remand, Ms. Kasulis described the circumstances behind Mr. Julien's arrest. She told of his arrest at Ft. Lauderdale airport, shortly after publication of the Pearson Article denouncing ForceField as a fraud. She contended that Defendant "St. Julien responded [to the Pearson Article] on April 17th denouncing the article as

being wholly untrue. Later that day, he purchased a plane ticket to leave Florida for Costa Rica and then boarded – attempted to board that flight later that night. He was intercepted at the airport and arrested at that time on this complaint." The Court understood that Ms. Kasulis mentioned the Pearson Article to show "how the timing of the post interacts with the timing of [St. Julien's] purchase of a ticket to leave the country. . . ." Simply stated, Defendant St. Julien's attempt to flee in such close proximity to the Seeking Alpha post was an indication of a guilty conscience.

132. In entering a permanent order of detention, the Court relied on Defendant St. Julien's "involvement with large sums of money, [his] manipulation of how that money was transported from account to account and the fact that he has co-conspirators who will essentially move money for him under their names, so that he's not connected to the financial transfers." The Court concluded that Defendant St. Julien "moves six and seven-figure amounts of money around and he could go anywhere. He has the means to go anywhere and we don't know really where his money is and who he has available to move it for him." For those reasons, the Court ruled, "we need a very heavy bail package and we need a real demonstration of strong, good faith before we would consider his release."

**e. The ForceField Defendants' Kickback Scheme to Solicit Investors in Private Placements**

133. The fraudulent schemes described above artificially increased ForceField's volume and stock price, and allowed the Company to raise more cash in private placements than would otherwise have been possible. The Company Defendants, needing cash to fund acquisitions, concocted another fraudulent scheme to entice investors to purchase shares in private placements.

134. Defendant Knippa and Louis Petrossi ("Petrossi") each agreed to solicit investors on ForceField's behalf, in exchange for substantial, undisclosed kickbacks. Neither was a registered broker when they agreed to do so. Both men attended investment conferences,

sometimes with St. Julien. At these conferences, and afterwards via phone and email, Knippa and Petrossi touted ForceField's success, often falsely.

135. Knippa and Petrossi provided potential investors with subscription agreements and payment instructions to buy ForceField stock, and returned the signed subscriptions to St. Julien, who arranged to have stock certificates delivered to the investors.

136. Between approximately December, 2009 and December, 2013, Petrossi falsely held himself out as an independent investment professional appearing on behalf of his "Wealth Research Institute," recommending ForceField stock. Petrossi conferred with ForceField's officers and with St. Julien about his investment pitch, and edited and suggested changes to the presentation materials that ForceField gave investors at conferences. Defendant Natan became a ForceField officer in 2010, Defendant Williams in 2011. By the time that Williams became ForceField's CFO, he and Natan were the only ForceField officers, and thus the only officers with whom Petrossi could confer about his role in the fraudulent scheme.

137. Petrossi made misleading and/or false statements to potential investors concerning how much ForceField stock management owned, the amount of debt ForceField carried, and how the Company had begun generating significant revenues. Petrossi also made misleading and/or false statements about his own purported investments in ForceField, stating that "I can not [sic] be bought" and that "[I] only recommend companies that [I] invest in."

138. Petrossi was paid kickbacks of 10% of the gross proceeds of moneys paid by investors he solicited. The scheme was lucrative for both Petrossi and for ForceField. Petrossi solicited more than $4.5 million from more than 60 investors in ForceField's private placements. As a result, ForceField paid Petrossi kickbacks in cash and ForceField stock worth more than $438,000. The kickbacks were wired from the Adventure Overseas or other third-party accounts

to accounts controlled by Petrossi, including accounts in his own name, his wife's name, and in the name of Chadwicke, Inc., a company controlled by Petrossi.

139. In June of 2014, Knippa urged St. Julien to hire him and "put me on the road." Knippa added that he could "pitch [ForceField stock] as good as anyone in the world." Knippa was then hired as ForceField's Director of Investment Relations, but was not paid a salary. Rather, he was paid a kickback of 10%-15% of the gross proceeds of moneys paid by investors that he solicited for private placements.

140. Knippa attended investor conferences with and without St. Julien, and made false and/or misleading statements about Forcefield to these potential investors.

141. Like Petrossi, Knippa was successful, and both he and ForceField benefitted. From July, 2014 to March, 2015, Knippa solicited more than $1.19 million from more than 10 investors in private placements. He was paid kickbacks of more than $120,000, wired from the Adventure Overseas account in Belize to an account in Knippa's name, and an account in the name of the company he owned, Kenai Capital Management.

142. Knippa was diligent in collecting his kickbacks. On March 31, 2015, Knippa sent an email to St. Julien, attaching a spreadsheet summarizing the number of investors he had solicited for ForceField, the total amount of investment, and the amount he believed he was personally owed.

143. ForceField raised more than $19.7 million from investors in private placements through Knippa, Castaldo and Petrossi.

144. Review of the public filings of both ForceField, signed by Defendants CEO Natan and CFO Williams, and of St. Julien, indicate that none ever mentioned the hundreds of thousands of dollars in cash and other benefits that left the Company's coffers and were used to pay kickbacks

to Petrossi and Knippa for recommending that investors buy ForceField stock in private placements. Nor do these public filings explain why ForceField ended up with 10%-15% less cash in its coffers than it should have had.

145. Neither Petrossi nor Knippa ever disclosed to investors that ForceField was paying them cash kickbacks to find investors for the Company's private placements.

146. Knippa never revealed to investors that he was ForceField's Director of Investor Relations.

**f. The Trouble with TransPacific**

147. As noted above, in the spring of 2012, ForceField entered the Exchange Agreements "to acquire an aggregate controlling equity interest of [TransPacific's] common stock. At the time, Defendants knew that the Exchange Agreements did not achieve a "controlling equity interest," but misrepresented that to investors anyway. Relations between ForceField and TransPacific's owners soured quickly. On September 18, 2014, TransPacific owners who received ForceField stock pursuant to the Exchange Agreements filed suit against Defendants ForceField, St. Julien, Natan and Williams in the California Superior Court for San Diego County, alleging, among other counts, breach of contract, intentional and negligent misrepresentation, intentional interference with economic relationship and defamation.

148. According to that complaint, Section 5(F)(2) of the Share Exchange Agreement required ForceField to "arrange financing of [TransPacific's] various projects," the terms and conditions of which the parties would agree to "on a project by project basis." Moreover, the ForceField shares that TransPacific's owners received were unregistered, but otherwise unrestricted. That is, TransPacific's owners were entitled to sell their ForceField shares in accordance with U.S. securities laws.

149. For example, TransPacific's owners were entitled to sell their ForceField shares pursuant to SEC Rule 144's "safe harbor" exemption, permitting the sale of unregistered securities under certain conditions, including an "applicable holding period." In their complaint, TransPacific's owners alleged that they had performed all conditions, covenants and promises required on their part to be performed under the Share Exchange Agreement, the SunSi Share Certificates, and SEC Rule 144.

150. From about June 20, 2012 through June 31, 2013, TransPacific presented ForceField with no fewer than seven (7) projects, requesting financing pursuant to the Exchange Agreements. TransPacific invested its own resource to develop those opportunities. Notwithstanding the fanfare that accompanied ForceField's trumpeted acquisition of TransPacific, ForceField, in violation of the Share Exchange Agreement, refused to finance each and every one of TransPacific's seven proposed projects. In addition, in January, 2013, Defendants Natan and Williams requested quarterly financial reports from TransPacific, though TransPacific did not have the personnel to prepare and provide those reports, or the funds to hire someone. Natan and Williams promised to pay an independent contractor to prepare those reports, but ultimately refused to pay the bill, necessitating that TransPacific cover the cost.

151. In February of 2013, one of the TransPacific owners sought to sell some of her ForceField shares through her stockbroker and in compliance with SEC Rule 144. On or about February 6, 2013, however, SunSi changed its name to ForceField, requiring a simple re-issue of the shares in question before they could be sold. The TransPacific owner's broker tendered the SunSi shares to ForceField's transfer agent, who refused to re-issue ForceField shares, informing the broker that such a sale was impermissible. ForceField advanced a spurious pretext for stopping the transfers of the TransPacific owners' ForceField common stock. According to the Company Defendants, the TransPacific owners fraudulently induced ForceField to execute the Share Exchange

Agreement by withholding material information about TransPacific's operations, and by not tendering a controlling interest therein as ForceField had sought.

152. According to the TransPacific Owners, however, at no point did ForceField bargain for a controlling interest. Indeed, they cite to email correspondence from May 16, 2012, in which ForceField acknowledged that it would not own a controlling interest in TransPacific upon execution of the Share Exchange Agreement. Moreover, prior to executing the Share Exchange Agreement, ForceField acknowledged, in writing, "its satisfaction with the nature and scope of its investigation and due diligence," into TransPacific's operations, which were "substantial."

153. In March of 2013, one TransPacific owner, while in full compliance with SEC Rule 144, attempted to exchange her SunSi share for ForceField's, so the owner could sell them. Pursuant to ForceField's instructions, the transfer agent refused to re-issue those shares. The broker of that TransPacific owner phoned Defendant St. Julien, who hung up on him. When the broker finally spoke with him, Defendant St. Julien stated that because TransPacific's owners had committed fraud in inducing ForceField to execute the Share Exchange Agreement, ForceField would block the sale of the TransPacific owner's ForceField shares. The actions of the Company Defendants in preventing the TransPacific owners from exchanging and selling their stock was pretext; they sought to and did prevent the TransPacific owners from selling over 250,000 shares into the market and thereby affecting the market price both through a poorly timed, conspicuous and substantial insider transaction – demonstrating a lack of faith in ForceField and its management to the market – and/or a material dilution of the float.

154. The TransPacific owners alleged their belief that because of the name change from ForceField and a two-for-one, reverse stock-split that ForceField engineered in October of 2013, that ForceField was trying to attract new investors by artificially increasing the market value of its shares. For the owners of TransPacific, who filed their complaint before the United States arrested

Defendant St. Julien for securities fraud, ForceField's refusal to allow them to sell their shares was a blatant attempt "to manipulate the value of SunSi/ForceField shares by unilaterally controlling the volume of stock sales."

155. Ultimately, ForceField and the TransPacific owners settled their litigation. In a Report on Form 8-K that ForceField filed with the SEC on March 15, 2015, the Company disclosed that the TransPacific owners and ForceField settled their claims and executed mutual releases. In exchange for ForceField's 50.3% interest, the TransPacific owners paid $50,000 to ForceField and returned their ForceField common stock. The return of those 255,000 shares to treasury – worth $1.9 million at the then current per share price of $7.49 – "reduce[d] the Company's outstanding share count from approximately 18.7 million shares outstanding to approximately 18.45 million shares outstanding." In a March 6, 2015 press release, Defendant Natan stated, "We are very pleased to have received nearly $2.0 million in value for our waste heat assets which have been essentially dormant for the last one and one half years. There is no doubt in our minds that this transaction, which enables us to retire 255,000 shares outstanding and reduce our share float, is in the best interest of our shareholders."

**g. The Mexican Misrepresentations**

156. During the Class Period, Defendants would tout the Company's Mexican operation and contracts achieved through it. Its representations, however, were false and misleading. A former employee of ForceField ("FE") described himself as a "sales representative" for ForceField whom Defendant St. Julien recruited and hired in mid-2014 after someone referred FE to Defendant St. Julien. While he worked at ForceField for the remainder of 2014 and early 2015, he reported to Defendant St. Julien and communicated with both him and with Jose Mora in Costa Rica.

157. In recruiting FE, Defendant St. Julien told FE that ForceField required FE's help in Mexico for both obtaining certification for ForceField's LED light meters and to sell LED street lights in Mexico. FE and St. Julien met in Mexico City over two days, resulting in a contract among ForceField and FE for FE to sell LED street lights in Mexico. FE asked for a meeting with Defendant Natan, something St. Julien refused. When St. Julien pushed for meetings with high level contacts of FE's in Mexico City, FE said that any such meeting would have to occur in New York. This angered St. Julien, who refused to travel to New York. Indeed, after only ten minutes, FE asked why St. Julien was located in Costa Rica. St. Julien was visibly angry and refused to answer. FE claims contacts in Mexico that are exceptional, including, his "good friendship" with Carlos Slim[15] and friendship with Georgina Kessel.[16] From the beginning of their relationship, St. Julien prodded FE to assist in selling ForceField stock to Carlos Slim. After more discussions about FE's contacts in Mexico, St. Julien tried to convince FE to purchase ForceField stock.

158. Immediately, FE set to work selling LED lighting products. As a matter of course, he asked Defendant St. Julien if ForceField had an RFC,[17] a license required to do business and pay taxes in Mexico. St. Julien told FE to "mind your own business." Because of FE's direct efforts, Grupo Merza executed a contract with ForceField to purchase $1.3 million of LED lighting for its retail stores and operational buildings. In the late summer of 2014, FE secured a contract on ForceField's behalf to sell $6 million in LED streetlights to the City of Uruapan ("Uruapan").

---

[15] Carlos Slim Helú is a Mexican business magnate, investor, and philanthropist. From 2010 to 2013, Slim was ranked as among the richest persons in the world.

[16] Dr. Kessel was a Secretary of Energy in Mexico and serves currently as a member of the U.N. Secretary General's High Level Group for Sustainable Energy for All. According to RM, she is also a director of Pennex, Mexico's leading oil company and a board member of the Federal Electricity Commission (CFE), the Mexican Electricity Company.

[17] RFC is the Mexican federal taxpayer registry.

159. Thereafter, on October 10, 2014, ForceField issued a press release, announcing "the signing of an LED lighting agreement with the municipality of Uruapan, Mexico. The shared savings agreement is expected to generate approximately $8.4 million in revenue for ForceField over a ten year period for the supply and installation of over 15,000 LED streetlights for all municipal roads and highways in Uruapan." Immediately, FE confronted Defendant St. Julien with the fact that the Uruapan contract was worth only $6 million, not the $8.4 that the Company announced. St. Julien told FE to "shut your mouth."

160. With respect to the certification of ForceField's meters, Defendant St. Julien told FE that the Company paid a San Diego company with a Tijuana, Mexico facility to manufacture them. St. Julien also told FE that ForceField manufactured LED lights at a factory in China. St. Julien said, however, that the Company was going to close the Chinese manufacturing facility in favor of a deal with the San Diego company to manufacture LED lights. FE received light samples from Jose Mora, known to FE as a ForceField employee in Costa Rica. FE saw no distinguishing mark on the lights that would indicate who manufactured them. Indeed, Jose Mora told FE that ForceField bought the lights it sent to him as samples for the Uruapan contract. St. Julien had tried to convince FE that ForceField manufactured its products. Ultimately, St. Julien told FE that ForceField had closed its factory in China. FE expressed concern for the Company's ability to meet the Uruapan contract, to which St. Julien replied, "don't worry, we have people we can buy the lights from."

161. According to FE, ForceField has defaulted on both Mexican contracts, but both Grupo Merza and Uruapan have come to FE, himself, seeking performance. According to FE, ForceField billed $3,500 to Grupo Merza for a small shipment. FE received a copy of a May 20,

2015 letter from Defendant Natan to Grupo Merza, assigning all rights to payment to FE, whom Grupo Merza refuses to pay.

162. With respect to the light meters for which Defendant St. Julien had prompted FE to seek certification in Mexico, the whole thing was a ruse. St. Julien knew that Georgina Kessel, FE's contact, was influential and he told FE that he would pay her a consulting fee to get the meters certified. Some time later, FE asked St. Julien about the certification. Defendant St. Julien swore at FE and stated, "we're never certifying meters in Mexico." According to FE, St. Julien simply wanted access to Dr. Kessel to convince her to serve on ForceField's board of directors. Indeed, St. Julien offered FE $50,000 if he could convince Dr. Kessel to serve as a ForceField board member because her participation "would make the stock price soar."

163. FE never met any other ForceField sales personnel and does not know whether they employ any others and, if so, how many. When FE asked Defendant St. Julien how many persons ForceField employed, St. Julien said "none of your business." In the end, FE scrambled to salvage the two Mexican contracts he had achieved in order to protect his commission. In 2015, he spoke with Neil Miller, whom FE believed was a principal in ALD, in an attempt to prompt ALD to produce the lights. According to FE, ALD purchases its LED lights from Sylvania. According to Neil Miller "legal constraints" prevented him from even speaking to FE.

164. In May of 2015, FE attempted to contact Defendant Natan. He spoke with Natan once, briefly. According to FE, Natan told him that ForceField's "legal department" told Natan not to speak with FE. FE had contact with Stephan Vachon, purportedly a ForceField executive working in Panama. Vachon promised FE his commissions, but never paid. FE had a friend call Natan with FE listening in but not participating. According to FE, Natan stated that ForceField no longer did business in Mexico and that he could not speak with FE because ForceField owed him

money. FE heard Natan say that FE "was never authorized to sell in Mexico." Defendants never amended or corrected their false statements about the Mexican operations.

***Defendants' False and Misleading Statements***

165. The Class Period begins on August 20, 2013 when Defendant St. Julien caused ForceField to transfer approximately $20,000 from its HSBC bank account to the Adventure Overseas BBI bank account that St. Julien controlled. As noted above, the next day, Adventure Overseas transferred nearly $100,000 to CC-1's Wells Fargo bank account. After transferring $20,000 to his Scottrade brokerage account, CC-1 used those funds to begin acquiring shares of ForceField common stock to create trading volume in ForceField using ForceField's own funds, provided by St. Julien.

166. Unbeknownst to Plaintiffs and the Class, Defendants knew or were reckless in not knowing that the foregoing schemes, artifices and devices to defraud, as detailed above in ¶¶51-164, continued throughout the Class Period, artificially inflating the stock price and causing damage to Plaintiffs and members of the Class.

167. As noted above, on September 16, 2013, ForceField issued a press release entitled *ForceField Energy Announces Engagement of MissionIR Investor Relations Services*, announcing its retention of MissionIR to provide "investor relations services." About this, Defendant Natan spoke of developing and implementing an investor relations campaign, "a key part of our overall strategy to achieve short term and long term goals."

168. The foregoing was materially false and misleading because, unbeknownst to Plaintiffs and the Class, Defendants knew or were reckless in not knowing that, as described above in ¶¶51-82, the Company would and did pay for and maintain editorial control of and authority over the content of and approve purported research reports, articles and blog posts – favorable to

ForceField – that would and did fail to disclose that ForceField compensated the authors and controlled the content and approval thereof.

169. On October 15, 2013, ForceField issued a press release, announcing that the NASDAQ Capital Market had approved its common stock for listing on that exchange, with trading expected to begin on October 17, 2013. About this new listing, Defendant Natan stated, "[w]e are very excited to be uplisted to the NASDAQ Capital Market. The transition to the NASDAQ underscores the strength of our transformation to a global provider of efficient energy solutions. We believe this move will support our evolution as a public company, further enhance our reputation and provide increased visibility, greater liquidity and increased exposure to the institutional investment community and customers."

170. For the following reasons, the foregoing statements were materially false and misleading:

(a) The Company Defendants knew or were reckless in not knowing that, as described in ¶¶51-146, ForceField had engaged in schemes to inflate artificially both the trading volume and price of its common stock, enabling it to achieve a listing on the NASDAQ Capital Market.

(b) The Company Defendants knew or were reckless in not knowing that, as described above in ¶¶147-155, the Company's legacy businesses were stagnant and that its TransPacific business was "dormant" such that ForceField was neither strong nor transforming into "a global provider of efficient energy solutions."

171. On October 27, 2013, GSCR published an edition of *The Goldman Guide*, a run-down on stocks that GSCR watched. Goldman, himself, wrote and titled the article "I Love This Market." About ForceField, one of GSCR's "Select stock picks," Goldman called it a "100%

Buy," noting the Company's "nice run" and that it was "poised to move higher after hitting yet another 52-week high on Friday as it operates in both sectors." Goldman focused on the trading volume of ForceField shares, stating that "since up-listing to NASDAQ on October 17th, the stock's average daily volume, which is modest, has risen by 4x for the past 7 trading sessions, as compared with the 7 sessions prior to the up-listing."

172. As described, in detail, above in ¶¶51-82, for the following reasons, the GSCR publication was materially false and misleading:

(a) GSCR and Goldman wrote and uploaded a positive post about ForceField without basis and without disclosing that ForceField paid GSCR to write positively about ForceField and without disclosing the compensation paid to it by ForceField.

(b) The Company Defendants, who had editorial control of and approval over the content of the GSCR post, knew or were reckless in not knowing that ForceField achieved its listing on the NASDAQ and the attendant bump in volume only through schemes perpetrated with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock, and arranging for paid stock promotions from GSCR, Goldman and others.

173. On October 28, 2013, Thomas Meyer, writing under the alias Wonderful Wizard for DTG, posted on *SeekingAlpha.com* a piece, titled "3 Reasons To Buy ForceField Energy." Meyer touted the Company and gave investors several reasons why it was a good choice to invest in the Company. He wrote that ForceField was "poised for significant growth" because of its "LED lighting and waste heat recovery through its majority ownership of TransPacific Energy ("TPE")." He complimented the recent NASDAQ listing, stating that it would "allow the company to gain more name recognition with traders and investors as the move provides greater liquidity and increased exposure to investment firms and money managers across the world." Meyer noted

the huge potential of the renewable energy segment, promoting ForceField as being "at the forefront of both" LED lighting and clean electricity. "With the company's smart use of resources, the recent technical strength, the latest strategic transactions in various countries, and the massive market potential," Meyer concluded, "it appears that ForceField Energy represents an excellent opportunity for investors." This article failed to disclose that it was a paid promotion.

174. As described, in detail, above in ¶¶51-82, for the following reasons, the post of Tom Meyer was materially false and misleading:

(a) DTG and/or MissionIR recruited Thomas Meyer to create and upload a positive post about ForceField without basis and without disclosing that ForceField, through MissionIR and DTG, paid Meyer to write positively about ForceField and without disclosing the compensation paid to it by ForceField .

(b) The Company Defendants, who had editorial control of and approval over the content of the Meyer post, knew that ForceField achieved its listing on the NASDAQ and the attendant bump in volume only through schemes perpetrated with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock, and arranging for paid stock promotions from Defendants DTG, MissionIR and others.

(c) In addition, the Company Defendants, who had editorial control of and approval over the content of the Meyer post, knew or were reckless in not knowing that ForceField was not at the forefront of any segment of the renewable energy market. Indeed, by the time of Meyer's post, the LED business was stagnant and the TransPacific business was "dormant," with ForceField refusing to fund any new projects despite the fact that the Exchange Agreement required it to do so.

175. On November 14, 2013, the Company filed with the SEC a Quarterly Report on Form 10-Q. ForceField claimed to have achieved a controlling interest in TransPacific for which it paid "$520,000 in cash and issued 255,356 shares of its common stock, valued at approximately $965,226 or $3.78 per share, in exchange for 24,753,768 shares of TPE's common stock in accordance with the terms of the [Exchange] Agreements." The Company disclosed that the $3.78 per share valuation was determined by calculating the 30-day weighted average trading price of the Company's common stock immediately preceding the initial June 14, 2012 funding of the transaction. Moreover, as of September 30, 2013, ForceField recorded $1,342,834 in goodwill associated with the acquisition of TransPacific, i.e. the entirety of its goodwill. ForceField recorded no impairment charge. On its balance sheet, ForceField showed $7,294,148 in shareholder equity. On its income statement, ForceField reported a net loss of $814,912.

176. Appended to that Form 10-Q, and incorporated therein by reference, was the Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX Certification"). In it, Defendants Natan and Williams stated, "In connection with the accompanying Quarterly Report on Form 10-Q of ForceField Energy Inc. for the quarter ended September 30, 2013 ("Report"), we certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to our knowledge, that: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents in all material respects, the financial condition and results of operations of ForceField Energy Inc.

177. The foregoing Form 10-Q was false and misleading for the following reasons:

(a) As described above, in detail, in ¶¶147-155, having wrongly accused the TransPacific owners of fraud over its failure to achieve a controlling interest in TransPacific, the Company Defendants, from at least early March of 2013, knew or recklessly disregarded that ForceField did not own a controlling interest in TransPacific and that due to their own refusal to finance any proposed projects pursuant to the Exchange Agreements, TransPacific's business was "dormant."

(b) As described above, in detail, in ¶¶147-155, given that TransPacific's business was dormant and that Company Defendants had refused and would continue to refuse to fund TransPacific's proposed projects, the Company Defendants knew or recklessly disregarded that ForceField should have impaired and written-off most or all of its goodwill. This failure to write-off its goodwill inflated ForceField's shareholders equity by 18%. In turn, ForceField should have recorded an impairment charge against net income (loss). Rather than a net loss of $814,912, the Company should have reported a net loss of $2,157,746, so the Company understated its net loss by nearly 164%. Thus, Defendants violated generally accepted accounting principles ("GAAP"), and the SOX Certification of Defendants Natan and Williams was knowingly or recklessly false.

(c) As described above, in detail, in ¶¶51-146, the Company Defendants also knew or recklessly disregarded that from 2012 on, when it was executing agreements with stock as components of the consideration with both TransPacific and Shanghai Lightsky, St. Julien had manipulated the trading price and volume of ForceField's common stock through multiple schemes, artificially inflating the price and, in turn, purchasing certain interests and distribution rights for too little stock. By virtue of St. Julien's manipulation of ForceField's stock price, the

Company Defendants knew or recklessly disregarded that the $3.78 valuation based on a weighted average trading price was false.

178. On November 27, 2013, John Mylant for DTG published an article entitled "ForceField Energy Is One Company Worth Watching In The LED Industry" on *SeekingAlpha.com*. Mylant focused exclusively on ForceField's LED division, predicting excellent growth potential. As exclusive distributor of a Chinese manufacturer's LED products in North America, Latin America and Europe, Mylant continued, ForceField targets hospitals, institutions, retailers and governments, "larger customers where significant cost savings and aesthetically better lighting that is also environmentally friendly appears most important." Conveying a focus on Latin America because of its high cost of electricity, Mylant wrote of hundreds of millions in business and potential business including a three year sub-distribution agreement with a firm in Wiesbaden, Germany for public schools installations and a $21 million, multi-year, street-light installation project in Costa Rica. Mylant ended, praising management and their histories of success. In particular, he singled out Defendant Williams, who, he wrote, "understands the importance of financing large projects like this and is well organized to offer it where needed." This article failed to disclose that it was a paid promotion.

179. As described, in detail, above in ¶¶51-82, the foregoing post of John Mylant was false and misleading because:

(a) DTG and/or MissionIR recruited John Mylant to create and upload a positive post about ForceField without basis and without disclosing that ForceField, through MissionIR and DTG, paid Mylant to write positively about ForceField and without disclosing the compensation ForceField paid.

(b) The Company Defendants, who had editorial control of and approval over

the content of the Mylant post, knew or recklessly disregarded that ForceField was not at the forefront of any segment of the renewable energy market. Indeed, by the time of Mylant post, the LED business remained nothing more than a distributorship of Chinese-made LED lights with little promise. In the first nine months of 2013, "all of the Company's sales for the LED segment were in the United States with the exception of $16,310 in sales in Costa Rica and Latin America." Moreover, not only did he fail to discuss the Individual Defendants' past associations with other fraudulent enterprises, but as the Company Defendants knew, ForceField had refused financing to at least seven proposed TransPacific projects, belying his comments about Defendant Williams.

180. On January 24, 2014, the Company filed a Current Report on Form 8-K, disclosing that on January 22, 2014, Anderson Bradshaw PLLC ("Anderson") resigned as ForceField's independent registered public accounting firm.

181. On March 27, 2014 – after falsely stating its net loss and shareholders equity in November, 2013, for the quarter ended September 30, 2013, and after nearly one month of sustained activity on the part of Defendant St. Julien to control trading and inflate the price of ForceField common stock artificially – the Company filed with the SEC a Current Report on Form 8-K, announcing a letter of intent to purchase ALD. According to the filing, "ForceField made a non-refundable good-faith payment of $100,000 to ALD, $50,000 of which shall be treated by the parties as an advance on the cash portion of the purchase consideration. The closing of the transaction is subject to ForceField obtaining additional working capital financing and other customary closing conditions."

182. On April 15, 2014, the Company filed with the SEC its 2013 10-K. ForceField reported total revenues of $343,636 of which TransPacific accounted for $236,672, or nearly 69%. The Company also disclosed that "[d]ue to the inability to meet anticipated sales growth, we

assessed the acquired goodwill associated with our related business units for impairment as of December 31, 2013. Based on the discounted cash flows model utilizing estimated future earnings and cash flows, the fair value of the reporting units was less than the carrying value of the acquired goodwill." The Company concluded that its "evaluation of goodwill resulted in a total impairment charge of $1,342,834, all of which was attributed to TransPacific Energy."

183. Thus, Defendants wrote down the value of its most profitable unit for 2013 only after it had announced its acquisition of ALD. The Company disclosed the dispute with the TransPacific owners over unspecified breaches of the Exchange Agreements, stating that TransPacific's inability "to meet anticipated sales growth," caused it to assess its recorded goodwill relating to its purchase of TransPacific as of December 31, 2013. "Our evaluation of goodwill," ForceField concluded, "resulted in a total impairment charge of $1,342,834, all of which was attributed to TransPacific Energy."

184. The Company also disclosed the acquisition of ALD as a subsequent event, reiterating that "[c]onsideration for the acquisition of ALD will include a combination of cash, stock and a secured promissory note."

185. The foregoing Forms 10-K and 8-K were false and misleading for the following reasons:

(a) As described in detail above in ¶¶147-155, and as Defendant Natan conceded on March 26, 2015, the TransPacific business had been "dormant" for eighteen months – since at least September of 2013. Moreover, the Company Defendants knew or recklessly disregarded that ForceField's goodwill impairment was not due to the inability to meet anticipated sales. Rather, it was due to the Company Defendants refusal to fund the operations of TransPacific despite the fact that the Exchange Agreements expressly obligated it to do so.

(b) Further, as described, in detail, above in ¶¶51-155, the Company Defendants knew or recklessly disregarded that at least since the start of the Class Period, they had engaged in various means of artificially inflating ForceField's stock price by: (1) authorizing and participating in undisclosed, paid promotions, (2) directly manipulating the trading volume and price of ForceField stock, (3) engaging in a kickback scheme to solicit investors in ForceField's private placements, and (4) improperly disabling the TransPacific owners' rights to sell their stock.

186. On April 30, 2014, the Company filed with the SEC its Definitive Proxy Statement on Form 14A. The Proxy called Defendant Natan "a seasoned financial executive. . . , a Big Four CPA with Deloitte Touche, he has more than thirty years of experience in areas of accounting, treasury, finance, corporate operations, and executive level management of both public and private companies." It described his 2007-2010 tenure as president of Nathan & Associates, LLC. Before that, the Proxy states that he served as CFO of three private companies, "participat[ing] in over fifteen merger and acquisition transactions. He has been instrumental in raising in excess of $500 million of debt and equity capital on favorable terms and from a variety of funding sources."

187. About Defendant St. Julien, the Proxy noted his education in Canada and his practice of law since 1992, "specializ[ing] in both International Business Law and Securities law in collaboration with strategic partners in Canada in the USA and in China." At the same time, the Proxy continued, St. Julien "has been involved in numerous business ventures as entrepreneur in Canada, in the United States as well as in other countries. . . , possess[ing] several years of experience in the public company environment, mostly in the USA, where he was involved in various listings, reorganizations, financings and acquisitions."

188. With respect to Defendant Williams, the Proxy described his service prior to joining ForceField as controller and CFO of Protective Products of America, Inc. and its successors, and

his service as Corporate Controller and Director of Reporting & Analysis at PharmaNet Development Group, Inc. Prior to those posts, Williams occupied "various financial leadership positions with Patagon.com, Inc., vFinance, Inc. and The BISYS Group."

189. The foregoing Proxy Statement was false and misleading because:

(a) The Company Defendants knew or recklessly disregarded, but the Proxy failed to disclose that, according to the Pearson Article, Defendant Natan had senior positions with several former pink sheet companies based in south Florida – "the center of stock promotion (and sometimes fraud) in America. At the time of the Proxy, most of those companies were bankrupt, including MBf, Global Technovations and IMX Pharma. Moreover, immediately before assuming his position at ForceField, Natan served as SFBC's CFO, certifying that company's financial statements. According to the Pearson Article, "SFBC was basically a south Florida recruitment mill for finding subjects (often illegal immigrants) to act as guinea pigs in clinical trials for drugs that had not yet been approved by the FDA." While Natan was SFBC's CFO, that company claimed to have "a new state of the art facility which would drive the majority of revenues going forward." The Pearson Article continued that authorities ultimately condemned the building – a dilapidated former Holiday Inn hotel – for demolition as structurally unsound.

(b) According to the Pearson Article, SFBC "was fraud, plain and simple." Other allegations included: unethical and dangerous recruitment practices "that severely compromised the integrity of the drug trials conducted by the Company;" violations of minimum waiting requirements; deceptive payment schemes to minimize the risk that participants would report adverse events; and using purportedly independent regulatory companies that were really affiliated entities. Even though all of this occurred while Natan was CFO, he failed even to disclose his affiliation with SFBC.

(c) The Company Defendants knew or recklessly disregarded, but the Proxy failed to disclose, St. Julien's association in 2009 with convicted fraudster Jean Lafleur, who operated a fraudulent scheme in Belize. Ultimately, "[t]he Canadian federal government [sued] Lafleur for $7 million for his role in a government sponsorship scandal." According to Lafleur, he attempted to liquidate and disburse his assets through Defendant St. Julien, "who refused to explain what happened to $460,000 from the house sale that was invested in his Belize company, Parameter, which is now insolvent." Lafleur went to prison, but the money was never recovered.

(d) The Company Defendants knew or recklessly disregarded, but the Proxy failed to disclose, that Pharmanet was SFBC and that Williams, too, was embroiled in that Company's fraud.

190. On May 20, 2014, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended March 31, 2014. The Company disclosed that during the quarter it "completed the private placement of two unsecured, convertible debentures for gross proceeds of $300,000." The fixed conversion prices were "$5.00 per share, or 50,000 shares of the Company's common stock if converted within the first year of issuance or a fixed conversion price of $6.00 per share, or 41,667 shares of the Company's common stock if converted during the second or third year following issuance." The fixed conversion price on a second, $50,000 debenture was "$7.00 per share, or 7,143 shares of the Company's common stock if converted within the first year of issuance or a fixed conversion price of $9.00 per share, or 5,556 shares of the Company's common stock if converted during the second or third year following issuance." The Company also disclosed that it had paid 5,000 shares to acquire the assets of Catalyst LED's LLC. The Company issued 5,000 shares of restricted common stock valued at $5.97 per share or $29,850 in value.

191. As described, in detail, above in ¶¶51-155, the foregoing was false and misleading because the Company Defendants knew or recklessly disregarded that they failed to disclose that, at least since the start of the Class Period, they had engaged in various means of artificially inflating ForceField's stock price by: (1) authorizing and participating in undisclosed, paid promotions, (2) directly manipulating the trading volume and price of ForceField stock, (3) engaging in a kickback scheme to solicit investors in ForceField's private placements, and (4) improperly disabling the TransPacific owners' rights to sell their stock and that therefore, any stock based payments, compensation or conversion rights were materially inaccurately priced.

192. On July 23, 2014, ForceField issued a press release that it appended to a Current Report on Form 8-K, filed with the SEC on July 24, 2014, announcing the acquisition of ESCO. The Company disclosed that it would pay a combination of cash, stock and a seller's note to acquire ESCO. About the ESCO acquisition, Defendant St. Julien touted ESCO's "strong business relationships[,] diverse and growing customer base, as well as key strategic relationships with leading utilities and global engineering firms to drive further growth potential." St. Julien continued that ESCO, with its focus on the LED lighting market on the east coast of the United States, complemented ForceField's recent acquisition of ALD and that unit's "strengths on the West Coast." St. Julien asserted that ForceField would "accelerate ESCO's revenue growth trajectory and EBITDA margin potential. . . ." He concluded that "we believe ForceField will have a powerhouse LED company dealing with a variety of high profile entities both domestically and internationally."

193. As described, in detail, above in ¶¶51-155, the foregoing was false and misleading because the Company Defendants knew or were reckless in not knowing that they failed to disclose that at least since the start of the Class Period, they had engaged in various means of artificially

inflating ForceField's stock price by: (1) authorizing and participating in undisclosed, paid promotions, (2) directly manipulating the trading volume and price of ForceField stock, (3) engaging in a kickback scheme to solicit investors in ForceField's private placements, and (4) improperly disabling the TransPacific owners' rights to sell their stock.

194. On August 13, 2014 GSCR and Goldman published a Select Research report, titled "Forcefield Energy, Inc. M&A To Drive Huge Revenue Growth; Major Short Squeeze In The Cards." Noting that the price of ForceField's stock had remained steady of late, Goldman touted catalysts that should boost that share price. He discussed the ESCO acquisition and the $10 million it would add to annual revenues. "Once closed," Goldman wrote, "FNRG could record an estimated $14-16M in revenue this year compared with a few hundred thousand in 2013." He predicted $25 million in revenue in 2015. "Next year, we preliminarily forecast sales of $25M+ with greater operating efficiency through high profile projects."

195. Goldman also wrote about a report in *Buyins.net*, a company that focuses discussion on short selling. According to Goldman, investors had shorted 855,000 shares of ForceField common stock since May, 2013, an average of 28% of daily volume – much of it naked shorts. The *Buyin.net* report, according to Goldman, stated that once ForceField's stock breached $5.53 per share all those shorts could be squeezed. The ESCO acquisition, Goldman opined, could be a precipitating factor – a motivating factor for the Company Defendants to attempt to boost ForceField's stock price artificially.

196. Goldman also predicted revenues eclipsing $111 million "if the current LED and ORC projects under signed initial agreements, Letters of Intent (LOI), bids and trials are successfully financed and completed. With a series of positive events on the horizon," Goldman

concluded, it is likely that a huge run in the stock could occur as short sellers who previously did not give credence to the FNRG model, frantically cover their positions.

197. The foregoing was false and misleading for the following reasons:

(a) As described, in detail, above in ¶¶51-82, GSCR and Goldman wrote and published a positive report about ForceField without basis and without disclosing that ForceField paid GSCR and Goldman to write positively about ForceField and without disclosing the compensation ForceField paid.

(b) As described, in detail, above in ¶¶51-82, 147-155, the Company Defendants, who had editorial control of and approval over the content of the GSCR post, knew or recklessly disregarded that TransPacific and its ORC business had been dormant since 2013 for their own lack of financing projects.

(c) As described, in detail, above in ¶¶51-146, the Company Defendants knew or recklessly disregarded that ForceField had employed schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock, soliciting investors in ForceField's private placements, and arranging for paid stock promotions from the Promoter Defendants and others to inflate the price of ForceField common stock artificially.

198. On August 19, 2014, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2014. In it, the Company detailed an unregistered sale of its securities: "During the three months ended June 30, 2014, we accepted subscription agreements from investors and correspondingly sold 200,000 shares of its common stock pursuant to its current private placement offering." The Company reported proceeds of $832,500, after $92,500 in commissions. The Company also issued "warrants to purchase 200,000 shares of [its] common stock at exercise prices ranging from $4.50 to $5.00 per share for a term of one year.

199. As described, in detail, above in ¶¶51-155, the foregoing was false and misleading because the Company Defendants knew or recklessly disregarded that they failed to disclose that, at least since the start of the Class Period, they had engaged in various means of artificially inflating ForceField's stock price by: (1) authorizing and participating in undisclosed, paid promotions, (2) directly manipulating the trading volume and price of ForceField stock, (3) engaging in a kickback scheme to solicit investors in ForceField's private placements, and (4) improperly disabling the TransPacific owners' rights to sell their stock and that therefore, any stock based payments, compensation or conversion rights were materially inaccurately priced.

200. On September 12, 2014, GSCR and Goldman disseminated yet another Select Research report, titled "Forcefield Energy, Inc. New Contract News + Higher Industry Peer Valuation = Higher Stock Price," stating "the early stages of a short squeeze, new contract news, and a higher valuation for a key peer mean that FNRG is primed to jump 20-25% from current levels in the near term." Goldman touted the $1.35 million contract with Grupo Merza, stating that "[w]ith a series of major LOIs, bids and trials to its credit, investors can expect more seven figure deals ahead." Noting the 40% share price bump EFOI experienced when it announced a deal in the LED space, Goldman predicted that ForceField "is the next stock to make a big move higher with future contract wins enabling the stock to achieve and sustain a much higher valuation base."

201. As described, in detail, above in ¶¶51-146, the foregoing was false and misleading for the following reasons:

(a) GSCR and Goldman wrote and published a positive report about ForceField without basis and without disclosing that ForceField paid them to write positively about it and without disclosing the compensation the Company paid.

(b) The Company Defendants, who had editorial control of and approval over the content of this GSCR post, knew or recklessly disregarded that ForceField had employed schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock, engaging in a kickback scheme to solicit investors in ForceField's private placements, and arranging for paid stock promotions from the Promoter Defendants and others to inflate the price of ForceField common stock artificially.

202. On March 2, 2015, GSCR issued still another Select Research report, titled "ForceField Energy, Inc. Stock Breaks Through $7 Target; New $10 Target Price." Calling ForceField's business model "dynamic," its valuation "attractive," GSCR, through Goldman, described ForceField as "[a] true diversified green energy provider." The ESCO deal coupled with the Company's "no money down" financing approach for customers, Goldman stated, have already led to potential deals of over $100 million. "This clever model," Goldman continued, "typically fosters greater than industry standard top-line growth, thus justifying a future market cap that could approach $200M in the next 12-18 months."

203. As described, in detail, above in ¶¶51-146, this report was false and misleading for the following reasons:

(a) GSCR and Goldman wrote and published a positive report about ForceField without basis and without disclosing that ForceField paid them to write positively about it and without disclosing the compensation the Company paid.

204. The Company Defendants, who had editorial control of and approval over the content of this GSCR report, knew or recklessly disregarded that ForceField had employed schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock, engaging in a kickback scheme to solicit investors in ForceField's

private placements, and arranging for paid stock promotions from the Promoter Defendants and others to inflate the price of ForceField common stock artificially.

205. On January 29, 2015, SCIR issued a press release entitled "One Bright Light in Energy Sector" about ForceField. The press release brags about ForceField's "strong national footprint" and the "strong headways" the Company was making in the "multi-billion dollar LED lighting market." The press release does not disclose ForceField's payments to SCIR.

206. Investors clicking on the link in the press release are directed to SCIR's January 29, 2015 report about ForceField, disseminated by SCIR's affiliate Caprock Research. The analyst report, which states that it provides "independent investment research," contains seventeen pages extolling ForceField's virtues. Citing no source, it notes at the very top, in bullet points and bold text, that ForceField has over $100 million of bids outstanding. Caprock concludes that, while subject to volatility, significant contract wins, combined with market demand for LED lighting deployment, meant that "the potential rewards outweigh the foreseeable risks," and makes a "Buy recommendation." There is no disclosure in the analyst report that ForceField paid SCIR to promote the Company.

207. On February 17, 2015, SCIR issued a "news release" entitled "Forcefield Energy Investor Update: Shining a Light on Improved Energy Efficiency." The "news" report bragged about the bright futures of ForceField's recent acquisitions, ESCO and American Lighting. The report further boasts of ForceField's acquisition of 50.3% of TransPacific Energy, and without citing a source states that TransPacific has a distribution agreement "to provide modular ORC units to industrial customers." The news release does not disclose ForceField's payments to SCIR, but states that a full disclosure can be found by viewing the February 16, 2015 analyst report whose publication is touted in the news release.

208. Investors clicking through to reach the February 16, 2015 analyst report and expecting to find in the report a full disclosure of monies paid to SCIR by ForceField will not find such a disclosure. The February 16 analyst report about ForceField, again disseminated by SCIR's affiliate Caprock Research, which states that it provides "independent investment research," and is authored by Charles I. Reed, contains nine pages extolling ForceField's virtues. Citing no source, it notes at the very top, in bullet points and bold text, that ForceField has over $100 million of bids outstanding. Similarly, and again without source, the report notes that Caprock expected ForceField to realize an estimated $25-30 million in revenue potential in the coming three to five years from streetlight conversions. Caprock concluded that while subject to volatility, significant contract wins, combined with market demand for LED lighting deployment, meant that "the potential rewards outweigh the foreseeable risks," and reiterated its "Buy recommendation."

209. The next step in the journey to finding any kind of disclosure by SCIR about payments received for its touts of ForceField involves going to SCIR's online home page. If the reader clicks on the "About Us" menu on the home page, then clicks on the sub-menu "Disclaimers & Disclosures," and then clicks on "Rule 17(b) disclosures" on the sub-sub-menu, one still cannot find a disclosure. Instead, the reader is informed that "any and all compensation received from a company is publicly stated in all correspondence with our members." In order to become a "member" of SCIR, one has to subscribe to SCIR's newsletter in order to proceed. Any of SCIR's paid promotions about ForceField can be read without ever going to SCIR's home page, much less becoming an SCIR member or signing up for its newsletter.

210. Both Caprock reports list as a "source" goldmanresearch.com. Clicking on the link sends the reader to GSCR's website, where a simple word search for "ForceField" leads to multiple articles touting the virtues of ForceField. The Caprock Research analyst reports never state that

SCIR has been paid by ForceField, nor do they state that one of the sources of information for both reports, GSCR, has been paid by ForceField.

211. The Caprock analyst reports also both list as a "source" redchip.com. Clicking on the link sends the reader to RedChip's website, where a simple word search for "ForceField" leads to articles touting the virtues of ForceField. The Caprock Research analyst reports never state that SCIR has been paid by ForceField, nor do they state that one of the sources of information for both reports, RedChip, has been paid by ForceField.

212. As described, in detail, above in ¶¶51-146, for the following reasons, these news and press releases, and the Caprock Research analyst reports to which they refer, were false and misleading for the following reasons:

(a) SCIR wrote and published a positive "news release" and a positive press release about ForceField without basis, without disclosing that ForceField paid it to write positively about it, and without disclosing the compensation that ForceField paid to SCIR.

(b) SCIR published two positive "analyst reports" about ForceField without basis, without disclosing that ForceField paid it to write positively about it, and without disclosing the compensation that ForceField paid to SCIR.

(c) The "analyst reports" published by ForceField list as a source Goldman Small Cap Research and link to GSCR's website without disclosing that ForceField also paid GSCR to write positively about it and without disclosing the compensation that ForceField paid to GSCR.

(d) The "analyst reports" published by ForceField list as a source RedChip.com and link to RedChip's website without disclosing that ForceField also paid RedChip to write positively about it and without disclosing the compensation that ForceField paid to RedChip.

(e) The Company Defendants, who had editorial control of and approval over the content of both the SCIR press release and "news release" and both SCIR "analyst reports," knew or recklessly disregarded that ForceField had employed schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock, engaging in a kickback scheme to solicit investors in ForceField's private placements and arranging for paid stock promotions from the Promoter Defendants to inflate the price of ForceField common stock artificially.

213. On July 15, 2014, Defendant Knippa appeared on Fox Business News' "Varney & Co." show, which aired from 9 a.m. to 12 p.m. Eastern Time, as a purported market commentator. When asked for a stock pick, Knippa stated that "I like to do my homework on individual companies. I like ForceField Energy…. They're very involved in… converting to LED lighting for compan[ies]. The business model is good. I know the CEO. I've met him personally." When asked by host Varney, with respect to ForceField stock, "[y]ou own it? You own it?" Knippa responded "[y]ou bet I do. I put my money where my mouth is. I'm a fund manager." That same day, ForceField's trading volume increased fourfold from the previous day.

214. The foregoing was false and misleading for the following reasons:

(a) Knippa did not disclose that he was working for ForceField as Director of Investor Relations;

(b) Knippa falsely stated that he owned ForceField stock; he did not;

(c) Knippa did not disclose that he and Defendant St. Julien had agreed that Knippa would be paid kickbacks of 10% of the value of purchased stock for soliciting investments in ForceField's private placements, and that Knippa had already begun soliciting such investments.

(d) The Company Defendants knew or recklessly disregarded that ForceField had employed schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock and arranging for paid stock promotions from the Promoter Defendants and others to inflate the price of ForceField common stock artificially.

215. On or about August 20, 2014, Knippa appeared on the Business News Network. Knippa was identified as the owner or "Kenai Capital Management." He recommended investment in ForceField, stating "I like the company….," and touted the Company's purported business model and future growth.

216. The foregoing was false and misleading for the following reasons:

(a) Knippa did not disclose that he was working for ForceField as Director of Investor Relations;

(b) Knippa did not disclose that he and Defendant St. Julien had agreed that Knippa would be paid kickbacks of 10% of the value of purchased stock for soliciting investments in ForceField's private placements, that Knippa had already begun soliciting such investments, and that he had already been paid two such kickbacks, totaling $18,000.

(c) The Company Defendants knew or recklessly disregarded that ForceField had employed schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock and arranging for paid stock promotions from the Promoter Defendants and others to inflate the price of ForceField common stock artificially.

217. On December 23, 2014, equities.com published a video online, a purportedly objective interview with Defendant Knippa. In the ten-minute video, the questioner repeatedly praised ForceField, calling it "awesome," "amazing," and that it had "amazing momentum." The host praised ForceField's "very smart growth strategy," said "that's a lot of advantage you're

offering" and called ForceField "one of the brightest companies." Knippa boasted that Forcefield's "growth possibilities are really, really big," and that "this company is doing all the right things." He also stated that "Mexico… is a big driver of business for us."

218. Nowhere in the video, or on the online page where the video appears, is there a disclosure that equities.com was paid by ForceField to promote the Company. At the bottom of the page is a link called "Legal." A sub-menu entitled "disclaimer" leads the reader to a page entitled "Disclaimer." Nowhere does the word "disclosure" appear on the page with the video. The "disclaimer" has a section entitled "Spotlight Companies Disclosure," which cites to section 17(B) of the Securities Act of 1933 and states that Equities.com "may be compensated by the companies profiled…." At no point does the "disclaimer" state that equities.com was actually paid to produce and publish the video, or that ForceField paid equities.com to produce and publish the promotional video.

219. As described, in detail, above in ¶¶51-146, the foregoing was false and misleading for the following reasons:

(a) Equities.com recorded and published a positive video about ForceField without basis, without disclosing that ForceField paid it to record the positive video about it, and without disclosing the compensation that ForceField paid to equities.com;

(b) Knippa did not disclose that he was working for ForceField as Director of Investor Relations;

(c) The Company Defendants, who had editorial control of and approval over the video, knew or recklessly disregarded that ForceField had employed schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock and

arranging for paid stock promotions from the Promoter Defendants and others to inflate the price of ForceField common stock artificially;

(d) Defendant Knippa participated and spoke in the video without disclosing that ForceField paid equities.com to record the positive video about it and without disclosing the compensation that ForceField paid to equities.com;

(e) Knippa did not disclose that he and Defendant St. Julien had agreed that Knippa would be paid kickbacks of 10% of the value of purchased stock for soliciting investments in ForceField's private placements, that Knippa had already begun soliciting such investments, or that he had already been paid kickbacks on multiple occasions.

220. On September 11, 2014, Defendant Knippa videotaped an interview with Stock News Now Live ("SNN Live"), a paid promoter. The interview was published on September 29, 2014. During the interview, Knippa stated about ForceField doing business in Mexico: "Here's where I think some really unique opportunities lie for ForceField – Mexico." Knippa stated more specifically that ForceField would actually do business in Mexico, stating "we signed a contract there yesterday." Knippa added "Mexico, there's a law on the books in Mexico – every commercial building in Mexico has to be converted to LED lighting by 2017," so Mexico "seems like a pretty fertile hunting ground to me."

221. On December 23, 2014, equities.com published a promotional video interview with Knippa online. Knippa boasted "Mexico… is a big driver of business for us." With respect to Richard St. Julien, he stated that "Richard and I have become very good friends over the years."

222. On April 13, 2015, Knippa was quoted in a paid promotion published online. He identified himself as the owner of "Kenai Capital Management." The paid promotion fails to mention that he was the Director of Investor Relations for ForceField. This promotion further cites

to a positive report about ForceField written by GSCR, with quotes from Robert Goldman, who owns GSCR, with no mention that these two entities are paid promoters for ForceField.

223. As described, in detail, above in ¶¶51-164, the foregoing was false and misleading for the following reasons:

(a) Defendant Knippa appeared in paid promotional videos and was quoted in promotional pieces published online without disclosing that ForceField paid the publishers of the videos and online pieces to write positively about it and without disclosing the compensation the Company paid;

(b) Knippa's statement that ForceField would install LED lighting in Mexico was false. ForceField never had an RFC, a license required to do business and pay taxes in Mexico. Knippa's longtime "very good friend," Defendant St. Julien, stated that "we're never certifying [light] meters in Mexico." Defendant Natan stated that the only person who might have done business for ForceField in Mexico "was never authorized to sell in Mexico";

(c) Knippa failed to disclose that he was the Director of Investor Relations for ForceField;

(d) The Company Defendants, who had editorial control of and approval over the promotional video and online promotion, knew or recklessly disregarded that ForceField had employed schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock, engaging in a kickback scheme to solicit investors in ForceField's private placements, and arranging for paid stock promotions from the Promoter Defendants and others to inflate the price of ForceField common stock artificially;

(e) Knippa did not disclose that he and Defendant St. Julien had agreed that Knippa would be paid kickbacks of 10%-15% of the value of purchased stock for soliciting

investments in ForceField's private placements, that Knippa had already begun soliciting such investments, or that he had already been paid kickbacks on multiple occasions.

224. On September 11, 2014, the Company issued a press release, announcing a first contract in Mexico with Grupo Merza. According to the Company Defendants, ForceField agreed to provide the Mexican retailer with $1.35 million of LED lighting solutions, retrofitting 145 store locations and 18 distribution centers. ForceField also claimed that it "will receive a percentage of maintenance and energy savings based on a mutually agreed schedule over the initial 5-year period." Grupo Merza was to fund the removal and installation costs while ForceField was "responsible for the upfront cost of the LED lighting products" for which it was required to obtain financing. According to Defendant St. Julien, the Grupo Merza deal provided ForceField "a unique opportunity to expand our presence and enhance our visibility in this growing market." With the Mexican government's adoption of energy reform, St. Julien concluded, ForceField was "confident demand from diverse businesses throughout Mexico will accelerate over the coming months and years."

225. On October 10, 2014, the Company issued a press release concerning another new contract with Uruapan, a Mexican municipality. In another "shared savings agreement" worth revenue of $8.4 million, ForceField would supply and install 15,000 LED streetlights on municipal roads and highways in Uruapan, beginning by the end of 2014. Once again, as with the Grupo Merza deal, ForceField was required to obtain financing that it expected to receive through Mexican government programs. About this deal, Defendant St. Julien touted significant economic and environmental benefits to Uruapan, while simultaneously "further support[ing ForceField's] participation in other large scale programs within Mexico."

226. As described, in detail, above in ¶¶156-164, the foregoing statements about the contracts in Mexico were false and misleading because the Company Defendants knew or recklessly disregarded that the contract with Uruapan was only for $6,000,000 – not for $8.4 million, inflating the size of those contracts by 40%.

227. On October 20, 2014, the Company issued a press release, announcing that it had closed the acquisition of ESCO, affording it access to ESCO's approximately $10.0 million in revenue and $1.2 million of EBITDA. Total consideration for the deal was $7.5 million "which included $1.0 million in cash; the issuance of $2.5 million in restricted common stock; and the issuance to the selling shareholder of two secured notes. . . ." Defendant St. Julien touted the acquisition of ESCO as positioning ForceField "for fast growth in the coming months and years."

228. As described, in detail, above in ¶¶51-155, the foregoing was false and misleading because the Company Defendants knew or recklessly disregarded their failure to disclose that, at least since the start of the Class Period, they had engaged in various schemes and means of artificially inflating ForceField's stock price by: (1) authorizing and participating in undisclosed, paid promotions, (2) directly manipulating the trading volume and price of ForceField stock through multiple schemes, and (3) engaging in a kickback scheme to solicit investors in ForceField's private placements, and (4) improperly disabling the TransPacific owners' rights to sell their stock and that therefore, any stock based payments, compensation or conversion rights, including that which the Company paid to acquire ESCO were materially inaccurately priced.

229. On November 19, 2014, ForceField filed with the SEC a Quarterly Report on Form 10-Q for the period ended September 30, 2014. In it, they disclosed that during the third quarter, ForceField had "accepted subscription agreements from investors and correspondingly sold 255,500 shares of our common stock pursuant to our current private placement offering, and

received $1,189,750 net after $87,750 in commissions. The Company also issued the same number of warrants to purchase shares at $5.00 each with a one year term.

230. As described, in detail, above in ¶¶51-155, the foregoing was false and misleading because the Company Defendants knew or recklessly disregarded that they failed to disclose that, at least since the start of the Class Period, they had engaged in various means of artificially inflating ForceField's stock price by: (1) authorizing and participating in undisclosed, paid promotions, (2) directly manipulating the trading volume and price of ForceField stock, (3) engaging in a kickback scheme to solicit investors in ForceField's private placements, and (4) improperly disabling the TransPacific owners' rights to sell their stock and that therefore, any stock based payments, compensation or conversion right was materially inaccurately priced.

231. On March 6, 2015, the Company issued a press release, disclosing a settlement with the former TransPacific shareholders. The Company stated that it sold its interest back to the TransPacific shareholders for consideration valued at approximately $2,000,000. The Company further broke down that consideration to $50,000 in cash and the return to it of 255,000 ForceField shares. That is, the Company derived a value of the "consideration" it received using its then current, artificially inflated stock price of approximately $7.65 per share. The Company called this "part of [its] ongoing strategic plan to focus its resources on very significant near term opportunities in the multi-billion LED market. Defendant Natan expressed the Company's pleasure "to have received nearly $2.0 million in value for our waste heat assets which have been essentially dormant for the last one and one half years. There is no doubt in our minds that this transaction, which enables us to retire 255,000 shares outstanding and reduce our share float, is in the best interest of our shareholders."

232. As described, in detail, above in ¶¶51-155, for the following reasons the foregoing press release was false and misleading:

(a) the Company Defendants knew or recklessly disregarded that they failed to disclose that, at least since the start of the Class Period, they had engaged in various means of artificially inflating ForceField's stock price by: (1) authorizing and participating in undisclosed, paid promotions, (2) directly manipulating the trading volume and price of ForceField stock, (3) engaging in a kickback scheme to solicit investors in ForceField's private placements, and (4) improperly disabling the TransPacific owners' rights to sell their stock and that therefore, any stock based payments, compensation or conversion rights were materially inaccurately priced.

(b) Even if the share price of $7.65 was appropriate to value the returned TransPacific owners' shares, ForceField paid $520,000 in cash, plus 255,351 shares to acquire its interest in TransPacific. It therefore received nothing close to $2,000,000 in value for its interest in this "dormant" asset. Rather, $1,950,000 of that $2,000,000 was simply the return of shares that the Company could not reissue. ForceField received only $50,000, not $2,000,000.

233. Once again, on March 9, 2015, GSCR issued a Select Research report, titled "Forcefield Energy, Inc. Making All the Right Moves." Goldman wrote of ForceField's sale of its interest in TransPacific for $2 million. According to Goldman, "[t]his deal represents a $500,000 (or 33%) increase in the value of the FNRG interest in TransPac versus the amount originally paid in cash and stock – impressive for a sub-3 year holding that did not meaningfully contribute to overall financial performance." Goldman translated this as "a commitment by management to its LED initiatives and that meaningful growth and market share gains are in the cards in this segment over the next 12 months. By no longer expending resources to the TransPac unit," Goldman continued, ForceField was free to concentrate "on the line of business that will

generate the greatest growth." Finally, Goldman noted the "roughly 1.5% shares outstanding reduction, which should be reflected in a slightly higher stock price." He reiterated his $10 target.

234. As described, in detail, above in ¶¶51-146, for the following reasons the foregoing report was false and misleading for the following reasons:

(a) GSCR and Goldman wrote and published a positive report about ForceField without basis and without disclosing that ForceField paid them to write positively about it and without disclosing the compensation the Company paid.

(b) The Company Defendants, who had editorial control of and approval over the content of this GSCR post, knew or recklessly disregarded that ForceField had employed schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock, engaging in a kickback scheme to solicit investors in ForceField's private placements, and arranging for paid stock promotions from the Promoter Defendants and others to inflate the price of ForceField common stock artificially.

235. On April 8, 2015, GSCR, through Goldman, issued a report, titled "Forcefield Energy, Inc. Stock Hits New High on Strong Volume; New Alliance to Drive Revenue." Praising the stock for reaching an all-time high the day before, on heavy volume, Goldman opined that ForceField's performance "should attract savvy traders." Reiterating, yet again, his $10 target, Goldman touted new contracts for ALD, without any specifics, but calling ForceField's offerings "a perfect fit" for customers who wish to save money.

236. As described, in detail, above in ¶¶51-146, for the following reasons the foregoing report was false and misleading for the following reasons:

(a) GSCR and Goldman wrote and published a positive report about ForceField without basis and without disclosing that ForceField paid them to write positively about it and without disclosing the compensation the Company paid.

(b) The Company Defendants, who had editorial control of and approval over the content of this GSCR post, knew or recklessly disregarded that ForceField had employed schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock, engaging in a kickback scheme to solicit investors in ForceField's private placements, and arranging for paid stock promotions from the Promoter Defendants and others to inflate the price of ForceField common stock artificially.

237. Also on April 8, 2015, Ultimate issued a report through Accesswire on the upside opportunities that certain small cap companies have in "extremely volatile equity markets." Ignored by analysts, journalists and investors, Ultimate purported to present the "incredible upside opportunities" these overlooked companies presented to investors. It focused on three, including ForceField. After summarizing the LED lighting sector and its potential, Ultimate stated, ForceField "is making a major push to expand its operations and recently announced the beefing up of its partner agreement with Constellation, one of the nation's top competitive energy providers." It then prompted investors to visit its website for more on ForceField. As of the filing of this Complaint, a search of www.ultimatestockalerts.com leads to no reports or stories about ForceField.

238. As described, in detail, above in ¶¶51-146, for the following reasons the foregoing report was false and misleading for the following reasons:

(a) Ultimate wrote and published a positive report about ForceField without basis and without disclosing that ForceField paid it to write positively about it and without disclosing the compensation the Company paid.

(b) The Company Defendants, who had editorial control of and approval over the content of this Ultimate report, knew or recklessly disregarded that ForceField had employed schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock, engaging in a kickback scheme to solicit investors in ForceField's private placements, and arranging for paid stock promotions from the Promoter Defendants and others to inflate the price of ForceField common stock artificially.

239. The Pearson Article described another paid promotional campaign for ForceField involving promotional emails, targeting retail investors. According to Pearson, during the week of April 13, 2015, ForceField or an affiliate paid *pennystockprofit.com* $15,000 to transmit promotional emails touting ForceField stock and citing GSCR as their source. The *pennystockprofit.com* email stated that ForceField "could turn out to be the biggest energy stories of 2015." It continued that "FNRG is making major progress in the LED lighting market and appears well-positioned to see growth in an already booming renewable energy sector." With $100 million in potential projects, *pennystockprofit.com* concluded, ForceField was "primed to continue trending upward."

240. As described, in detail, above in ¶¶51-146, for the following reasons the foregoing report was false and misleading for the following reasons:

(a) *Pennystockprofit.com* wrote and transmitted by email a positive report about ForceField without basis and without disclosing that ForceField paid it to write and transmit this email.

(b) The Company Defendants, who had editorial control of and approval over the content of the *pennystockprofit.com* email, knew or recklessly disregarded that ForceField engaged in schemes with the purpose and effect of directly manipulating the trading volume and price of ForceField common stock, engaging in a kickback scheme to solicit investors in ForceField's private placements, and arranging for paid stock promotions from the Promoter Defendants and others to inflate the price of ForceField common stock artificially.

***The Truth Emerges***

241. On April 15, 2015, *SeekingAlpha.com* published the Pearson Article. This adverse information caused the price of ForceField stock to tumble $2.97 per share, or approximately 39%, over the next two days to close at $4.74 per share on April 16, 2015 on relatively enormous volume of 2,141,600 shares traded.

242. On April 17, 2015, the Company issued a false and misleading press release in response to the Pearson Article. According to the Company it had sought "a regulatory agency review [of] the trading activity in its common stock subsequent to the issuance of" the Pearson Article. The Company also sought a review of "any relationships, arrangements and commonalities between short sellers and others." The Company Defendants asserted that the *SeekingAlpha.com* post "contains material inaccuracies about its management, business and prospects." The press release quoted Defendant St. Julien as stating, "[w]e are not going to stand by and allow our Company, officers and directors, employees and shareholders to continue to suffer through what appears to be an orchestrated short selling attack based on misinformation." St. Julien continued that the Company Defendants "intend to defend ourselves and pursue all possible remedies against the allegations asserted in the opinion." The Company concluded that

it intended to "provide our shareholders and investment community a business update in a release pre-market on Monday, April 20, 2015."

243. Also on April 17, 2015, the FBI arrested St. Julien while he attempted to board a plane in South Florida, bound for Costa Rica. This adverse information caused the price of ForceField stock to fall $0.77 per share, or another 16%, to close at $3.97, on relatively enormous daily volume of 1,110,800 shares traded.

244. On April 20, 2015, the Company filed with the SEC a Current Report on Form 8-K. It did not provide a "business update" about ForceField, as promised. Rather, it stated, that on April 19, 2015 Defendant St. Julien "voluntarily resigned as the Company's Executive Chairman of the Board, and from all other positions he held with the Registrant." The Board appointed Defendant Natan to the Chairman's post that St. Julien vacated. The Company also acknowledged St. Julien's arrest but claimed not to know the basis and that "neither Registrant nor any of its other officers or directors believes that any of such persons have conducted any illegal activity." The Company concluded that it intended to continue operating "in accordance with its normal and historic procedures."

245. This adverse information caused the price of ForceField stock to tumble, yet again, by $0.86, or nearly 22%, to close at $3.11 per share on April 20, 2015 on relatively large daily volume of 674,000 shares traded.

246. On April 21, 2015, the Company filed with the SEC another Current Report on Form 8-K, acknowledging that St. Julien had been arrested on allegations of securities fraud and conspiracy to commit securities fraud. In additions, "[a]t approximately 10:21 A.M. (EST) on April 20, 2015, the NASDAQ Capital Market ("NASDAQ") halted trading in Registrant's common stock. The Registrant is responding to and cooperating with inquiries from NASDAQ."

That same day, pursuant to Section 12(k) of the Exchange Act, the SEC suspended trading in ForceField common stock through May 4, 2015 at 11:59 p.m. ForceField stock has not traded on the NASDAQ since.

247. On April 22, 2015, the Company filed with the SEC a Current Report on Form 8-K, stating that "[o]n April 21, 2015, the Registrant received from the staff of the Securities and Exchange Commission, a subpoena for the production of certain documents and information pursuant to a Formal Order of Investigation."

248. On May 1, 2015, the Company issued a press release, disclosing that it had informed NASDAQ of its "determination to voluntarily terminate the listing of its shares of common stock from the NASDAQ Capital Market." The Company further disclosed its intention to "file the required Form 25 with the SEC to effectuate its voluntary termination of the listing of its common stock on NASDAQ no earlier than May 11, 2015." Last, the Company disclosed that it was delinquent on a $1,000,000 note to the sellers of ALD and was "currently evaluating its options and financing arrangements. ALD is currently operating its business in the normal course."

249. On July 7, 2015, the Company filed a Current Report on Form 8-K, disclosing a July 2, 2015 agreement between it and the former owners of ESCO to sell back ForceField's interest in ESCO. In exchange for $900,000 in cash, the return of over 450,000 shares of ForceField common stock, the cancellation of two promissory notes and other consideration, ESCO separated from ForceField.

250. ForceField common stock is now all but worthless.

## I. CLASS ACTION ALLEGATIONS

251. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ForceField securities traded on NASDAQ or otherwise tied to NASDAQ traded securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

252. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Throughout the Class Period, ForceField securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ForceField or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

253. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

254. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

255. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ForceField;
- whether the Individual Defendants caused ForceField to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of ForceField securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

256. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

257. Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine. At all relevant times, the market for ForceField common stock was efficient for the following reasons, among others:

(a) For most of the Class Period, ForceField's shares of common stock traded on the NASDAQ;

(b) As a regulated issuer, ForceField filed periodic public reports with the SEC;

(c) ForceField regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

(d) During the Class Period, the average weekly trading volume in ForceField's shares was 123,731 shares. With a public float of 8.67 million shares outstanding, 1.4% of the float traded weekly, establishing a strong presumption that the market for its stock was efficient;

(e) New Company specific information was rapidly reflected in the Company's stock price; and

(f) During the Class Period, as many as forty six (46) market makers made a market in the Company's stock.

258. As a result of the foregoing, the market for ForceField's common stock promptly digested current information regarding ForceField from all publicly available sources and reflected such information in ForceField's stock price. Under these circumstances, all purchasers of ForceField's common stock during the Class Period suffered similar injury through their purchase of ForceField's common stock at artificially inflated prices, and a presumption of reliance applies.

Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

259. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**FIRST CLAIM**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5(b) Promulgated Thereunder against**
**the Company Defendants**

260. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

261. During the Class Period, each of the Company Defendants participated in the preparation and/or dissemination of or approved some or all of the false statements, as specified above, that they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

262. These Defendants made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, they engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of ForceField as specified herein.

263. These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly.

264. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ForceField's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of ForceField's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclose in public statements by these Defendants during the Class Period, Plaintiffs and the other members of the Class acquired ForceField common stock during the Class Period at artificially high prices and were or will be damaged thereby.

265. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding ForceField's financial results, which were not disclosed by these Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their ForceField common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

266. By virtue of the foregoing, these Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

267. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

268. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**SECOND CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5(a) and (c) Promulgated Thereunder against the Company Defendants, the Promoter Defendants and the Broker Defendants**

269. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

270. During the Class Period, Defendants violated Rules 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of ForceField publicly traded common stock during the Class Period as alleged herein. Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase ForceField's common stock at artificially inflated prices. In furtherance of these unlawful schemes, plans and courses of conduct, Defendants, and each of them, took the actions set forth herein.

271. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock to maintain artificially

high market prices for ForceField's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

272. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct, including controlling the trading volume and price of ForceField's common stock through clandestine trades, causing the publication of undisclosed, paid promotions and suppressing the float. Defendants employed these devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ForceField value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make the statements made about ForceField and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of ForceField common stock during the Class Period.

273. Defendants had actual knowledge of the devices, schemes, and artifices to defraud or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of supporting the artificially inflated price of ForceField's securities.

274. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ForceField publicly traded securities. Plaintiffs and the Class would not have purchased ForceField publicly traded securities at the

prices they paid, or at all, had they been aware that the market prices for ForceField's common stock had been artificially inflated by Defendants' devices, schemes, and artifices to defraud.

## THIRD CLAIM
## Violation of Section 20(a) of The Exchange Act
## Against the Individual Defendants

275. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

276. The Individual Defendants are control persons of ForceField and the Promoter Defendants.

277. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, these defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violators, including the content and dissemination of the various statements that plaintiff contends are false and misleading. In particular, each defendant had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

278. In particular, defendants named in this count had direct and supervisory involvement in the day-to-day operations of ForceField and/or the Promoter Defendants and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein. Those defendants exercised that power.

279. As set forth above, ForceField and/or the Promoter Defendants each violated Section 10(a), 10(b) or 10(c), and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

280. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

281. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

**FOURTH CLAIM**
**Violation of Section 20(a) of The Exchange Act Against ForceField**

282. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

283. Defendant ForceField is a control person of the Promoter Defendants and the Broker Defendants.

284. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, these defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violators, including the content and dissemination of the various statements that plaintiff contends are false and misleading. In particular, each defendant had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

285. In particular, defendants named in this count had direct and supervisory involvement in the day-to-day operations of the Promoter Defendants and/or the Broker Defendants and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein. Those defendants exercised that power.

286. As set forth above, The Promoter Defendants and the Broker Defendants violated Section 10(a), 10(b) or 10(c), and Rule 10b-5 by its acts and omissions as alleged in this Complaint.

287. By virtue of its position as a controlling person, ForceField is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

288. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## FIFTH CLAIM
## Violation of Section 20(a) of The Exchange Act
## Against the Brokerage Defendants

289. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

290. The Brokerage Defendants are control persons of the Broker Defendants.

291. The Financial Industry Regulatory Authority ("FINRA"),[18] requires that "[e]ach member [brokerage firm] shall establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules. Final responsibility for proper supervision shall rest with the member [brokerage firm]. *See* FINRA Rule 310.[19] Specifically, each brokerage firm is required to "establish and maintain a system to supervise the activities of each [broker]… to achieve compliance with applicable securities laws and regulations." Brokerages must have

---

[18] All of the Brokerage Defendants are members of FINRA.
[19] finra.complinet.com/en/display/display_viewall.html?rbid=2403&element_id=7290&record_id=10216&filtered_tag=.

qualified compliance personnel, written compliance and enforcement procedures, and must have procedures for the review of written incoming and outgoing written correspondence. *Id.*

292. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, these defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violators, including the content and dissemination of the various statements that plaintiff contends are false and misleading. In particular, each defendant had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

293. In particular, defendants named in this count had direct and supervisory involvement in the day-to-day operations of the Broker Defendants and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein. Those defendants exercised that power.

294. As set forth above, the Broker Defendants violated Section 10(a), 10(b) or 10(c), and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

295. By virtue of their positions as controlling persons, the Brokerage Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

296. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 23, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Phillip Kim
Phillip Kim (PK 9384)
Laurence M. Rosen (LR 5733)
275 Madison Avenue, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com

and

Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046

Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
ghaklay@rosenlegal.com

***Lead Counsel for Lead Plaintiff Named Plaintiffs and the Putative Class***

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2016, I electronically filed the foregoing ***Consolidated Third Amended Complaint for Violation of the Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
E-M: jgoldberg@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Class***