UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X

In re ForceField Energy Inc. Securities Litigation

**MEMORANDUM AND ORDER**

15 Civ. 3020 (NRB)

---------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

This putative securities class action is brought by shareholders of ForceField Energy Inc. ("ForceField") alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Various defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the moving defendants' motions are granted in part and denied in part.

I.  <u>BACKGROUND</u>

The following facts are drawn from the third amended complaint filed on May 23, 2016 (ECF No. 113) (the "TAC"). The facts are also drawn from documents incorporated into the TAC by reference, which may be considered on a motion to dismiss. <u>See</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152-53 (2d Cir. 2002). We also take judicial notice of ForceField's public SEC filings, not for the truth of their contents, but for the fact that the contents were disclosed. <u>See</u> <u>Garber v. Legg Mason, Inc.</u>, 347 F. App'x 665, 669 (2d Cir. 2009).

A.    **Parties**

1.   ForceField

ForceField is a Nevada corporation with its principal office in either New York or Florida.  Prior to February 28, 2013, the company was named SunSi Energies Inc. ("SunSi").

During the period relevant to this motion, ForceField had only three executives: defendants David Natan, Jason Williams, and Richard St. Julien.  Natan is ForceField's CEO and a director on the company's Board of Directors; previously, he was the company's CFO.  As of 2014, he owned over one million shares or approximately 6% of ForceField's outstanding common stock.  Williams is ForceField's current CFO.  St. Julien was ForceField's largest shareholder, owning over 6 million shares or approximately 18% of the company's outstanding common stock as of 2014.  He was also ForceField's Vice President and Secretary and chaired ForceField's five-person Board of Directors until he was arrested in April 2015.[1]

Defendant Herschel C. "Tres" Knippa III was ForceField's Director of Investor Relations from approximately June 2014. Knippa also owns Kenai Capital Management.

---

[1] Facts regarding the ForceField executives are also taken from the SEC Complaint appended to the TAC and ForceField's proxy statement filed with the SEC on April 30, 2014.

2.   <u>DreamTeam Group and MissionIR</u>

Defendants Mission Investor Relations ("MissionIR") and DreamTeamGroup (collectively, "DTG") are securities advertisers and investor relations firms.  They are affiliated with one another.

3.   <u>Broker and Brokerage Defendants</u>

Defendants Richard L. Brown, Gerald Cocuzzo, Naveed A. Khan, Maroof Miyana, and Pranav V. Patel (collectively, the "Broker Defendants") are current or former registered brokers.

Defendants Chelsea Morgan Securities, Inc., dba Chelsea Financial Services ("Chelsea"), Newbridge Securities Corporation ("Newbridge"), Meyers Associates, L.P. ("Meyers"), Legend Securities, Inc. ("Legend"), Dawson James Securities, Inc. ("Dawson") (collectively, the "Brokerage Defendants") are brokerage firms and employed the respective Broker Defendants.

4.   <u>Plaintiffs</u>

Plaintiffs Beverly Brewer, Nipul Patel, and Edward Huang are ForceField shareholders who purchased ForceField stock during the proposed class period, defined as August 20, 2013, to April 20, 2015.

**B.  General Background**

The company at the center of this securities litigation, ForceField Energies, Inc., is a small manufacturer, distributor, and licensee of alternative energy products and technology.  Prior

3

to 2012, ForceField had a limited presence in the United States. Its operations were focused almost entirely in China, where it owned interests in the production and distribution of trichlorosilane, a chemical used in producing solar panels. Its U.S. based-operations consisted primarily of a holding company funded by loans and private stock placements.

Beginning in 2012, ForceField began to develop its U.S.-based operations through several acquisitions. In May 2012, it acquired a controlling interest in TransPacific Energy ("TPE"), a renewable energy company located in California and Nevada. In mid-2014, it purchased American Lighting & Distribution, a California commercial lighting specialist, and ESCO Energy Services Company, a company specializing in energy efficiency upgrades and lighting retrofit projects. In 2014 ForceField also ventured into the Mexican market, entering into contracts to supply or install LED lighting to a Mexican retailer and the city of Uruapan, Mexico.

ForceField's stock was listed on NASDAQ in 2013. By April 2015, the company's market capitalization reached over $130 million. Its stock then plunged to virtually nothing in April and May 2015 following two incidents. First, on April 15, 2015, an article was published on the investor website SeekingAlpha.com, asserting that ForceField paid writers to tout ForceField stock without disclosing that ForceField was ultimately paying for the articles. The article also claimed that ForceField's executive

had been connected to past fraudulent activities.  Two days later, St. Julien, the chair of ForceField's board of directors, was arrested by the FBI as he was about to board a flight from Florida to Costa Rica.  St. Julien's arrest was based on the belief that he violated federal securities law by seeking to artificially inflate ForceField's stock price.  Shortly following the arrest, ForceField's stock was suspended from trading and delisted from NASDAQ.

In May 2016, the SEC brought a civil complaint against St. Julien, Knippa, the Broker Defendants, and others, alleging that St. Julien orchestrated a scheme to defraud ForceField investors by paying kickbacks to the Broker Defendants and others to induce investors to buy ForceField stock (the "SEC Complaint" or "SEC Compl.").  In May 2016, the DOJ obtained an indictment against Knippa, the Brokerage Defendants, and several other individuals who were involved in the fraudulent schemes (the "DOJ Indictment").  The DOJ Indictment, in which St. Julien was identified as an unnamed "Co-Conspirator" rather than a defendant, alleged that defendants engaged in a scheme to defraud ForceField investors in connection with the kickbacks.

As of this opinion, it appears that St. Julien is still in jail, although the Court has been unable to determine the status of his prosecution.  ForceField's stock has not been publicly traded since it was delisted following St. Julien's arrest and it

is no longer filing annual or quarterly reports with the SEC.  It has also been in "default" with the Nevada Secretary of State for failing to renew its Nevada state business license and file a list of officers.

### C.   Alleged Fraudulent Schemes

Plaintiffs allege that ForceField and other defendants engaged in four primary schemes to defraud ForceField investors by artificially inflating ForceField's stock price.  Specifically, defendants (1) purchased ForceField stock in order to manipulate its price and trading volume; (2) authorized undisclosed, paid promotions touting ForceField's stock; (3) paid kickbacks to brokers and others to solicit investors in ForceField's private placements; and (4) improperly prevented TPE shareholders from selling ForceField stock.

### 1.   Purchasing ForceField Stock to Manipulate Its Price and Trading Volume

Drawing primarily from the FBI affidavit and complaint submitted in connection with St. Julien's arrest, plaintiffs allege that St. Julien "and others" sought to artificially inflate ForceField's stock between August 2012 and September 2014 by making undisclosed purchases of ForceField stock with ForceField funds. Specifically, plaintiffs allege that St. Julien used offshore accounts to funnel money to a dermatologist in Boulder, Colorado

("CC-1"), who purchased and sold ForceField stock under St. Julien's direction.

For example, in late August 2012, $20,000 was transferred from an account owned by ForceField's predecessor, SunSi, to an offshore account controlled by St. Julien. The funds were then transferred to CC-1's brokerage account, from which CC-1 bought SunSi stock. Between March 3, 2014, and March 19, 2014, CC-1 again bought and sold ForceField stock, during which period the stock price rose nearly 25%. In June 2014, CC-1 again traded ForceField stock after receiving $75,000 from St. Julien, at least $25,000 of which ultimately came from a ForceField account. On some days, CC-1's trades accounted for nearly 25% of ForceField's daily trading volume.

### 2.   Undisclosed Paid Promotions

Plaintiffs next allege that ForceField paid writers to promote its stock without disclosing that the promotions were ultimately paid for by ForceField. Plaintiffs' allegations regarding the scheme are drawn primarily from three sources.

First, an article was posted on Fortune.com on March 20, 2014, claiming that DTG repeatedly paid for articles touting ForceField and other companies, without disclosing that they were paid promotions. The Fortune article describes a promotion written by John Mylant that was apparently paid for by DTG or its affiliate,

MissionIR, while ForceField was DTG's client.  The Mylant article
did not disclose that it was a paid promotion.

Second, the TAC relies on an article published on April 15,
2015, by Richard Pearson on the investor website SeekingAlpha.com
(the "Pearson Article").  In the article, Pearson claims that DTG
was paid by ForceField "to write undisclosed paid articles, which
were edited and approved by management teams of their clients,"
and "were designed to prop up the share price and volume so that
companies could issue stock to raise money."  TAC ¶ 59.  Pearson
claims to have posed as a stock promoter and contacted DTG in order
to undercover the fraud.  He describes how DTG, through its
affiliate MissionIR, recruited writers with no relevant
credentials or expertise to pose as industry experts and post
analysis of ForceField in various publications, including
Forbes.com, TheStreet.com, SeekingAlpha.com, and the Wall Street
Cheat Sheet.  The article identifies the two "main" DTG writers as
Mylant and Thomas Meyer, TAC ¶ 61, the latter of whom asked Pearson
to draft an article touting ForceField.  It further claims "that
the standard process for these writers was to submit their drafts
to management at the target company for review before publication.
In other words, management of these companies knew and encouraged
the illegal stock promotion as a way of getting their share prices
up."  TAC ¶ 62.  Pearson concludes that "[t]he scam worked

exceptionally well." TAC ¶ 59. SeekingAlpha.com eventually removed Mylant's and Meyer's articles from the website.

Pearson identifies other paid promotions. For example, Pearson claims that Goldman Small Cap Research ("GSCR") published a newsletter touting ForceField while ForceField was a client. Pearson also identifies articles touting ForceField that were published by Ultimate Stock Alerts ("Ultimate") or posted on the website hotstocked.com. The Pearson Article does not specifically state that these articles were paid for by ForceField.[2]

Third, plaintiffs rely on allegations made by an unidentified source referred to in the TAC as the "Promoter." According to the Promoter, he was hired by DTG's CEO, Michael McCarthy, to write articles promoting ForceField and other companies. In each case, his drafts were sent to McCarthy, who forwarded the articles to the company at issue for approval and editing. The Promoter sometimes participated in phone calls to discuss the articles and edits with McCarthy and someone from the company at issue. The Promoter could also identify the person responsible for the edits from the metadata in the Microsoft Word drafts that were returned to him.

---

[2] GSCR and its founder, Robert Goldman, were named as defendants in the first amended complaint. See ECF No. 40. However, they were dropped as defendants in the TAC, apparently as a result of reaching a settlement with plaintiffs. See ECF No. 107. Ultimate was also named as a defendant in the first amended complaint and dropped in the TAC.

The Promoter claims to have written at least five articles touting ForceField for DTG.  All articles that the Promoter wrote about ForceField came back to him with edits and some came back with entirely new sections.  On several occasions, the Promoter called McCarthy to ask about an article's status only to be told that the article was "on hold" because ForceField had not yet approved or finished editing it.  TAC ¶ 66.  Even though the Promoter did not always agree with the edits made to the ForceField articles, he "didn't think [he] could necessarily say no" to the edits, and therefore "by and large" published what he was given. TAC ¶ 69.  According to the "best of [the Promoter's] knowledge, David Natan was the person responsible for making edits to any articles."  TAC ¶ 71.  The Promoter also claims to have discussed whether to disclose that ForceField was paying for the articles with McCarthy, who told him not to do so since ForceField was only paying DTG directly, not the Promoter.

### 3.   Kickbacks

The third alleged scheme is that ForceField and St. Julien paid kickbacks to various promoters and brokers who, in return, recommended ForceField stock to investors.  Relying on allegations drawn from the SEC Complaint and the DOJ Indictment, plaintiffs claim that St. Julien engaged in four kickback schemes.

Starting in October 2014, St. Julien engaged Jared Mitchell, an "investor relations" professional, to act as a middleman to pay

kickbacks to the Broker Defendants.  The kickbacks, which Mitchell and the brokers split, were based on the amount of ForceField stock the brokers convinced investors to purchase.  The Broker Defendants induced investors to buy more than $3 million of ForceField stock and received over $100,000 in kickbacks.  At least some kickback funds ultimately came from ForceField bank accounts and were routed through accounts controlled by St. Julien.

Between June 2012 and January 2014, St. Julien paid kickbacks to the president and other employees of non-party Wall Street Buy Sell Hold, Inc., a subscription investment newsletter.  The newsletter's employees touted ForceField to prospective investors in return for kickbacks equal to 10% of the amount of ForceField stock that they induced investors to buy.  The newsletter's employees solicited more than $600,000 in open market purchases of ForceField stock.  Besides St. Julien (who is identified as "Co-Conspirator 1"), the DOJ's indictment refers to a "Co-Conspirator 2."  Co-Conspirator 2 is identified as a ForceField executive who was emailed the account number and routing information for the newsletter's bank account through which the kickbacks were funneled.  According to the superseding DOJ indictment, at least $128,000 of the funds came from ForceField accounts.  <u>See</u> Superseding Indictment, <u>United States v. Castaldo et al.</u>, 16-cr-234 (Dkt. No. 116) at ¶ 12.

Between December 2009 and December 2013, non-party Louis Petrossi received kickbacks equal to 10% of the amount of ForceField stock that he induced investors to purchase. Petrossi solicited more than $4.5 million in stock purchases and received approximately $438,000 in kickbacks. According to the TAC and the SEC Complaint, Petrossi conferred with ForceField officers other than St. Julien about his investment pitches.

Finally, between July 2014 and March 2015, defendant Knippa received kickbacks equal to 10% to 15% of the amount of investments he solicited in ForceField stock. Knippa solicited more than $1.19 in purchases of ForceField private placements and received approximately $120,000 in kickbacks. Defendant Knippa was hired as ForceField's Director of Investment Relations in June 2014, but received no salary for that position apart from the kickbacks.

    4.   <u>TPE Deal</u>

Plaintiffs also allege that ForceField's conduct with respect to TPE amounted to a fraudulent scheme.[3]

---

[3] Plaintiffs have failed to clearly identify the conduct covered by the TPE scheme. In various places the TAC identifies a fourth scheme in which ForceField "improperly disabl[ed] the TransPacific owners' rights to sell their stock." <u>See</u> TAC ¶¶ 7, 185, 191, 193, 199, 228, 230, 232. Elsewhere, the TAC refers to this conduct, not as a scheme, but rather as illustrating "another way in which the Company avoided both the dilution of the float and a conspicuous insider sale at a critical time." TAC ¶ 7; <u>see also</u> Opp. at 37 (stating that the TPE allegations are included "to show how the [ForceField] Defendants' conduct toward TPE furthered ForceField's own fraudulent conduct toward investors"). Plaintiffs' counsel failed to provide clarity at oral argument, suggesting that the TPE allegations should be considered as a type of "misrepresentation" liability. <u>See</u> Transcript of Oral Argument, Mar. 2, 2017 ("Tr.") at 16:15-20:6; <u>id.</u> at 20:7-12 ("TPE is a misrepresentation that enables the company to show the market a material movement forward operationally which never happened. It was illusory. And to the extent that the share purchase

As described above, ForceField, while it was still SunSi, entered into an agreement with TPE's shareholders in May 2012 to purchase a controlling interest of TPE's common stock in exchange for cash and 255,351 in newly issued shares valued at approximately $965,226.  The newly issued shares were issued in SunSi's name and were unregistered but otherwise unrestricted.

According to plaintiffs, two TPE shareholders asked ForceField to reissue the shares in ForceField's name so that the TPE shareholders could sell them.  On both occasions, ForceField refused on the grounds that it had been "fraudulently induced" to enter into the agreement with the TPE shareholders in the first place and therefore the shareholder agreement was invalid.

TPE shareholders subsequently sued ForceField in September 2014, claiming that ForceField impermissibly prevented them from selling their SunSi/ForceField shares.  The lawsuit settled around March 2015, with the TPE shareholders paying ForceField $50,000 in cash and returning the 255,351 SunSi/ForceField shares in exchange for ForceField returning its interest in TPE.

---

and the refusal to allow them to obtain and alienate those shares is complimentary [*sic*] to that claim, that's why it's there.").  Given this lack of clarity, we treat the allegations that ForceField improperly prevented TPE shareholders from selling their ForceField stock under the rubric of scheme liability and the remaining TPE-related allegations under a misrepresentation or omission theory.

D.    **Alleged Misrepresentations**

Plaintiffs allege that ForceField made numerous misrepresentations or omissions, both in connection with the above schemes and in relation to other matters.  The TAC contains 32 pages of allegations purportedly identifying ForceField's false or misleading statements.  The allegations are often repetitive, and it is unclear whether many are being offered as actionable misrepresentations in their own right or as further evidence of the schemes described above.  Nevertheless, the alleged misrepresentations can be summarized as follows.

First, the TAC identifies various ForceField press releases, SEC filings, and articles touting ForceField that are allegedly misleading because they failed to disclose the fraudulent schemes described above.

Second, the TAC alleges that ForceField's proxy statement filed with the SEC on April 30, 2014, was misleading because it described the ForceField's executives' prior business experience without disclosing that Natan, Williams, and St. Julien had all previously been connected to fraudulent conduct.

Third, the TAC identifies various allegedly false or misleading statements in ForceField press releases and SEC filings relating to TPE.  The TAC claims that the press releases and SEC filings (1) failed to disclose that TPE's business operations were effectively "dormant" due to ForceField's failure to fund TPE's

operations, (2) improperly reported goodwill associated with the TPE acquisition on ForceField's balance sheets longer than appropriate, resulting in false financial statements and SOX certifications, (3) falsely stated that ForceField had acquired a "controlling interest" in TPE, and (4) overstated the consideration ForceField received in its settlement with the TPE shareholders.

Fourth, the TAC claims that ForceField made false or misleading statements regarding its business opportunities in Mexico, namely, that ForceField (1) overstated the value of contracts signed with the city of Uruapan, Mexico, and (2) misled investors about other business opportunities in Mexico.

Fifth, the TAC seeks to hold ForceField liable for various statements made by defendant Knippa while touting ForceField. Among other things, Knippa falsely stated that he owned ForceField stock, failed to disclose that he was working for ForceField as Director of Investor Relations, and failed to disclose that he was receiving kickbacks from ForceField.

Sixth, the TAC identifies miscellaneous generalized statements or statements regarding ForceField's future performance that are allegedly false.

### E.   Procedural Background

In April 2015, three different class actions were filed in this Court.   They were consolidated into the present action on

July 22, 2015.  See ECF No. 37.  Plaintiffs subsequently amended their complaint in August and October 2015.  See ECF Nos. 40, 64.

Plaintiff filed the operative TAC on May 23, 2016.  See ECF No. 113.  The TAC asserts five counts.  Count I seeks to hold ForceField, Natan, Williams, St. Julien, and Knippa liable for making false or misleading statements in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder. Count II seeks to hold ForceField, Natan, Williams, St. Julien, Knippa, DTG, MissionIR, and the Broker Defendants liable for scheming to defraud ForceField investors in violation of Section 10(b) and Rules 10b-5(a) and (c).  Count III through V seek to hold various defendants liable as control persons under Section 20(a) of the Exchange Act.  Specifically, Count III claims that Natan, Williams, St. Julien, and Knippa are control persons of ForceField, DTG, MissionIR, and Knippa.  Count IV claims that ForceField is a control person of DTG, MissionIR, Knippa, and the Broker Defendants.  Count V claims that the Brokerage Defendants (Chelsea, Newbridge, Meyers, Legend, and Dawson James) are control persons of the individual Broker Defendants (Cocuzzo, Khan, Miyana, Patel, and Brown).

Before this Court now are six motions to dismiss brought by (1) ForceField, Natan, and Williams, see ECF No. 144, and (2) each of the five Brokerage Defendants, see ECF Nos. 187, 189, 198, 203, and 208.  Defendants DTG and MissionIR also moved to dismiss, see

ECF No. 143, but we were informed prior to oral argument that plaintiff and DTG had reached a settlement and were in the process of executing it, see ECF No. 219.  Accordingly, we will consider DTG's motion to dismiss as withdrawn.  Defendants St. Julien, Knippa, Cocuzzo, Khan, Miyana, Patel, and Brown either have not been served or have not appeared in the action.

Oral argument on the motions to dismiss was heard on March 2, 2017.

## II.   PLEADING STANDARDS

In ruling on a Rule 12(b)(6) motion to dismiss, we must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor.  Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009).  To survive a 12(b)(6) motion, plaintiffs' well-pleaded factual allegations must assert a "plausible" claim, not merely a "conceivable" one.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 570 (2007).

Claims brought under Section 10(b) of the Exchange Act and Rule 10b-5 are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b).  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  To satisfy Rule 9(b), a complaint alleging securities fraud must state "the circumstances constituting fraud" with "particularity."  Fed. R. Civ. P. 9(b); see also ATSI, 493 F.3d at

17

99.   Accordingly, a complaint "based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Id. (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)).  Conclusory and factually-unsupported allegations are insufficient.  Id.

The PSLRA imposes further pleading requirements.  First, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," i.e., scienter.  15 U.S.C. § 78u-4(b)(2).  This may be done by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  ATSI, 493 F.3d at 99.  An inference of scienter is sufficiently "strong" if, taking "into account plausible opposing inferences," "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323-24 (2007).

If a claim is based on a false statement or omission, the PSLRA also requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons

why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99.

III. **SCHEMES TO DEFRAUD**

   A. **Standard**

   To state a claim under Rule 10b-5(a) or (c), the plaintiff must allege that the defendant "(1) committed a deceptive or manipulative act, (2) with *scienter*, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries." In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 491-92 (S.D.N.Y. 2005).[4]

   B. **Plaintiff's Improper Scheme Pleading**

   As an initial matter, we note that plaintiffs have improperly pleaded scheme liability as a single claim. The TAC asserts Count

---

[4] Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 in turn provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

II as a single scheme brought against all defendants except for the Brokerage Defendants.  Plaintiffs confirmed this was the intent at oral argument, likening the scheme to a hub-and-spoke conspiracy with ForceField and its executives at the hub.  However, there is no conspiracy liability in a private right of action brought under Section 10(b) or Rule 10b-5.  See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837, 843 (2d Cir. 1998) ("[W]here the requirements for primary liability are not independently met, they may not be satisfied based solely on one's participation in a conspiracy in which other parties have committed a primary violation.").  Thus, plaintiffs' hub-and-spoke analogy fails, as defendants in one spoke cannot be liable for the deceptive conduct of defendants in another spoke.  As a result, we treat Count II as alleging four separate schemes as described below.

### C.   Purchasing ForceField Stock to Manipulate Its Price and Trading Volume

Plaintiffs claim that ForceField, Natan, Williams, and St. Julien schemed to defraud ForceField investors by channeling money to CC-1 to purchase ForceField stock and that at least part of the money came from ForceField.

ForceField does not dispute that these allegations state a claim against St. Julien under Rules 10b-5(a) and (c).  Instead, ForceField argues that it, Natan, and Williams cannot be held

directly liable because St. Julien acted alone and without their knowledge.  We disagree.

The only particularized allegation that ForceField, Natan, and Williams were directly involved in St. Julien's scheme is that money was wired from ForceField's bank account into bank accounts controlled by St. Julien on two occasions.  Specifically, on or about August 20, 2012, "SunSi transferred approximately $20,000 from its HSBC bank account – on which Defendant St. Julien was a signatory – to the Adventure Overseas BBI bank account that St. Julien controlled." TAC ¶ 90.  Similarly, on "June 13, 2014, ForceField itself once again, wired nearly $25,000 from its HSBC account to Adventure Overseas' BBI bank account."  TAC ¶ 98.

We find that these allegations are sufficient to establish a claim against ForceField, Natan, and Williams.  Certainly, the fact that St. Julien was a signatory on ForceField's HSBC account means it is possible, as ForceField argues, that St. Julien authorized the transfers without the others' knowledge or participation.  However, it is just as plausible and compelling to infer that someone else at ForceField, namely Natan or Williams, authorized and knew of the transfers, especially given the company's small size and the fact that there were only three executives.  See Tellabs, 551 U.S. at 324; see also S.E.C. v. China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d 379, 392 (S.D.N.Y. 2014) (finding that "it strains credulity" to believe that CEO and

largest shareholder who controlled company was not involved in the allegedly improper transfers of funds).  ForceField's argument that $45,000 is a relatively small amount of funds is misplaced at this stage given that plaintiffs have not conducted discovery and in light of the allegations that additional funds were withdrawn from ForceField's bank accounts to fund the other schemes.[5]

### D.   Undisclosed Paid Promotions

Plaintiffs next claim that ForceField, Natan, Williams, St. Julien, DTG, and MissionIR schemed to defraud ForceField investors through undisclosed paid promotions.

#### 1.   ForceField, Natan, and Williams

ForceField primarily argues that the TAC fails to establish that it participated in the fraudulent scheme by paying for or editing the articles at issue.  We disagree.

First, the TAC adequately alleges that ForceField edited the articles at issue.  For example, the Pearson Article, which purports to be based on Pearson's personal knowledge as an undercover paid promoter, claims that the "standard process" at DTG was for the paid promoters "to submit their drafts to management at the target company for review before publishing.  In other words, management of these companies knew and encouraged the

---

[5] Because we find that the TAC adequately alleges that ForceField directly participated in the alleged scheme, we do not address whether St. Julien's conduct can be imputed to ForceField under an agency theory.

illegal stock promotion as a way of getting their share prices up."  TAC ¶ 62.

This claim is corroborated by the Promoter's allegations. The Promoter claims that "to the best of my knowledge, David Natan was the person responsible for making edits to any articles."  TAC ¶ 71.  In support, the Promoter alleges that he sent articles about ForceField to DTG's CEO, McCarthy, and that every article came back to him with edits.  The Promoter claims to "know[] that ForceField received, edited and approved the articles because on multiple occasions he phoned McCarthy to ask about the status of an article . . . only to be told that ForceField had his draft but had not yet approved the article or finished editing the article, so that the article was 'still on hold.'"  TAC ¶ 66.  The Promoter further claims, although not specifically with respect to ForceField, that

> When the edited documents came back to him, he could look at the 'markup' view in Microsoft Word and see the edits that had been made. Often, the name of the editor – always a person from the company being promoted – appeared in the edits.  On other occasions, Promoter participated in conference calls with McCarthy and someone from the promoted company to discuss his articles, edits, and what the company wanted from the articles.

TAC ¶ 67.

ForceField argues that these allegations are insufficient to satisfy the PSLRA's particularity requirement because they either

are not based on the Promoter's personal knowledge or are not specific to ForceField.  The PSLRA, however, "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based.  Rather, plaintiffs need only plead with particularity *sufficient* facts to support those beliefs." Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000).  Thus, the Second Circuit has found that a confidential witness satisfies the PSLRA where the complaint contains "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Id. at 314.  We are convinced that the Promoter's factual allegations, especially when combined with the Pearson Article, provide more than sufficient particularity to satisfy the PSLRA with respect to whether ForceField was editing the articles at issue.

The TAC also adequately alleges that ForceField was ultimately paying for at least some articles at issue.  The TAC alleges that ForceField hired MissionIR to provide investor relations services and that Mylant, Meyers, Pearson, and the Promoter were paid by MissionIR or its affiliate, DTG, for the articles touting ForceField.  The obvious inference, therefore, is that ForceField paid for the articles using DTG or MissionIR as an intermediary.  This is further supported by the Promoter's allegation that DTG's CEO told him that ForceField was directly

paying DTG for the articles.  Moreover, the inference is the most logical one.  The writers would have little reason to permit ForceField to edit the articles if ForceField was not ultimately paying for them.  Similarly, DTG would have no reason to pay for articles touting ForceField if ForceField was not paying it to do so.

ForceField next argues that even if it was editing and paying for the articles, it cannot be held liable because the instruction not to disclose the payments came from McCarthy, not ForceField. While that is a plausible theory, the inference that the instruction ultimately came from ForceField is just as plausible and compelling at this stage.

Finally, ForceField asks us to dismiss the claims against Williams because he is not alleged to have edited any articles. We decline to do so.  Given that Williams is ForceField's CFO and one of only three executive officers, it is reasonable to infer that he was also involved in the scheme.

### 2.   DTG and MissionIR

DTG moved to dismiss on the grounds that is cannot be held liable in connection with the paid promotion scheme.  However, as noted above, the Court has been informed that plaintiffs and DTG have reached a settlement and thus we consider its motion to dismiss as withdrawn.

25

### E.    Kickbacks

Plaintiffs allege that ForceField, St. Julien, Natan, Williams, Knippa, and the Broker Defendants (Cocuzzo, Khan, Miyana, Patel, and Brown) are liable under Rules 10b-5(a) and (c) for engaging in a scheme to defraud investors by paying kickbacks in exchange for inducing investors to buy ForceField stock.

ForceField, Natan, and Williams do not dispute that the kickbacks generally constituted a scheme to defraud in violation of Rule 10b-5(a) and (c), but instead argues that the scheme was orchestrated entirely by St. Julien and that the TAC does not allege their involvement.  We disagree.

According to the TAC, over $800,000 in kickbacks were paid, with the actual figure potentially much higher.  That sum is considerable in light of ForceField's annual operating cash, which ForceField claims was $1,568,306 in 2012 and $2,100,959 in 2014.  See Reply Mem. of Law in Further Support of ForceField's Mot. to Dismiss (ECF No. 162) at 10 n.9.  The TAC specifically alleges that at least some of this "[m]oney was wired from ForceField's bank accounts, including its HSBC account, to [St. Julien's overseas bank account]." TAC ¶ 107.[6]  Moreover, the DOJ indictment identifies "Co-Conspirator 2" as a ForceField executive other than St. Julien, who on at least one occasion was emailed the account

---

[6] The superseding DOJ indictment alleges that at least $128,000 of the funds came from ForceField accounts.

number and routing information for the bank account to which kickbacks were wired.  Finally, the TAC alleges that Knippa, while working as ForceField's Director of Investor Relations, received kickbacks in lieu of a salary, which would have raised red flags. These particularized allegations are more than sufficient to support the inferences that some kickback funds came from ForceField and that someone other than St. Julien, namely Natan or Williams, was involved in the kickback scheme.  In any event, given the amount of funds at issue, Natan and Williams were at least reckless in not knowing of or questioning the expenditures.

**F.    Improperly Preventing TPE Shareholders From Selling Stock**

The fourth alleged scheme is that ForceField, St. Julien, Natan, and Williams improperly prevented the TPE shareholders from selling the ForceField shares they had received as part of ForceField's acquisition of a controlling interest in TPE.

As a threshold matter, defendants argue that plaintiffs may not rely on allegations drawn from the TPE shareholders' civil complaint, which appears to provide the basis for the TAC's allegations.  Courts in this Circuit are split on the issue. Compare RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) ("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not

resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)."), aff'd, 387 F. App'x 72 (2d Cir. 2010), with In re OSG Sec. Litig., 12 F. Supp. 3d 619, 620–22 (S.D.N.Y. 2014) ("[N]o Second Circuit precedent indicates" "the broad rule that a complaint may never reference allegations from a separate proceeding that has not been decided on the merits. . . . While allegations from another lawsuit are not evidence . . . plaintiffs need not provide admissible proof at this stage.").

We need not resolve the issue here, however, as plaintiffs' allegations are insufficient to establish scienter even considering those drawn from the TPE shareholders' complaint. According to the TAC, ForceField refused to reissue the shares at issue because ForceField believed it had been fraudulently induced to enter into the shareholder agreement.  Plaintiffs claim this was merely a "spurious pretext," TAC ¶¶ 151, 153, but offer no support for that conclusion.  Moreover, the fact that the TPE shareholders ultimately settled with ForceField suggests that ForceField's position was at least colorable.  Accordingly, plaintiffs have failed to establish a strong inference that ForceField's stated reason for refusing to reissue the shares was mere pretext or that it otherwise acted with a fraudulent intent.

IV.   **MISREPRESENTATIONS (AGAINST FORCEFIELD DEFENDANTS ONLY)**

    **A.   Standard**

To state a claim under Rule 10b-5(b), a plaintiff must allege (1) a misstatement or omission of material fact, (2) scienter, (3) a connection with the purchase or sale of securities, (4) reliance, (5) economic loss, and (6) loss causation, i.e., a causal connection between the material misrepresentation and plaintiff's loss. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

    **B.   Failure to Disclose Fraudulent Schemes**

Plaintiffs identify various ForceField press releases and SEC filings that are allegedly misleading because they failed to disclose the fraudulent schemes described in the previous section. Plaintiffs also claim that ForceField and its executives may be held liable for the paid promoters' failure to disclose that they were ultimately paid for by ForceField.

With respect to failing to disclose the first three schemes, we decline to consider whether defendants may be liable on the present motion. Because we found above that plaintiffs have stated a Section 10(b) claim against ForceField and its executives for manipulating trading volume, orchestrating paid promotions, and paying kickbacks, it is not necessary to determine whether the same conduct also violates Section 10(b) under an omission theory. Cf. In re Alstom SA, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005) (declining to address plaintiff's claims under Rules 10b-5(a) and

(c) where court had already found that plaintiff stated a claim under Rule 10b-5(b) for the same conduct).

With respect to the TPE scheme, we found above that plaintiff had not established a strong inference of scienter that ForceField acted fraudulently by preventing TPE shareholders from selling their ForceField shares.  Nor has plaintiff established that ForceField's failure to disclose what was in essence a contract dispute was itself fraudulent or done with scienter.  Accordingly, we dismiss that claim.

### C.   Failure to Disclose ForceField Executives' Prior Histories

The TAC alleges that ForceField's proxy statement filed with the SEC on April 30, 2014, was misleading because it disclosed St. Julien's, Natan's, and Williams's prior work experience without also disclosing the executives' histories at companies that had been accused of fraud.

ForceField argues that the omissions are not material because the executives' backgrounds were publicly available.  ForceField relies on Ganino v. Citizens Utilities Co., 228 F.3d 154 (2d Cir. 2000), in which the Second Circuit discussed the "truth-on-the-market defense," which may be used to rebut the fraud-on-the-market presumption.  Under this doctrine, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."

Id. at 167.  "A defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known.  However, the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements."  Id. (citations omitted) (internal quotation marks omitted).

Whatever its ultimate merits, ForceField's reliance on a truth-on-the-market defense is premature at this stage.  As the Second Circuit noted, the defense is "intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."  Id.  At this stage, it is unclear that all of the executives' prior histories were publicly available.  ForceField claims that the TAC's allegations are all drawn from the Pearson Article, which was based largely on news articles and publicly filed court documents.  But the Pearson Article does not state that it was based *entirely* on publicly available information.  Moreover, it is not clear how the "truth" was actually conveyed to the market, much less that it was conveyed with the "degree of intensity and credibility sufficient to counter-balance" ForceField's omissions, as required to assert the defense.  See id.

ForceField also argues that it is not attempting to rebut the fraud-on-the-market presumption but merely asserting that the omissions were immaterial.  ForceField's argument is misplaced. As Ganino makes clear, the high burden imposed by the truth-on-the market defense applies even when defendants challenge an omission's materiality, precisely what ForceField is doing here. See id. ("The truth-on-the-market defense . . . is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."); In re MBIA, Inc., Sec. Litig., 700 F. Supp. 2d 566, 581 (S.D.N.Y. 2010) (same); see also In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 477 (S.D.N.Y. 2012), aff'd, 525 F. App'x 16 (2d Cir. 2013).

Accordingly, we deny ForceField's motion to dismiss plaintiffs' 10b-5(b) claim regarding the ForceField executives' prior work history.

**D.  Misrepresentations Relating to TPE**

Plaintiffs claim that ForceField and its executives made various false statements or omissions relating to its interest in TPE.

1.  Misrepresentations Relating to TPE's "Dormancy"

First, plaintiffs claim that at various points in 2013 and 2014 ForceField and its executives failed to disclose that TPE's business was "dormant" because ForceField was breaking its contractual obligation to fund TPE's operations.

We note that plaintiffs' claim is hardly a model of clarity. Despite repeatedly claiming that TPE was "dormant," plaintiffs never explain what that term means.  Nevertheless, we construe plaintiffs' assertion to be that TPE ceased operations and stopped generating revenue for ForceField at some point in mid- to late-2013.  That interpretation is generally confirmed by ForceField's SEC filings, which report that TPE generated approximately $214,890 in sales for ForceField in the first half of 2013, but only $21,782 in sales in the second half of 2013, and no sales in 2014.  See ForceField Form 10-K, filed Apr. 14, 2015; ForceField Form 10-K, filed Apr. 15, 2014; ForceField Form 10-Q, filed Aug. 15, 2013.  It is further confirmed by defendant Natan's statement in March 2015 that TPE had "been essentially dormant for the last one and one half years."  TAC ¶ 155.

To the extent that plaintiffs claim that ForceField failed to disclose that TPE was "dormant," we reject the claim.  As noted above, ForceField's SEC filings clearly *did* disclose that its TPE-related revenue dramatically decreased after mid-2013.

If, on the other hand, plaintiffs are claiming that ForceField failed to disclose the purported *reason* for TPE's declining revenue, i.e., that ForceField was not funding TPE's projects, we will allow the claim to proceed.  While plaintiffs have not clearly articulated their theory, it is plausible that ForceField's affirmative statements regarding TPE were rendered misleading by

33

the omission.  Whether ForceField would have a duty to disclose is another matter, one that no party briefed and we therefore decline to decide at this stage.

### 2. Misrepresentations Regarding TPE's Goodwill

Plaintiffs next allege that ForceField improperly carried goodwill associated with its TPE acquisition longer than appropriate, resulting in false or misleading financial statements and SOX certifications.  Again, the allegations are far from clear, but plaintiffs' theory appears to be as follows.  When ForceField acquired its 50.3% interest in TPE, it recorded $1,342,834 in TPE-related goodwill as an asset.  The goodwill remained on ForceField's balance sheet through 2013, including on its third quarter financial report, which was filed with the SEC in November 2013.  In April 2014, ForceField filed its 2013 annual report and wrote off the entire $1,342,834 in TPE-related goodwill as an impairment charge.  Plaintiffs claim that ForceField should have written off this goodwill earlier than April 2014 because it knew that TPE was "dormant" as early as mid-2013.  According to plaintiffs, ForceField's failure to do so rendered ForceField's financial statements and SOX certifications misleading.

Where an omission is based on an accounting write-down's timing, it is not sufficient to simply allege the write-down should have occurred earlier; instead, the complaint must include "factual allegations from which a reader could infer Defendants

intentionally or recklessly failed to take write-downs" when they should have.  Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010).

Under GAAP rules, a company must reassess goodwill at least annually and whenever "an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." City of Omaha v. CBS Corp., No. 08 CIV. 10816 (PKC), 2010 WL 1029290, at *7 (S.D.N.Y. Mar. 16, 2010) (emphasis omitted) (quoting Financial Accounting Standards Board's Statement of Financial Accounting Standards No. 142), aff'd sub nom. City of Omaha, Neb. Civilian Empls' Ret. Sys. v. CBS Corp., 679 F.3d 64 (2d Cir. 2012).  According to plaintiffs, ForceField should have reassessed its goodwill in mid-2013 when it knew that it was no longer funding TPE's operations.  Whether such circumstances are sufficient to trigger a duty to reassess goodwill is a factual question that should not be resolved on a motion to dismiss.  Therefore, we will allow plaintiffs' goodwill-related claim to proceed.

      3.   Misrepresentations Regarding ForceField's
           "Controlling Interest" in TPE

Plaintiffs next allege that ForceField falsely disclosed in November 2013 that it had acquired a 50.3% "controlling interest"

in TPE's common stock when, in fact, it had not acquired such an interest.

Plaintiffs did not address this claim in their opposition memorandum and stated at oral argument that they would abandon it. Tr. at 32:14-19.   In any event, the actual agreements between ForceField and the TPE shareholders, which were disclosed in ForceField's public SEC filings, clearly indicate that ForceField acquired more than 50% of TPE's common stock.   Decl. of Martin P. Russo in Support of ForceField's Mot. to Dismiss (ECF No. 147), Ex. B.   Accordingly, if plaintiffs had decided to pursue this claim, we would have found that the statement is not false and that plaintiffs have failed to state a claim.

### 4.   Misrepresentations Regarding TPE Shareholder Settlement

Finally, plaintiffs allege that ForceField misleadingly overstated the amount it had received in its settlement with the TPE shareholders.   According to plaintiffs, ForceField stated that it sold its interest in TPE back to TPE's shareholders for "consideration valued at approximately $2,000,000," which consisted of $50,000 in cash and 255,351 ForceField shares valued at $7.65 per share.   TAC ¶¶ 43, 231.   The TAC claims that this disclosure is false because the 255,351 ForceField shares were merely the same shares that ForceField had initially issued to purchase the interest in TPE and therefore "$1,950,000 of that

$2,000,000 was simply the return of shares that the Company could not reissue." TAC ¶ 232.

Plaintiffs again did not address this claim in their opposition memorandum and stated at oral argument that they would abandon it. Tr. at 32:6-12. In any event, defendants correctly argue that nothing in this disclosure is false. The press release at issue clearly disclosed that the 225,351 shares were being "returned." See ForceField Form 8-K, filed Mar. 6, 2015. While it is true that the shares' value had roughly doubled since they were issued, that fact does not render the statement false. To the extent plaintiffs claim that the disclosure was misleading because ForceField omitted to disclose that the shares had been artificially inflated, that claim has effectively been addressed above. See supra Section IV.B. Accordingly, we dismiss plaintiffs' misrepresentation claims with respect to the TPE shareholder settlement.

### E.   Misrepresentations Regarding ForceField's Mexican Operations

Plaintiffs claim that ForceField and its executives made various false statements or omissions relating to ForceField's Mexican operations.[7]

---

[7] At oral argument, plaintiffs suggested that the Mexican-related allegations were part of a larger scheme to defraud. Tr. at 20:17-21:10. The TAC, however, nowhere describes such a scheme. To the contrary, the factual allegations relating to ForceField's Mexican operations are found under the heading "Mexican Misrepresentations." TAC ¶¶ 156-64. Moreover, plaintiff's attempt to tie the misrepresentations to a larger, albeit poorly defined, scheme

### 1. Misrepresentations Regarding ForceField's Uruapan Contract

In October 2014, ForceField announced that it had entered into a contract with the city of Uruapan, Mexico, to supply and install LED lighting. Plaintiffs claim that ForceField falsely announced that the contract was worth $8.4 million in revenue, when it was in fact only worth $6 million.

ForceField does not address this claim in its motion to dismiss, although it argued at oral argument that the misrepresentation was not made with scienter. See Tr. at 32:21-33:13. We find no basis for that argument, as ForceField was at a minimum reckless in overstating the value of a major contract by 40%. Accordingly, plaintiffs have stated a claim with respect to the amount of ForceField's Uruapan contract.

### 2. Misrepresentations Regarding ForceField's Mexican Business Opportunities

Plaintiffs allege that various statements made in late 2014 regarding ForceField's business opportunities in Mexico, including press releases announcing two contracts to supply or install LED lighting in Mexico, were misleading because ForceField was never actually set up or intending to do business in Mexico.

---

runs into the same problem noted above. Since there is no conspiracy liability under a private 10b-5 right of action, the alleged schemes must be analyzed individually.

Plaintiffs fail to allege adequate factual support for their assertion that ForceField was never set up or intending to do business in Mexico, which they ask us to infer from various statements made by St. Julien and Natan.  For example, plaintiffs point to a conversation between St. Julien and a former ForceField employee, in which the employee asked St. Julien if ForceField had an "RFC" license as required to do business and pay taxes in Mexico and St. Julien responded, "mind your own business."  TAC ¶ 158. While St. Julien's response may have been rude, it does not plausibly support the inference that ForceField lacked, and never intended to obtain, a license to do business and pay taxes in Mexico.

Plaintiffs also rely on a May 2015 conversation between the ForceField employee and Natan in which Natan stated that ForceField no longer did business in Mexico and that the employee "was never authorized to sell in Mexico."  TAC ¶ 164.  While these statements suggest that ForceField no longer intended to do business in Mexico by mid-2015, they do not suggest that ForceField had formed that intent in late 2014 when the allegedly misleading statements were made.  A finding to the contrary would invite impermissible fraud-by-hindsight.  Finally, plaintiffs rely on an undated statement by St. Julien that "we're never certifying [light] meters in Mexico," TAC ¶ 162, which suffers from the same issue with timing as above.

Accordingly, we find that plaintiffs have failed to state a claim with respect to statements relating to ForceField's business opportunities in Mexico, apart from the misrepresentation regarding the Uruapan contract discussed above.

### F.   Misrepresentations Made by Knippa

Plaintiffs allege that Knippa, while working as ForceField's Director of Investor Relations, made numerous false statements on television business shows and in articles and videos posted online. Specifically, Knippa failed to disclose that he was working for ForceField, failed to disclose that he was receiving kickbacks from ForceField, and falsely stated that he owned ForceField stock.

ForceField does not dispute that Knippa's statements are actionable and that it can be held liable for them.

In contrast, Natan and Williams argue that the statements cannot be imputed to them. We disagree. If, as alleged, Knippa was acting as ForceField's Director of Investor Relations when he made the public statements, the statements would be imputable to ForceField and, by extension, to its CEO and CFO. We also agree with plaintiffs that it "defies credulity" not to believe that Natan and Williams were aware of the public statements of ForceField's Director of Investor Relations. We note, however, that our conclusion is not based on the group pleading doctrine, which plaintiffs ask us to rely on. That doctrine "allows a plaintiff to rely on a presumption that *written* statements that

are group-published, *e.g.*, SEC filings and press releases, are statements made by all individuals with direct involvement in the everyday business of the company." City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 373 (S.D.N.Y. 2012) (internal quotation marks omitted).  Since Knippa's statements were neither written nor "group-published," the group pleading doctrine has no bearing here.

### G.   Statements Regarding Future Performance and Generalized Statements

The TAC identifies various other miscellaneous statements that are too generalized to be actionable or are non-actionable predictions of future performance.  Generally, projections of future performance are not actionable, unless "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them."  In re Int'l Bus. Machines Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998) (citation omitted).  Likewise, statements that are "too general to cause a reasonable investor to rely upon" them and therefore "could not[] amount to a guarantee" are considered "puffery" and are not actionable.  ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009).

Here, the TAC identifies several such statements.  For example, an October 2013 article posted by Thomas Meyer on

SeekingAlpha.com stated that ForceField was "poised for significant growth" and noted the huge potential of the renewable energy segment, concluding that "it appears that ForceField Energy represents an excellent opportunity for investors." TAC ¶ 173. Likewise, a November 2013 article posted by John Mylant on SeekingAlpha.com "predict[ed] excellent growth potential" for ForceField. TAC ¶ 178. Even if these statements are attributable to ForceField, they are non-actionable statements of future performance. Plaintiffs argue that ForceField did not believe these statements because at the time they were made ForceField's businesses were "stagnant" or "dormant." But even if true, that does not mean that ForceField believed its *future* growth prospects were poor.

The TAC also identifies several generalized statements. For example, an October 2013 ForceField press release announced that ForceField stock would be listed on NASDAQ and stated that "[t]he transition to the NASDAQ underscores the strength of our transformation to a global provider of efficient energy solutions." In addition, Mylant's November 2013 article praised defendant Williams, stating that he "understands the importance of financing large projects like this and is well organized to offer it where needed." These generalized statements are non-actionable puffery as no reasonable investor would rely on them.

V.    **CONTROL PERSON LIABILITY**

A.    **Standard**

Section 20(a) of the Exchange Act provides as follows:

> Every person who, directly or indirectly,
> controls any person liable under any provision
> of this chapter or of any rule or regulation
> thereunder shall also be liable jointly and
> severally with and to the same extent as such
> controlled person to any person to whom such
> controlled person is liable . . . , unless the
> controlling person acted in good faith and did
> not directly or indirectly induce the act or
> acts constituting the violation or cause of
> action.

15 U.S.C. § 78t(a).

To establish a "prima facie case" under Section 20(a), plaintiff must show "a primary violation by the controlled person," "control of the primary violator by the targeted defendant," and "that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996) (alterations omitted) (internal quotation marks omitted).

As the parties recognize, the Second Circuit has not clearly set forth the standard for *pleading*, as opposed to proving, a Section 20(a) claim.  While the Second Circuit held in First Jersey that a plaintiff must show culpable participation in order to "establish" a "prima facie case," id. at 1472-73, courts within this District have disagreed over whether culpable participation

must be pleaded at the motion to dismiss stage.[8]  The Second Circuit

has recognized this disagreement but not yet resolved it.  See In

re Lehman Bros. Mortg.-Backed Sec. Litig., 650 F.3d 167, 186 (2d

Cir. 2011).

Nonetheless, this Court has consistently sided with most

judges in the District and found that a plaintiff must plead

culpable participation with scienter.[9]  The scienter element may

---

[8] Compare, e.g., In re Lihua Int'l, Inc. Sec. Litig., No. 14-CV-5037 (RA), 2016 WL 1312104, at *18 (S.D.N.Y. Mar. 31, 2016) (Abrams, J.) (holding that plaintiffs must "plead culpable participation with the same particularity they must plead scienter under the PSLRA"), In re ShengdaTech, Inc. Sec. Litig., No. 11 CIV. 1918 (LGS), 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (Schofield, J.) (same), Lapin v. Goldman Sachs Grp., Inc., 506 F. Supp. 2d 221, 244-48 (S.D.N.Y. 2006) (Karas, J.) (same), In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 413-19 (S.D.N.Y. 2001) (Marrero, J.) (same), Mishkin v. Ageloff, No. 97 Civ. 2690, 1998 WL 651065, at *22-26 (S.D.N.Y. Sept. 23, 1998) (Preska, J.) (same), with In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 307-10 (S.D.N.Y. 2005) (Kaplan, J.) (holding that culpable participation is not an independent element of control person liability, at least at the motion to dismiss stage), In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 414-16 (S.D.N.Y. 2003) (Cote, J.) (same), In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 392-98 (S.D.N.Y. 2003) (Scheindlin, J.) (same).

[9] See, e.g., Kuhns v. Ledger, No. 15 CIV 3246 (NRB), 2016 WL 4705160, at *5 (S.D.N.Y. Aug. 24, 2016) ("To state a claim of control person liability under § 20(a), a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." (quoting Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014)); IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC, 91 F. Supp. 3d 456, 498 (S.D.N.Y. 2015) (Buchwald, J.) ("To sustain a securities fraud claim on a control-person theory, IOP must adequately plead (1) the existence of a primary securities fraud violation; (2) control of the primary violator by the defendant; and (3) culpable participation 'in some meaningful sense' by the defendant."); In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 274 (S.D.N.Y. 2010) (Buchwald, J.) (suggesting that plaintiffs adequately pleaded "culpable participation"); Davidoff v. Farina, No. 04 CIV 7617 (NRB), 2005 WL 2030501, at *16 (S.D.N.Y. Aug. 22, 2005) ("[I]n the context of a claim under § 20(a), plaintiffs are still required, in order to make out a prima facie case, to allege that Verizon was in some meaningful sense a culpable participant in the post-IPO statements. . . . Accordingly, the post-IPO claims against Verizon must be dismissed on the additional grounds that the Complaint does not satisfy . . . the 'culpable participation' requirements of § 20(a)." (internal quotation marks omitted)); Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 00 CIV. 8058 (NRB), 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001) (requiring plaintiff to "plead[] facts

be established by pleading either conscious misbehavior or recklessness.  Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 00 CIV. 8058 (NRB), 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001).[10]

**B.  Natan and Williams**

Count III seeks to hold Natan and Williams liable as control persons of both ForceField and the "Promoter Defendants," i.e., DTG, MissionIR, and Knippa.

1.  Control Liability for ForceField's Primary Violations

Given that Natan and Williams were CEO and CFO and two of ForceField's three corporate officers, there is no question that they "controlled" ForceField.

The only issue is whether plaintiffs have alleged that they engaged in culpable conduct with respect to ForceField's surviving primary violations.  Although the parties spend considerable time briefing the issue——primarily in the context of the related issue

---

sufficient to meet the culpable participation requirement" on a motion to dismiss); Laser Mortg. Mgmt., Inc. v. Asset Securitization Corp., No. 00 CIV. 8100 (NRB), 2001 WL 1029407, at *11 (S.D.N.Y. Sept. 6, 2001) (similar).

[10] Plaintiffs suggest that the Second Circuit's decision in Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank, supports their position that culpable participation need not be pleaded.  To the contrary, the Second Circuit stated that "Controlling-person liability is a form of secondary liability, under which a plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud."  250 F.3d 87, 101 (2d Cir. 2001) (citing First Jersey, 101 F. 3d at 1472).  While the Second Circuit's application of this standard is cursory, the opinion nowhere states that culpable participation need not be pleaded.

of whether Natan and Williams had scienter with respect to the primary violations——we find the issue is not a close one.

As alleged in the TAC, ForceField was essentially a shell company operating as a massive fraud valued at over $130 million. When the fraud was uncovered, its stock collapsed and ForceField shareholders lost everything.  At this stage, we find it implausible that St. Julien orchestrated the schemes on his own and without the involvement of ForceField's CEO and CFO, ForceField's only other executives.  At a minimum, they would be reckless in failing to discover that their company was, in essence, a fraud.  This is not an application of the core operations doctrine, as defendants contend, but a simple inference.  See, e.g., S.E.C. v. China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d 379, 392 (S.D.N.Y. 2014) (finding that "it strains credulity" to believe that CEO and largest shareholder who controlled company was not involved in the allegedly improper transfers of funds).

Accordingly, we find that Natan and Williams may be liable as control persons of ForceField.

### 2. Control Liability for Promoter Defendants' Primary Violations

It is less clear that Natan and Williams may be held liable as control persons of the Promoter Defendants, i.e., DTG, MissionIR, and Knippa.  In any event, we decline to reach the issue as we have already found that Natan and Williams can be held

primarily liable and also liable as ForceField's control persons for the schemes in question.

### C.   ForceField

Count IV seeks to hold ForceField liable as control person of the Promoter Defendants and the Broker Defendants.   Again, we decline to reach the issue because we have found that ForceField can be held primarily liable for the schemes in question.

### D.   Brokerage Defendants

Count V seeks to hold each Brokerage Defendant liable as a control person of the Broker Defendant it employed.

The Brokerage Defendants do not dispute that the Broker Defendants committed a primary violation by accepting kickbacks, but instead argue that the TAC fails to plead that they culpably participated in that conduct.   We agree.

As an initial matter, the TAC contains no allegations directly addressing the Brokerage Defendants' culpable participation. Instead, plaintiffs rely on two theories to establish culpable participation: (1) the Broker Defendants' knowledge may be imputed to the Brokerage Defendants under an agency theory; and (2) the Brokerage Defendants were reckless because they failed to adequately supervise the Broker Defendants.   Neither theory is persuasive.

1.  <u>Imputed Knowledge</u>

Plaintiffs first argue that the Broker Defendants' knowledge may be imputed to the Brokerage Defendants under general agency principles.  However, as plaintiffs' cases make clear, an agent's knowledge is only imputed to his principle if the agent is acting within the scope of his authority.  <u>See, e.g.</u>, <u>Elbit Sys., Ltd. v. Credit Suisse Grp.</u>, 917 F. Supp. 2d 217, 229 (S.D.N.Y. 2013) ("[T]he general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it." (internal quotation marks omitted)); <u>CompuDyne Corp. v. Shane</u>, 453 F. Supp. 2d 807, 831 (S.D.N.Y. 2006) ("In an agency situation, control person liability is properly pled by pleading control over the agent/primary violator while the agent is acting within the scope of their duties in connection with the illegal acts.").

Here, there are no allegations that the Broker Defendants were acting within the scope of their authority when they accepted the kickbacks.  To the contrary, the kickbacks were paid covertly by a "brown bag" man hired by St. Julien.  There are no allegations that any the Brokerage Defendants knew about the kickbacks or the middle man, nor are there any allegations suggesting that the kickbacks were made in the Brokerage Defendants' ordinary course of business.  While plaintiffs argue that an agency's scope is

ordinarily a fact question inappropriate for resolution on a motion to dismiss, they are not absolved from alleging *some* facts from which it could be inferred that the acts were within the agency's scope, which they have failed to do.

### 2. Failure to Supervise

Plaintiffs next argue that the culpable participation element is satisfied because the Brokerage Defendants acted recklessly by failing to supervise the brokers.

Plaintiffs rely on CompuDyne Corporation v. Shane, which held that "[a] broker-dealer . . . has an 'affirmative duty' to see that its employees comply with applicable securities regulations and is subject to certain supervision obligations imposed on broker-dealers by Section 15 of the 1934 Act, and the failure to supervise satisfies the culpable participation element to establish liability under Section 20(a)."  453 F. Supp. 2d 807, 830 (S.D.N.Y. 2006) (alterations omitted) (internal quotation marks omitted).  Whatever this theory's merits, plaintiffs have failed to adequately plead that the Brokerage Defendants acted recklessly by failing to supervise the individual brokers.

To begin with, plaintiffs' recklessness theory is undermined by the TAC's own allegations that that the Brokerage Defendants would not have discovered the kickbacks no matter what supervision was in place.  The TAC concedes that "[n]one of the brokers disclosed to their clients that they were receiving kickbacks."

TAC ¶ 6.  It further concedes that the "participants attempted to hide the scheme."  TAC ¶ 6.  Among other things, Mitchell (the so-called "brown bag" man) "tried to hide his payment of kickbacks to the Broker Defendants by withdrawing funds from his account in cash, meeting the Broker defendants face-to-face, and handing them the cash."  TAC ¶ 108.  Moreover, Mitchell and the brokers "tried to conceal their illegal scheme by communicating with each other on prepaid, disposable (i.e., 'drop' or 'burner') phones" and by "using an encrypted, 'content-expiring' messaging application (or app) on their cellphones."  TAC ¶ 108.  Thus, plaintiffs can hardly argue that the Brokerage Defendants were reckless for failing to discover conduct that they concede was covert.

Plaintiffs instead rely on various allegations that the Brokerage Defendants had previously been fined and sanctioned for failing to supervise their brokers.  Plaintiffs also rely on FINRA "BrokerCheck Reports," which disclosed previous complaints made against the brokers by their customers.  Even assuming that we may consider the reports, which were not attached or otherwise referenced in the TAC, nothing in the allegations and reports suggests that the Brokerage Defendants failed to supervise the brokers with respect to the misconduct at issue here.  Plaintiffs cannot allege recklessness or misconduct unrelated to the Broker Defendants' conduct to create an inference of propensity,

especially when the TAC's own allegations suggest that the scheme was unlikely to be discovered.[11]

Accordingly, we find that plaintiffs have failed to plead culpable participation and that their claims against the Brokerage Defendants must be dismissed.

## VI. CONCLUSION

For the above reasons, (1) ForceField's motion to dismiss is granted in part and denied in part and (2) the Brokerage Defendants' respective motions to dismiss are granted. ForceField, Natan, and Williams are ordered to answer the TAC within fourteen days of the entry of this decision.

This Memorandum and Order resolves Docket Nos. 143, 144, 187, 189, 198, 203, and 208,

**SO ORDERED.**

Dated:     New York, New York
           March *29*, 2017

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[11] In this context, we find it telling that the SEC investigated the Brokerage Defendants in connection with the scheme, but did not name the Brokerage Defendants in the civil complaint brought against the Broker Defendants.

51